# EXHIBIT A-41

*Filed and Attested by the Office of Judicial Records 15 JUN 2023 06:37 pm A. STAMATO*

HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor

         Plaintiff,

     v.

MEAD JOHNSON & COMPANY, LLC, et al.,

         Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

**PHILADELPHIA COUNTY COURT OF COMMON PLEAS**

**MARCH TERM, 2022**
**No. 220302588**

### ORDER

**AND NOW**, this _____ day of _____ 2023, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs' Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby DISMISSED with prejudice.

**BY THE COURT:**

_____ J.

| | |
|---|---|
| **HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor** : | |
| : | **PHILADELPHIA COUNTY COURT OF** |
| : | **COMMON PLEAS** |
| Plaintiff, : | |
| v. : | **MARCH TERM, 2022** |
| : | **No. 220302588** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| : | |
| : | |
| Defendants. : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____ 2023, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson

Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs'

Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary

Objections are **SUSTAINED**. It is further **ORDERED** that:

1.   Count I of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2.   Count II of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3.   Count III of Plaintiffs' Complaint is **DISMISSED** with prejudice;

4.   Count IV of Plaintiffs' Complaint is **DISMISSED** with prejudice;

5.   Count V of Plaintiffs' Complaint is **DISMISSED** with prejudice;

6.   Plaintiffs' Complaint is **STRICKEN** for lack of specificity;

7.   Plaintiffs' claims for punitive damages as to Defendants Mead Johnson &

Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along

with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

8.   Plaintiff Holli Carter's claims in her own right are **DISMISSED** with prejudice; and

2

9.   Plaintiffs' Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                                                J.

3

Case ID: 220302588
Control No.: 23063373

<u>**NOTICE TO PLEAD:**</u>

<u>**To Plaintiff:**</u> **You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.**

**/s/ Kenneth A. Murphy**
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

| | |
|---|---|
| **TUCKER LAW GROUP, LLC**<br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>(215) 875-0609<br>kmurphy@tlgattorneys.com<br>holson@tlgattorneys.com | **ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY** |

| | | |
|---|---|---|
| **HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor** | : <br> : <br> : | |
| Plaintiff, | : | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS** |
| v. | : <br> : | **MARCH TERM, 2022** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br> : <br> : | **No. 220302588** |
| Defendants. | : <br> : | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFFS' COMPLAINT**

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Moving Defendants" or "Mead Johnson") hereby preliminarily object to Plaintiffs' Complaint, and, in support thereof, aver as follows:

I.    **INTRODUCTION**

1.     The case before the Court involves speculative and unsupported allegations by Plaintiffs that the minor Plaintiff, J.C., developed a condition known as necrotizing enterocolitis ("NEC") following his alleged ingestion of Similac and/or Enfamil cow's milk-based infant formula manufactured and sold by Moving Defendants and/or defendant Abbott Laboratories ("Abbott"). Plaintiffs fail to identify the particular product that J.C. purportedly ingested, and the entirety of Plaintiffs' claims rest on their unsubstantiated conclusion that the formula consumed by J.C. is an unreasonably dangerous product. Plaintiffs acknowledge that premature infants such as J.C. have an inherent high risk of developing NEC. However, to support their theory of causation, Plaintiffs cite to certain literature that compares cow's milk-based products to breast milk. None of the literature upon which Plaintiffs rely concludes that cow's milk-based formula causes NEC. In fact, the articles carefully avoid that conclusion, saying only that breast milk may be protective against NEC. The Complaint is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused J.C. to develop NEC. Plaintiffs allege only that J.C. was born on a certain date; *may* have been provided one of Defendants' infant formula products; and, at some point, developed NEC. But, Plaintiffs have failed to identify which Mead Johnson product the infant received; whether the infant received mother's own milk; whether the infant received donor milk; how the infant came to receive Mead Johnson's product; when J.C. ingested the product; when J.C. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury J.C. allegedly sustained. Plaintiffs nowhere allege how cow's milk purportedly *causes* NEC, or how the facts of J.C.'s case relate to the scientific evidence Plaintiffs cite. Pennsylvania's procedural rules do not allow for

Case ID: 220302588
Control No.: 23063373

such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs'
Complaint should be dismissed.

2.      Plaintiffs instituted this action via the filing of a Complaint on March 24,
2022, against Moving Defendants as well as Co-Defendant Abbott, The Pennsylvania
Hospital of the University of Pennsylvania and The Trustees of the University of
Pennsylvania ("HUP"). *See* Plaintiffs' Complaint, attached as Exhibit "A."

3.      Plaintiffs have filed nearly 30 essentially identical lawsuits against Moving
Defendants, Abbott, HUP, and other hospitals in Philadelphia based on claims relating
to alleged ingestion of cow's milk-based infant formula by premature infants following
their birth.

4.      Plaintiffs allege that "upon information and belief" the Plaintiff-minors,
including J.C., developed NEC, a gastrointestinal disorder that occurs in premature
infants. *See* Plaintiffs' Complaint, attached as Exhibit "A," ¶ 13. Plaintiffs allege that
premature infants fed with their mother's breast milk or donor breast milk are at
decreased risk of developing NEC as compared with infants given cow's milk-based
infant formula.

5.      In addition to asserting product liability claims against Moving Defendants
and Abbott, as the infant formula manufacturers, Plaintiffs have brought claims against
The Pennsylvania Hospital of the University of Pennsylvania and The Trustees of the
University of Pennsylvania alleging liability on theories of failure to warn and corporate
liability.

6.      The factual background regarding the Plaintiff-minor's birth, diagnosis and
injuries are limited to four (4) paragraphs in the Complaint.

Case ID: 220302588
Control No.: 23063373

7.      Plaintiffs aver that J.C. was born prematurely October 6, 2014 and that "[u]pon information and belief J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after his birth." *Id.*, ¶¶ 11-12.

8.      Plaintiffs further allege that "upon information and belief" J.C. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

9.      Plaintiffs generally allege that J.C. "suffered injuries and has continued to suffer long term health effects," with no specific description of those alleged injuries or long-term health effects. *Id.*, ¶ 14.

10.      Moving Defendants Preliminarily Object to Plaintiffs' Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.      ARGUMENT

### A.      DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

11.      Plaintiffs allege in Counts I and II of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products.

12.      Plaintiffs allege in Count III (Negligence) of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm.

4

13.     Plaintiffs allege in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to provide truthful, accurate, fulsome information about their cow's milk-based products.

14.     Counts I, II, III, IV, and V are based upon Plaintiffs' theory against Moving Defendants that Moving Defendants' cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

15.     In support of their theories and claims, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit "A," ¶¶ 17-23.

16.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for defective design and failed to state a claim for failure-to-warn, due to an absence of proof of that the products are indeed unreasonably dangerous.

17.     As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United State Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants.

18.     The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Thus, Plaintiffs' contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

5

19.     "The law governing strict products liability actions in Pennsylvania has been developed based upon the principles outlined in Section 402A of the Second Restatement of Torts." *High v. Pennsy Supply, Inc.,* 154 A.3d 341 (Pa. Super. 2017). Section 402(A) provides:

(1)     One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a)     the seller is engaged in the business of selling such a product, and

(b)      it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)     The rule stated in Subsection (1) applies although

(a)     the seller has exercised all possible care in the preparation and sale of his product, and

(b)     the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402(A).

20.     To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

21.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective

6

Case ID: 220302588
Control No.: 23063373

when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

22.     Based on the foregoing, the threshold Plaintiffs must cross as to Counts I, II, III, IV, and V, is that Plaintiffs must aver sufficient facts demonstrating the Moving Defendants' products are unreasonably dangerous for their intended use, triggering the duties set forth in Plaintiffs' Complaint at Counts I, II, III, IV, and V.

23.     Although Plaintiffs cite in their Complaint to research studies relating to the purported risks of cow's milk-based products in premature infants, the studies demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

24.     At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

25.     Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id*. However, the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

26.     The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies

Case ID: 220302588
Control No.: 23063373

than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk." *Id*. at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.  Indeed, the study itself[1] explains that the difference in NEC incidence may be mediated by the protective effects of immunoglobulin in breast milk, which, when added to formula, also protected against NEC:  "We suggest, in the light of the finding that oral immunoglobulin in formula fed babies was prophylactic, that breast milk may protect against necrotizing enterocolitis by providing IgA in the gut lumen." Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519, 1522 (1990). The article goes on to *recommend* the concomitant use of bovine formulas to meet the increased nutritional needs of premature infants. *Id*.

27.    As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products." *Id*. at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet**. Thus, Plaintiffs'

---

[1] For the Court's convenience, Moving Defendants have attached as Exhibit "B" a copy of A. Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519-1523 (1990), which is the first study that Plaintiffs quote from, and rely on, in their Complaint, but have failed to attach.  Where a plaintiff has averred the existence of certain written documents and premised a cause of action upon those documents, it is proper in Pennsylvania for a defendant to attach those documents in support of a demurrer.  *See Richardson v. Wetzel*, 74 A.3d 353, 358 n.4 (Pa. Commw. Ct. 2013).  As Plaintiffs in the instant matter rely extensively on this and other studies to prove their theory of causation, Moving Defendants have properly attached them here for the Court's consideration.

Case ID: 220302588
Control No.: 23063373

second study likewise does not state that cow's milk-based feeding products cause NEC. To the contrary, it too posits that breast milk is simply protective: "These data suggest that exclusive human diets may exert protective, rather than threshold, effects with respect to NEC." Sandra Sullivan, et al., *An Exclusively Human Milk-Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products,* 4 J. PEDIAT. 562, 566 (2010), a true and correct copy of which is attached hereto as Exhibit "C."

28.     The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier." *Id*. at ¶ 19. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

29.     The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id*. at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

Case ID: 220302588
Control No.: 23063373

30.     According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id*. at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id*. This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC.  Instead, as quoted by Plaintiffs, the statement touts the potent protective effects of breastmilk.

31.     The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id*. at ¶¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

32.     Thus, all of the studies identified and quoted by Plaintiffs undercut Plaintiffs' allegations that cow's milk-based products cause NEC and do not support Plaintiffs' contention that such products are unreasonably dangerous.

33.     The numerous studies and reports cited by Plaintiffs in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's

10

Case ID: 220302588
Control No.: 23063373

milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet.

34.     All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be protective against the risk of NEC, not that cow's milk-based alternatives affirmatively cause NEC. This proposition does not make the Moving Defendants' cow's milk-based alternatives unreasonably dangerous within the meaning of § 402(A) of the Restatement (Second) of Torts.

35.     Thus, Plaintiffs' Complaint fails to aver sufficient facts to demonstrate that Moving Defendants' products are indeed unreasonably dangerous.  Consequently, Plaintiffs' Complaint should be stricken at Counts I, II, III, IV, and V for failure to state a claim.

## B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V

36.     Counts IV and V of Plaintiffs' Complaint allege intentional and negligent misrepresentation, respectively, against Moving Defendants.  Plaintiffs cannot maintain misrepresentation claims because they fail to allege that they received any specific representation from Moving Defendants on which they relied.  In fact, as they have not even alleged that J.C. received a Mead Johnson product, they cannot claim that misrepresentations by Mead Johnson caused reliance or their purported injury.

37.     The elements of a claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt-Rite Contractors v. Architectural Studio*, 866 A.2d 270, 277 (Pa.

11

2005) (quoting <u>Bortz v. Noon</u>, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999)).  Negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz*, 729 A.2d at 561.

38.     The elements of an intentional misrepresentation claim require:  "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 499 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (1994), citing, Restatement (Second) of Torts § 525 (1977)).

39.     Here, Plaintiffs' claims fail to allege that they received any specific representation from Moving Defendants, intentional or otherwise.  Plaintiffs further fail to allege that they relied on a specific representation of the Moving Defendants.

40.     Because of these omissions from Plaintiffs' Complaint, Plaintiffs have failed to articulate a viable claim for intentional and negligent misrepresentation.  *See, e.g., Cruz v. Roberts*, No. CI-04-01947, 2005 Pa. Dist. & Cnty. Dec. LEXIS 186, 70 Pa. D. & C.4th 225 (Pa. CCP Jan. 26, 2005) (dismissing negligent and intentional misrepresentation claims for insufficient pleading); *see also Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257 (Pa. Super. Nov. 25, 2015) (dismissing fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Case ID: 220302588
Control No.: 23063373

41.     Thus, Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must be dismissed.

**C.     MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

42.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

43.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

44.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Case ID: 220302588
Control No.: 23063373

45.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

46.     Plaintiffs' Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.[2]

47.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14.

48.     Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or his birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

---

[2] Access to the relevant medical records **before** filing suit would have allowed Plaintiffs to comport themselves consistently with Rule 1019(a).  Given that minor plaintiff's purported claims are tolled until age of majority, no good reason exists for Plaintiffs' failure to support their complaint with required facts.

14

Case ID: 220302588
Control No.: 23063373

49.     Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 37-38.

50.     Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

51.     The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

52.     Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

53.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

**D.      <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>**

54.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 22, 25, 28, and 31.

55.     However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

56.     Rather, Plaintiffs merely allege that "upon information and belief" J.C. may have been given a cow's milk-based infant formula following birth, absent any context to

Case ID: 220302588
Control No.: 23063373

indicate that such an action was inappropriate based on the specific issues involved in J.C.'s medical care and condition following birth.

57.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

58.     Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

59.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

60.     Absent specific factual allegations to justify the claim that the use of infant formula in J.C.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

61.     Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

62.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish

16

Case ID: 220302588
Control No.: 23063373

that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

63.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

64.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson*, *supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id*. at 772.

65.     Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id*.

Case ID: 220302588
Control No.: 23063373

66.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

18

Case ID: 220302588
Control No.: 23063373

67.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g., Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

68.     All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case.

Case ID: 220302588
Control No.: 23063373

69.     The facts underlying Plaintiffs' bare assertions of oppressive, reckless, malicious and fraudulent conduct do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Without any factual support, the conclusory allegation that Moving Defendants was reckless is insufficiently pled and must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

**E.**     **MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS**

70.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of J.C.

71.     Plaintiffs' Complaint includes allegations in each count against Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 75, 83, 92, 102 and 112.

72.     However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

73.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Case ID: 220302588
Control No.: 23063373

74. Accordingly, it is improper for Plaintiffs to plead in a single count their claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the instant Complaint. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

75. Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Fanscali ex rel. Fanscali v. Univ. Health Center of Pittsburgh, 563 Pa. 439 (2000); Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

76. Plaintiffs allege that J.C. was born on October 6, 2014, was fed Similac and/or Enfamil cow's milk-based products shortly after his birth at Pennsylvania Hospital, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.

77. Thus, because Plaintiffs filed the Complaint at issue on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations and must be dismissed.

**F.    MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

78. Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

Case ID: 220302588
Control No.: 23063373

79.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

80.     In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A."

81.     Accordingly, the Complaint should be stricken for lack of an appropriate verification.

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  June 15, 2023             /s/ Kenneth A. Murphy
                                  Kenneth A. Murphy, Esquire
                                  Heather R. Olson, Esquire

                                  **WELSH & RECKER, P.C.**

                                  /s/ Catherine M. Recker
                                  Catherine M. Recker, Esquire
                                  Amy B. Carver, Esquire
                                  Richard D. Walk, III, Esquire

                                  **Attorneys for Defendants,**
                                  **Mead Johnson & Company, LLC and**
                                  **Mead Johnson Nutrition Company**

Case ID: 220302588
Control No.: 23063373

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather  R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor** : | |
| : | **PHILADELPHIA COUNTY COURT OF** |
| : | **COMMON PLEAS** |
| Plaintiff, : | |
| v. : | **MARCH TERM, 2022** |
| : | **No. 220302588** |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, : | |
| : | |
| : | |
| Defendants. : | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF
DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON
NUTRITION COMPANY TO PLAINTIFFS' COMPLAINT**

**I.**    **MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead

Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to

Plaintiffs' Complaint.

The case before the Court involves speculative and unsupported allegations by

Plaintiffs that the minor Plaintiff, J.C., developed a condition known as necrotizing

enterocolitis ("NEC") following his alleged ingestion of Similac and/or Enfamil cow's

milk-based infant formula manufactured and sold by Moving Defendants and/or

defendant Abbott Laboratories ("Abbott"). Plaintiffs fail to identify the particular product

that J.C. purportedly ingested, and the entirety of Plaintiffs' claims rest on their

1

Case ID: 220302588
Control No.: 23063373

unsubstantiated conclusion that the formula consumed by J.C. is an unreasonably dangerous product. Plaintiffs acknowledge that premature infants such as J.C. have an inherent high risk of developing NEC. However, to support their theory of causation, Plaintiffs cite to certain literature that compares cow's milk-based products to breast milk. None of the literature upon which Plaintiffs rely concludes that cow's milk-based formula causes NEC. In fact, the articles carefully avoid that conclusion, saying only that breast milk may be protective against NEC. The Complaint is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused J.C. to develop NEC. Plaintiffs allege only that J.C. was born on a certain date; *may* have been provided one of Defendants' infant formula products; and, at some point, developed NEC. But, Plaintiffs have failed to identify which Mead Johnson product the infant received; whether the infant received mother's own milk; whether the infant received donor milk; how the infant came to receive Mead Johnson's product; when J.C. ingested the product; when J.C. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury J.C. allegedly sustained. Plaintiffs nowhere allege how cow's milk purportedly *causes* NEC, or how the facts of J.C.'s case relate to the scientific evidence Plaintiffs cite. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs' Complaint should be dismissed.

## II.     STATEMENT OF QUESTIONS PRESENTED

1.     Whether this Honorable Court should dismiss Count I of Plaintiffs' Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are

Case ID: 220302588
Control No.: 23063373

unreasonably dangerous, and Moving Defendants cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.     Whether this Honorable Court should dismiss Count II of Plaintiffs' Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are unreasonable dangerous, and Moving Defendants cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.     Whether this Honorable Court should dismiss Count III of Plaintiffs' Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.     Whether this Honorable Court should dismiss Count IV of Plaintiffs' Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

*Suggested Answer in the affirmative.*

5.     Whether this Honorable Court should dismiss Count V of Plaintiffs' Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

*Suggested Answer in the affirmative.*

3

Case ID: 220302588
Control No.: 23063373

6.      Whether this Honorable Court should strike Plaintiffs' Complaint in its

entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive

damages as to Moving Defendants because the Complaint fails to plead facts providing

a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiffs' Complaint for failure

to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested Answer in the affirmative.*

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs have filed nearly 30 essentially identical lawsuits against Moving

Defendants and Abbott in Philadelphia based on claims relating to alleged ingestion of

cow's milk-based products by premature infants in the hospital following their birth.[1]

Plaintiffs allege that the Plaintiff-minors, including J.C., developed NEC, a

gastrointestinal disorder that occurs in premature infants. *See* Plaintiffs' Complaint,

attached as Exhibit "A" at ¶ 13. Plaintiffs aver that premature infants fed with their

mother's breast milk or donor breast milk are at decreased risk of developing NEC as

compared with infants given cow's milk-based products (infant formula). Many of the

allegations of the Complaint are pleaded "upon information and belief," including the

allegations that Plaintiff-minors actually received infant formula, and that they developed

NEC shortly after being fed with infant formula.

---

[1] Lawsuits involving identical claims have been filed against Pennsylvania Hospital, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302588
Control No.: 23063373

In addition to asserting product liability claims against Moving Defendants and Co-Defendant, Abbott, Plaintiffs have alleged that the Pennsylvania Hospital of the University of Pennsylvania and the Trustees of the University of Pennsylvania ("HUP") are liable based on claims of failure to warn and corporate liability. *See* Plaintiffs' Complaint at Counts VI and VII. As is discussed in detail below Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Although Plaintiffs aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Complaint to research studies and reports that, as alleged by Plaintiffs, indicate only that NEC is more common in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. *See* Exhibit "A" at ¶¶ 17-23. As discussed in detail, *infra*, assuming the truth of the factual allegations stated in Plaintiffs' Complaint, the research studies cited by Plaintiffs do not support the conclusion that cow's milk-based formula causes NEC.  In fact, the authorities they cite avoid that conclusion. As such, there is no basis to contend that cow's milk-based products are unreasonably dangerous for premature infants.

Plaintiffs' Complaint provides scant information regarding J.C.'s own circumstances.  Plaintiffs aver that J.C. was born prematurely on October 6, 2014 and that "[u]pon information and belief J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital shortly after his birth." *Id.* at ¶ 12. Plaintiffs further allege that "upon information and belief" J.C. developed NEC shortly after first ingesting the Moving Defendants and Co-Defendant Abbott's products. *Id.*, ¶ 13. Plaintiffs provide no details regarding the extent of J.C.'s prematurity, his birth weight, or his condition following birth other than that he developed NEC on an unidentified date.

Case ID: 220302588
Control No.: 23063373

Further, Plaintiffs allege no facts as to whether Plaintiff-parent provided breast milk to J.C., whether she had the opportunity to use donor milk, and if J.C. actually received a cow's milk product, what it was, how much, and for how long.[2] Finally, the Complaint is silent as to the nature and extent of J.C.'s alleged injuries other than a vague reference to "injuries" and "long term health effects." *Id*. ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at HUP regarding the allegations that J.C. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs conceded in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 41. However, Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at HUP related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiffs plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

Plaintiffs also do not explain how cow's milk could be an unreasonably unsafe product.  The US FDA regulates both cow's milk and infant formula, and places no restriction on the use of cow's milk-based products for premature infants. FDA's statutory mandate is to prevent the sale of adulterated foods, which are defined as those that may be injurious to human health.  21 U.S.C. §342(a).  Far from deeming milk injurious, but in order to "promote honesty and fair dealing in the interest of

---

[2] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 37-38.

Case ID: 220302588
Control No.: 23063373

consumers" (21 U.S.C. §341), FDA has created a standard of identity for cow's milk. See 21 C.F.R. 131.110 (standard of identity for milk.)  It has elsewhere said: "First, of all foods, none surpasses milk as a single source of those dietary elements needed for the maintenance of proper health, especially in children and older citizens. For this reason, the USPHS has for many years promoted increased milk consumption…"  U.S. Dep't. of Health and Human Serv. Public Health Serv. FDA, *Grade "A" Pasteurized Milk Ordinance (Grade "A" PMO)*, (2019 Revision), *available at* https://www.fda.gov/media/140394/download.

As for formula, the federal Infant Formula Act of 1980 ("IFA") was enacted to "assure the safety and nutrition of infant formulas." Pub. L. No. 96-359,94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages, 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. (Exhibit "A" ¶¶ 37-38); 21 C.F.R § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA; and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures

Case ID: 220302588
Control No.: 23063373

apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for instant formulas intended for use by an infant with a low birth weight.

In short, since (1) the scientific authorities cited by Plaintiffs do not say that cow's milk formula *causes* NEC, (2) the Plaintiffs have provided virtually no information about J.C.'s medical or nutritional circumstances (such as the use of mother's own milk or the availability of donor milk), (3) FDA recognizes cow's milk and infant formulas as safe, and (4) since Plaintiffs have not even alleged a probability that J.C. received a Mead Johnson product, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

## IV. <u>ARGUMENT</u>

### A. <u>DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V</u>

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this

8

Case ID: 220302588
Control No.: 23063373

case, Counts I, II, III, IV, and V of Plaintiffs' Complaint should be stricken pursuant to this Rule, as Plaintiffs have failed to plead certain core facts with sufficient detail to survive the pleading stage. For the reasons set forth, *supra*, where Plaintiffs' fail to demonstrate Moving Defendants' cow's milk-based product was unreasonably dangerous, Plaintiffs fail to state a cause of action upon which relief can be granted at Counts I, II, III, IV, and V.

Plaintiffs allege in Counts I and II of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Counts I and II are based upon Plaintiffs' theory against Moving Defendants that Moving Defendants' cow's milk-based products are unreasonably dangerous, and therefore defective, for strict liability purposes, under claims of design defect and failure-to-warn. In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for defective design and failed to state a claim for failure-to-warn, due to an absence of proof of that the products are indeed unreasonably dangerous.

"The law governing strict products liability actions in Pennsylvania has been developed based upon the principles outlined in Section 402A of the Second Restatement of Torts." *High v. Pennsy Supply, Inc.,* 154 A.3d 341 (Pa. Super. 2017). Section 402(A) provides:

Case ID: 220302588
Control No.: 23063373

    (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

        (a)    the seller is engaged in the business of selling such a product, and

        (b)    it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

    (2)    The rule stated in Subsection (1) applies although

        (a)    the seller has exercised all possible care in the preparation and sale of his product, and

        (b)    the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402(A).

To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.*

10

Case ID: 220302588
Control No.: 23063373

Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Moving Defendants' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn. The only factual reference Plaintiffs make with regard to intended use is to marketing campaigns, where Defendant Manufacturers advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit "A" at ¶ 43. They have not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose, as the studies and reports they cite in their Complaint do not say or support – based on the very allegations in the Complaint – what Plaintiffs claim they do. These studies and reports are the sole factual support that the products in question "cause" NEC, and are the foundation for their strict products liability claims of design defect and failure-to-warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products <u>cause</u> NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id*. However, the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk." *Id*. at ¶ 17 (emphasis added). To

11

Case ID: 220302588
Control No.: 23063373

say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based products cause NEC.  Indeed, the study itself[3] explains that the difference in NEC incidence may be mediated by the protective effects of immunoglobulin in breast milk, which, when added to formula, also protected against NEC:  "We suggest, in the light of the finding that oral immunoglobulin in formula fed babies was prophylactic, that breast milk may protect against necrotizing enterocolitis by providing IgA in the gut lumen."  Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519, 1522 (1990). The article goes on to *recommend* the concomitant use of bovine formulas to meet the increased nutritional needs of premature infants.  *Id.*

As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products."  *Id.* at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet**. Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.  To the contrary, it too posits that breast milk is simply protective: "These data suggest that

---

[3] For the Court's convenience, Moving Defendants have attached as Exhibit "B" a copy of A. Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519-1523 (1990), which is the first study that Plaintiffs quote from, and rely on, in their Complaint, but have failed to attach.  Where a plaintiff has averred the existence of certain written documents and premised a cause of action upon those documents, it is proper in Pennsylvania for a defendant to attach those documents in support of a demurrer.  *See Richardson v. Wetzel*, 74 A.3d 353, 358 n.4 (Pa. Commw. Ct. 2013).  As Plaintiffs in the instant matter rely extensively on this and other studies to prove their theory of causation, Moving Defendants have properly attached them here for the Court's consideration.

Case ID: 220302588
Control No.: 23063373

exclusive human milk diets may exert protective, rather than threshold, effects with respect to NEC." Sandra Sullivan, et al., *An Exclusively Human Milk-Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products,* 4 J. PEDIAT. 562, 566 (2010), a true and correct copy of which is attached hereto as Exhibit "C."

The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier." *Id*. at ¶ 19. As Plaintiffs admitted in the Complaint, preterm and low-weight-birth infants are especially susceptible to NEC. Put another way, **these infants are already at an increased risk of NEC regardless of their diet.** This study, as described in Plaintiffs' Complaint, reflects this in explaining different rates of risk of developing NEC when using cow's milk-based or breast milk-based fortifiers. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id*. at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC

Case ID: 220302588
Control No.: 23063373

occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id*. at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id*. This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC. Instead, as quoted by Plaintiffs, the statement touts the "potent protective effects of breastmilk." *Id*.

The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id*. at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

Ultimately, Plaintiffs' claim that Moving Defendants' cow's milk-based feeding products "cause" NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. The numerous studies and reports cited by Plaintiffs

14

in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet. All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be protective against the risk of NEC, not that cow's milk-based alternatives affirmatively cause NEC. This proposition does not make the Moving Defendants' cow's milk-based alternatives unreasonably dangerous within the meaning of § 402(A) of the Restatement (Second) of Torts. Thus, Plaintiffs' Complaint fails to aver sufficient facts to demonstrate that Moving Defendants' products are indeed unreasonably dangerous and maintain a cause of action sounding in strict products liability. Consequently, Plaintiffs' Complaint should be stricken at Counts I, II, III, IV, and V for failure to state a claim.

**B.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

Counts IV and V of Plaintiffs' Complaint allege intentional and negligent misrepresentation, respectively, against Moving Defendants. Plaintiffs cannot maintain misrepresentation claims because they fail to allege that they received any specific representation from Moving Defendants on which they relied. In fact, as they have not even alleged that J.C. received a Mead Johnson product, they cannot claim that misrepresentations by Mead Johnson caused reliance or their purported injury.

The elements of a claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the

Case ID: 220302588
Control No.: 23063373

misrepresentation." *Bilt-Rite Contractors v. Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005) (quoting Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999)). Negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz*, 729 A.2d at 561.

The elements of an intentional misrepresentation claim require: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 499 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (1994), citing, Restatement (Second) of Torts § 525 (1977)).

Here, Plaintiffs' claims fail to allege that they received any specific representation from Moving Defendants, intentional or otherwise. Plaintiffs further fail to allege that they relied on a specific representation of the Moving Defendants. Because of these omissions from Plaintiffs' Complaint, Plaintiffs have failed to articulate a viable claim for intentional and negligent misrepresentation. *See, e.g., Cruz v. Roberts*, No. CI-04-01947, 2005 Pa. Dist. & Cnty. Dec. LEXIS 186, 70 Pa. D. & C.4th 225 (Pa. CCP Jan. 26, 2005) (dismissing negligent and intentional misrepresentation claims for insufficient pleading); *see also Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257 (Pa. Super. Nov. 25, 2015) (dismissing fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

16

Case ID: 220302588
Control No.: 23063373

Thus, Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must be dismissed.

### C.   MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

17

Case ID: 220302588
Control No.: 23063373

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.[4] Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or his birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiffs have failed to identify which of

---

[4] Plaintiffs' complaint violates the most basic pleading rules. It is procedurally deficient and bereft of relevant substantive support. Relying upon vague place-holder pleading conventions (e.g., "upon information and belief," "and/or") and citation to inapposite scientific studies, Plaintiffs' complaint is replete with supposition, leaps in logic and unsubstantiated innuendo. The Court should not countenance such flouting of the rules.

Case ID: 220302588
Control No.: 23063373

the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 37-38. Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiffs' Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

### D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 22, 25, 28, and 31. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" J.C. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in J.C.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to

19

discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in J.C.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

20

Case ID: 220302588
Control No.: 23063373

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson*, *supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id*. at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an

21

Case ID: 220302588
Control No.: 23063373

award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g., Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from

Case ID: 220302588
Control No.: 23063373

neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Without any factual support, the conclusory allegation that Moving Defendants were reckless is insufficiently pled and must be stricken from the Complaint pursuant to Rule 1028(a)(3).

E.     **MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS**

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of J.C.  Her claims should be dismissed for the reasons set forth below.

23

Case ID: 220302588
Control No.: 23063373

Plaintiffs' Complaint includes allegations in each count against Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 75, 83, 92, 102 and 112. However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged conduct of Moving Defendants.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count their claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the instant Complaint. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Fanscali ex rel. Fanscali v. Univ. Health Center of Pittsburgh, 563 Pa. 439 (2000); Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

Case ID: 220302588
Control No.: 23063373

Plaintiffs allege that J.C. was born on October 6, 2014, was fed Similac and/or Enfamil cow's milk-based products shortly after his birth at Pennsylvania Hospital, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.  Thus, because Plaintiffs filed the Complaint at issue on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations and must be dismissed.

### F. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate verification.

### V. REQUESTED RELIEF

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

Respectfully submitted,

Case ID: 220302588
Control No.: 23063373

**TUCKER LAW GROUP, LLC**

Dated:  June 15, 2023

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

26

## CERTIFICATE OF SERVICE

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiffs' Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com

**Keller Lenkner, LLC**
Ashley Keller, Esquire
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
ack@kellerlenkner.com

**Walsh Law, PLLC**
Alex Walsh, Esquire
1050 Connecticut, NW, Suite 500
Washington, DC 20036
awalsh@alexwalshlaw.com

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire

Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com

By:     /s/ Kenneth A. Murphy
          Kenneth A. Murphy, Esquire

Dated: June 15, 2023

Case ID: 220302588
Control No.: 23063373

# EXHIBIT "A"

Case ID: 220302588
Control No.: 23063373

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MARCH 2022**

E-Filing Number: 2203054589

**002588**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| HOLLI CARTER | MEAD JOHNSON & COMPANY, LLC, |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 16 CARMEN DRIVE<br>CAPE MAY  NJ 08210 | ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD  IL 62703 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| J C | MEAD JOHNSON NUTRITION COMPANY |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 16 CARMEN DRIVE<br>CAPE MAY  NJ 08210 | ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD  IL 62703 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
|  | ABBOTT LABORATORIES |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
|  | CT CORPORATION SYSTEM  208 SO. LASALLE STREET<br>SUITE 814<br>CHICAGO  IL 60604 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 2 | 5 | ☒ Complaint | ☐ Petition Action | ☐ Notice of Appeal |
| | | ☐ Writ of Summons | ☐ Transfer From Other Jurisdictions | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☐ Mass Tort | ☐ Commerce | ☐ Settlement |
| ☒ More than $50,000.00 | ☒ Jury | ☐ Savings Action | ☐ Minor Court Appeal | ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals | ☐ W/D/Survival |
| | ☐ Other: | | | |

**CASE TYPE AND CODE**

2P - PRODUCT LIABILITY

**STATUTORY BASIS FOR CAUSE OF ACTION**

**RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)**

**FILED**
**PRO PROTHY**

MAR 24 2022

**S. RICE**

IS CASE SUBJECT TO
COORDINATION ORDER?
YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: HOLLI CARTER , J C

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| TRACY A. FINKEN | ONE LOGAN SQUARE<br>130 N. 18TH ST.<br>SUITE 1600<br>PHILADELPHIA PA 19103 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)735-0773 | (215)875-7731 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 82258 | tfinken@anapolweiss.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| TRACY FINKEN | Thursday, March 24, 2022, 02:18 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

Case ID: 220302588
Control No.: 23063373

**COMPLETE LIST OF DEFENDANTS:**

1. MEAD JOHNSON & COMPANY, LLC,
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
2. MEAD JOHNSON NUTRITION COMPANY
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
3. ABBOTT LABORATORIES
   CT CORPORATION SYSTEM  208 SO. LASALLE STREET  SUITE 814
   CHICAGO  IL 60604
4. THE PA HOSPITAL OF THE UNIVERSITY OF PA HEALTH SYSTEM
   ALIAS: PENNSYLVANIA HOSPITAL
   3400 CIVIC CENTER BLVD
   PHILADELPHIA  PA 19104
5. THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA
   ALIAS: PENN MEDICINE
   133 SOUTH 36TH STREET
   PHILADELPHIA  PA 19104

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
Identification Number: 82258
**One Logan Square**
**130 N. 18th Street, Suite 1600**
**Philadelphia, PA 19103**
**(215) 735-0773**
Email: tfinken@anapolweiss.com

Filed and Attested by the
Office of Judicial Records
24 MAR 2022 02:18 pm
S. RICE

**ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: Ashley Keller (*pro hac vice forthcoming*)**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**
**Telephone: (312) 741-5220**
**Fax: (312) 971-3502**
Email: ack@kellerlenkner.com

**ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: Alex Walsh (*pro hac vice forthcoming*)**
**1050 Connecticut Ave, NW, Suite 500**
**Washington, D.C. 20036**
**Telephone: (202) 780-4127**
**Fax: (202) 780-3678**
Email: awalsh@alexwalshlaw.com

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **HOLLI CARTER, on her own behalf and as** | : | **COURT OF COMMON PLEAS** |
| **Parent and Natural Guardian of J.C., a minor** | : | **PHILADELPHIA COUNTY** |
| **16 Carmen Drive** | : | |
| **Cape May, NJ 08210** | : | |
| **Plaintiffs** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO.** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |
| **CT Corporation System** | : | |
| **208 So. Lasalle Street, Suite 814** | : | |

1

Case ID: 220302588

Chicago, IL 60604       :

:

**THE PENNSYLVANIA HOSPITAL OF**  :
**THE UNIVERSITY OF PENNSYLVANIA**  :
**HEALTH SYSTEM d/b/a PENNSYLVANIA**  :
**HOSPITAL**  :
**3400 Civic Center Blvd.**  :
**Philadelphia, PA 19104**  :

:

**THE TRUSTEES OF THE UNIVERSITY OF**  :
**PENNSYLVANIA d/b/a PENN MEDICINE**  :
**133 South 36th Street**  :
**Philadelphia, PA 19104**  :

:

             **Defendants**    :      **JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

2

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

**ANAPOL WEISS**
BY: TRACY FINKEN, ESQUIRE
IDENTIFICATION NUMBER: 82258
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
(215) 735-0773
EMAIL: TFINKEN@ANAPOLWEISS.COM                    **ATTORNEY FOR PLAINTIFFS**

KELLER LENKNER LLC
BY: ASHLEY KELLER (*PRO HAC VICE FORTHCOMING*)
150 N. RIVERSIDE PLAZA, SUITE 4100
CHICAGO, ILLINOIS 60606
TELEPHONE: (312) 741-5220
FAX: (312) 971-3502
EMAIL: ACK@KELLERLENKNER.COM                      **ATTORNEY FOR PLAINTIFFS**

WALSH LAW PLLC
BY: ALEX WALSH (*PRO HAC VICE FORTHCOMING*)
1050 CONNECTICUT AVE, NW, SUITE 500
WASHINGTON, D.C. 20036
TELEPHONE: (202) 780-4127
FAX: (202) 780-3678
EMAIL: AWALSH@ALEXWALSHLAW.COM                    **ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **HOLLI CARTER,** ON HER OWN BEHALF BEHALF AND AS PARENT AND NATURAL GUARDIAN OF J.C., A MINOR **16 CARMEN DRIVE** **CAPE MAY, NJ 08210** | : : : : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| PLAINTIFFS | : | |
| V. | : : | **CIVIL ACTION** |
| **MEAD JOHNSON & COMPANY, LLC** ILLINOIS CORPORATION SERVICE CO. **801 ADLAI STEVENSON DRIVE** **SPRINGFIELD, IL 62703** | : : : : : | |
| | : | **NO.** |
| **MEAD JOHNSON NUTRITION COMPANY** ILLINOIS CORPORATION SERVICE CO. **801 ADLAI STEVENSON DRIVE** **SPRINGFIELD, IL 62703** | : : : : | |
| | : : | |
| **ABBOTT LABORATORIES** CT CORPORATION SYSTEM **208 SO. LASALLE STREET, SUITE 814** **CHICAGO, IL 60604** | : : : : : | |
| | : : | |
| **THE PENNSYLVANIA HOSPITAL OF** **THE UNIVERSITY OF PENNSYLVANIA** **HEALTH SYSTEM** D/B/A **PENNSYLVANIA** | : : : | |

3

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

HOSPITAL                                      :
3400 CIVIC CENTER BLVD.                        :
PHILADELPHIA, PA 19104                         :
                                               :
                                               :
THE TRUSTEES OF THE UNIVERSITY OF              :
PENNSYLVANIA D/B/A PENN MEDICINE              :
133 SOUTH 36TH STREET                          :
PHILADELPHIA, PA 19104                         :
                                               :
_____DEFENDANTS_____  :   JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead
Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories
(collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania
d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System
d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together
"Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts
and experiences and upon information and belief, including investigation conducted by Plaintiff's
attorneys, as to all other matters.

## I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant")
who was given the Defendant Manufacturers' cow's milk-based infant feeding products at
Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied
the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their
unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to
develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that
largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.     Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.     PARTIES

3.     Plaintiff Holli Carter is a natural adult person and a resident of New Jersey.  Ms. Carter is the parent and natural guardian of J.C., a minor. Ms. Carter's address is 16 Carmen Drive, Cape May, New Jersey 08210.

4.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

6

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *J.C.'s NEC Diagnosis*

11.     J.C. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 6, 2014.

12.     Upon information and belief J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after his birth.

13.     Upon information and belief shortly after J.C. first ingested the Defendant Manufacturers' products, he developed NEC.

14.     J.C. suffered injuries and has continued to suffer long term health effects.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

7

Case ID: 220302588

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis."  The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

22.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products

30.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

10

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

31. Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32. Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

11

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding.  We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs."  This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets.  For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up.  During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development."  Yet, no mention was made of the accompanying significantly increased risk of NEC.  At some point, the website was edited to remove this statement.  However, upon information and belief, the statement remained on the website until at least December 2020.

12

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder).  In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use.  For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks.  Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk."  The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

40.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373



43.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

*The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online.  No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

51.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

56.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those

17

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant,

Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers'

products in its hospitals without any adequate warning.

57.     To that end, Penn Medicine has participated in studies designed to increase the use of donor

milk while, at the same time, reducing formula feeding in neonates.   The University of

Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research

into the risks associated with feeding formula to premature infants.  It recently partnered with the

National Institute of Nursing Research to publish clinical determinations based on its experience

"changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of
> necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral
> feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the

incidence and severity of . . . necrotizing enterocolitis (NEC)."

58.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital

Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in

preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.

Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has

not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks

associated with providing the Defendant Manufacturers' cow's milk-based products to premature

infant patients instead of breast milk-based nutrition.  In an internal newsletter from 2012 touting

donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet,

quoting a staff lactation consultant:

18

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.  As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.  This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

19

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

*Safer Alternative Designs*

63.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.  The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

66.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

69.    Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

76. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

   a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

23

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

d. Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

83.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.     At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

26

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

c.   Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.   Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.   Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

27

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

90.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

92.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94.     At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96.     Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98. Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

100. The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

      a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

      c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

      d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

      e.   For interest as permitted by law;

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

103.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

105.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

32

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.   That cow's milk-based products were safe for premature infants; and/or

e.   That cow's milk-based products were necessary for optimum growth; and/or

f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.   Abbott and Mead were negligent or careless in not determining those representations to be false.

109.   The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

110.   The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
#### (Against Penn Medicine and Pennsylvania Hospital)

113.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117.    Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute,

35

and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119.    Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

      a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

      b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

   d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

   e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

   f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

   g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

125.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126.    As a further direct and proximate result of Penn Medicine and Pennsylvania  failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

      a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

      c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

      d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive,  reckless, and/or malicious conduct, as permitted by law;

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

  e. For interest as permitted by law;

  f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

  g. For such other and further relief as the Court deems proper.

## COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

127. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

131.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

43

Case ID: 220302588
Control No.: 23063373

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

44

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

144.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

148. Plaintiff hereby demands a jury trial for all claims triable.


Dated: March 24, 2022

Respectfully submitted,

**ANAPOL WEISS**

Tracy Finken
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Email: tfinken@anapolweiss.com

**KELLER LENKNER LLC**
Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220

46

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiff*

47

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

Tracy Finken

Tracy Finken

48

Case ID: 220302588

Case ID: 220302588
Control No.: 23063373

## **VERIFICATION**

I, the undersigned, Tracy Finken, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____

Tracy Finken

Date: March 24, 2022

49

Case ID: 220302588

# EXHIBIT "B"

Case ID: 220302588
Control No.: 23063373

VOL 336 THE LANCET 1519

# MEDICAL SCIENCE

## Breast milk and neonatal necrotising enterocolitis

A. Lucas    T. J. Cole

In a prospective multicentre study on 926 preterm infants formally assigned to their early diet, necrotising enterocolitis developed in 51 (5·5%). Mortality was 26% in stringently confirmed cases. In exclusively formula-fed babies confirmed disease was 6–10 times more common than in those fed breast milk alone and 3 times more common than in those who received formula plus breast milk. Pasteurised donor milk seemed to be as protective as raw maternal milk. Among babies born at more than 30 weeks' gestation confirmed necrotising enterocolitis was rare in those whose diet included breast milk; it was 20 times more common in those fed formula only. Other risk factors included very low gestational age, respiratory disease, umbilical artery catheterisation, and polycythaemia. In formula-fed but not breast-milk-fed infants, delayed enteral feeding was associated with a lower frequency of necrotising enterocolitis. With the fall in the use of breast milk in British neonatal units, exclusive formula feeding could account for an estimated 500 extra cases of necrotising enterocolitis each year. About 100 of these infants would die.

*Lancet* 1990; **336**: 1519–23.

## Introduction

Necrotising enterocolitis is the most common serious gastrointestinal disease seen in neonatal intensive care units, with a reported mortality in well-established cases of 20–40%.[1] The causes have been elusive. Prematurity or low birthweight are the most consistently reported associated factors,[2] but up to 10% of cases occur in term babies.[3] Some studies suggest a strong relation between necrotising enterocolitis and factors that could cause gut ischaemia or hypoxia;[4–6] others fail to find these associations.[1,2,7] An infective aetiology has been suggested by case clustering, the presence of a predominant organism in outbreaks, the effectiveness of standard infectious disease control methods in epidemics,[8,9] and the apparent prophylactic value of oral immunoglobulin.[10] Nevertheless, no single organism has proved to be the cause[11] and most of the microorganisms identified are present in normal gut flora. The importance of enteral feeding as a risk factor has been emphasised,[3,12–14] but 5–10% of cases occur in babies who have never been

enterally fed.[1,3] Further suggested factors related to feeding include early initiation of enteral feeds,[14] rapid escalation of feed volumes,[13] and hyperosmolar feeding,[15,16] but others doubt their importance.[4,17] Several small studies and anecdotal observations[18–20] have suggested that breast milk is protective. This idea is supported by findings in a rat model that live milk leucocytes are prophylactic.[21,22] Nevertheless, necrotising enterocolitis can occur in infants fed exclusively on fresh, frozen, or pasteurised breast milk.[4,14,23]

It seems that no single aetiological factor explains necrotising enterocolitis and that the mucosal lesion can be provoked in several ways. An important question, however, is whether there are any important risk factors that can be avoided readily in clinical practice. Feeding policy is the factor most amenable to manipulation. In our prospective, randomised, multicentre study of dietary management in 926 infants,[24] we have re-explored the relation between early diet or feeding practice and the frequency of necrotising enterocolitis.

## Subjects and methods

926 infants with birthweights below 1850 g (mean 1370 [SD 320] g; mean gestation 31 [3] weeks) were recruited in five centres, to test whether early diet, randomly assigned, affected short-term morbidity and long-term outcome. Necrotising enterocolitis was identified as a major short-term outcome response.

There were two parallel dietary studies. In three centres (study A) infants were randomly assigned to pasteurised banked donated breast milk or a nutrient-enriched preterm formula ('Osterprem', Farley Health Products Ltd, Nottingham, UK). The randomisation was stratified according to whether the mother provided breast milk for her own infant. Thus, donor milk and preterm formula could be compared as sole diets (in infants whose mothers did not provide their own milk) or as supplements to breast milk. In two further centres (study B) the same randomisation procedure was used to compare infants fed a standard "term" formula ('Ostermilk', Farley Health Products Ltd) or the preterm formula, again as sole diets or as supplements to mother's milk. When the trial diets (donor milk, term formula, or preterm formula) were used as a supplement to maternal breast milk, the median intake of mother's milk was 48% (interquartile range 10–86%) with no difference between diet groups. Randomisation is described elsewhere;[24] it took place within 48 h of birth, independently in each

ADDRESS: University Department of Paediatrics and MRC Dunn Nutrition Unit, Cambridge, UK (A. Lucas, MRCP, T. J. Cole, PhD). Correspondence to Dr A. Lucas, MRC Dunn Nutrition Unit, Downhams Lane, Milton Road, Cambridge CB4 1XJ, UK.

Case ID: 220302588
Control No.: 23063373

THE LANCET

centre, and assignments were based on permuted blocks of variable length.

Detailed composition of the formulas is available from the manufacturers. Briefly, for each 100 ml the standard formula contained 1·45 g protein and 286 kJ (68 kcal), and the preterm formula 2·0 g protein and 336 kJ (80 kcal). The preterm formula was also enriched in sodium, calcium, phosphorus, copper, zinc, vitamins D, E, and K, water-soluble vitamins, carnitine, and taurine. The osmolality of both formulas was 300 mosmol/kg. Donor breast milk was pasteurised and frozen. Mother's milk was not pasteurised and was fed untreated or after a period of refrigeration or, occasionally, freezing.

Various classifications have been proposed for necrotising enterocolitis.[25,26] We have used the British Association for Perinatal Pediatrics classification based on features of the disease in 165 cases in 54 British centres.[26] Grade 1 cases had at least two of the following features: pneumatosis intestinalis on abdominal radiograph; abdominal distension or an abdominal radiograph showing gaseous distension or frothy appearance of bowel lumen (or both); blood in the stool; lethargy, hypotonia, or apnoeic episodes, or a combination of the three. Grade 2 cases had, as well as grade 1 features, one or more of: abdominal tenderness or rigidity; tissue (mucosa) in stool; abnormal bleeding with trauma; spontaneous bleeding; peripheral white blood cell count below $6 \times 10^9$/l at the time of illness; peripheral platelet count below $100 \times 10^9$/l at the time of illness; or an abdominal radiograph showing gas in the portal vein or free air in the abdomen. The cases were further divided into confirmed cases (with classic radiological features [pneumatosis intestinalis, gas in the portal venous system, or free air in the abdomen] or with necrotising enterocolitis established surgically or at necropsy) and unconfirmed cases.

The frequency of necrotising enterocolitis was examined among the randomised diet groups. In the main analysis, however, necrotising enterocolitis was examined in three non-randomised enteral feed groups—human milk only (donor or donor plus mother's milk), formula (term or preterm) as a supplement to mother's milk, and formula only. Extensive logistic regression analyses were used—to adjust for potential confounding factors in the comparison between non-randomised feed groups; to quantify other risk factors for necrotising enterocolitis; and to identify interactions between diet and non-dietary factors. For most analyses, data are presented for all cases of necrotising enterocolitis and for confirmed cases only.

## Results

Clinical features of necrotising enterocolitis developed in 51 of the 926 infants studied, and the diagnosis· was more stringently "confirmed" in 31 (table I). All the infants who required surgery or who died had grade 2 confirmed disease. Of the confirmed cases, 35% needed surgery, and necrotising enterocolitis was considered the principal cause of death in 26%. All infants in whom necrotising enterocolitis developed had received enteral feeds.

The clinical characteristics of the study population and the higher frequency of necrotising enterocolitis at low gestation and with respiratory disease are shown in table II.

The only formal randomised comparison of human milk and formula feeding on the incidence of necrotising enterocolitis was that of infants fed exclusively on donor breast milk or on preterm formula. Among the 86 infants exclusively fed on donor milk there were 3 (4%) cases (1 [1%] confirmed cases) and among the 76 fed exclusively on preterm formula there were 6 (8%) cases (4 [5%] confirmed); the odds ratios were 2·4 (95% CI 0·6–9·8) for all cases and 4·7 (0·5–43) for confirmed cases. However, the sample size was not large enough to detect a difference smaller than ten-fold in frequency of necrotising enterocolitis between these groups with adequate power. In study A as a whole there were 11 (43%) cases among the 253 infants who received donor milk alone or with maternal milk

### TABLE I—OCCURRENCE AND OUTCOME OF NECROTISING ENTEROCOLITIS

| — | No of babies (% of total) | No (% of group) who required surgery | No (% of group) who died |
|---|---|---|---|
| *Grade 1* | | | |
| Unconfirmed | 16 (1·7%) | 0 | 0 |
| Confirmed | 9 (1·0%) | 0 | 0 |
| *Grade 2* | | | |
| Unconfirmed | 4 (0·4%) | 0 | 0 |
| Confirmed | 22 (2·4%) | 11 (50%) | 8 (36%) |
| *Total cases* | 51 (5·5%) | 11 (22%) | 8 (16%) |
| *Confirmed cases* | 31 (3·3%) | 11 (35%) | 8 (26%) |

(3 [1·2%] confirmed) and 12 (4·8%) cases among the 249 who received preterm formula as a sole diet or with maternal milk (9 [3·6%] confirmed). The odds ratios were 1·1 (0·5–2·6) for all cases and 3·1 (0·8–11·7) for confirmed cases; however, the 3-fold difference was not significant (p = 0·07). In study B the incidence of necrotising enterocolitis was similar in infants fed preterm or term formula either as sole diets (6/81 cases *vs* 11/79 cases) or as supplements to mother's milk (12/213 cases *vs* 16/211 cases).

The 253 subjects fed only human milk ranged from those fed exclusively pasteurised donor milk to those fed almost entirely raw maternal milk. More detailed data modelling (not shown here) confirmed the findings above, that the incidence of necrotising enterocolitis in this subgroup was not affected by the type of breast milk consumed.

Since the occurrence of necrotising enterocolitis was the same in infants fed on different types of breast milk and in infants fed on the two types of formula, we were able to divide the whole population into three large diet groups for comparison—formula only (n = 236), formula plus breast milk (n = 437), and human milk only (n = 253). The formula only group were at a significantly higher risk of necrotising enterocolitis than the other groups (table III). The odds ratio (95% CI) for the comparison of formula only and formula plus mother's milk was 3·0 (1·5–5·7; p < 0·005) for all cases and 3·0 (1·4–6·5; p < 0·005) for confirmed cases. For the comparison of formula only and breast milk only the odds ratios were 2·5 (1·2–5·2; p < 0·02) for all cases and 6·5 (1·9–22; p < 0·001) for confirmed cases.

This comparison might have been confounded by the fact that the infants exclusively fed human milk were contributed by only three centres (study A), whereas the formula-fed infants were contributed by all five centres (studies A and B). The frequency of necrotising enterocolitis in preterm formula-fed babies did not, however, differ significantly between studies A and B (7·9 *vs* 7·4%).

### TABLE II—CHARACTERISTICS OF STUDY POPULATION

| | All cases | Confirmed cases |
|---|---|---|
| *No (%) with gestation of:* | | |
| 25–27 wk (n = 118) | 20 (16·9%) | 12 (10·2%) |
| 28–30 wk (n = 314) | 18 (5·7%) | 11 (3·5%) |
| < 30 wk (n = 494) | 13 (2·6%) | 8 (1·6%) |
| *No (%) with birthweight of·* | | |
| < 1000 g (n = 144) | 18 (12·5%) | 11 (7·6%) |
| 1000–1500 g (n = 403) | 23 (5·7%) | 15 (3·7%) |
| > 1500 g (n = 379) | 10 (2·6%) | 5 (1·3%) |
| *No (%) of cases with concomitant respiratory disease\*1* | 36/51 (71%) | 21/31 (68%) |
| *Median (IQR) enteral feed volume before NEC* | 410 (140–1160) | 390 (160–990) |
| *Median (IQR) day of onset* | 12 (7–18) | 11 (7–18) |

NEC = necrotising enterocolitis. IQR = interquartile range.
\*338 (39%) of the 875 infants without NEC had concomitant respiratory disease
†Ventilated for > 24 h in the first 72 h

Case ID: 220302588
Control No.: 23063373

#### TABLE III—NECROTISING ENTEROCOLITIS BY FEED GROUP

| — | n | No (%) of cases | |
|---|---|---|---|
| | | All cases | Confirmed cases |
| Formula only | 236 | 24 (10·2%) | 17 (7·2%) |
| Formula plus mother's milk | 437 | 16 (3·7%) | 11 (2·5%) |
| Human milk only | 253 | 11 (4·3%) | 3 (1·2%) |

#### TABLE IV—LOGISTIC REGRESSION MODELS FOR FACTORS SIGNIFICANTLY RELATED TO FREQUENCY OF NECROTISING ENTEROCOLITIS

| | All cases | | Confirmed cases | |
|---|---|---|---|---|
| | t | Odds ratio (95% CI) | t | Odds ratio (95% CI) |
| Formula only vs breast milk + formula | 3·37 (p<0·001) | 3·3 (1·6–6·8) | 3·05 (p<0·01) | 3·5 (1·5–8·1) |
| Formula only vs breast milk only | 3·06 (p<0·01) | 3·5 (1·5–8·1) | 3·74 (p<0·001) | 10·6 (3·0–37·3) |
| Gestation* | 3·06 (p<0·01) | 1·2 (1·1–1·4) | 2·43 (p<0·05) | 1·2 (1·0–1·5) |
| Days of umbilical artery catheterisation† | 2·97 (p<0·01) | 1·2 (1·1–1·3) | 3·04 (p<0·01) | 1·2 (1·1–1·4) |
| Day of first feed‡ | 2·60 (p<0·01) | 1·2 (1·0–1·4) | 2·23 (p<0·05) | 1·2 (1·0–1·4) |
| Haemoglobin 200 g/l | 2·39 (p<0·05) | 2·4 (1·2–5·1) | | |
| Respiratory distress§ | 2·31 (p<0·05) | 2·6 (1·1–6·2) | | |

*Odds ratio is for each week shorter.
†Odds ratio is for each day in first 10
‡Odds ratio is for each day earlier.
§Requiring >24 h ventilation

Logistic regression was used to adjust for any differences between groups in factors that have been associated previously with necrotising enterocolitis. The large differences between diet groups were seen even after adjustment for length of gestation, birthweight, sex, birth asphyxia, previous blood transfusions, use of theophylline and frusemide, polycythaemia, respiratory disease, duration of umbilical artery catheterisation, age at first enteral feed, rate of incrementation of early feed volumes, and maternal steroid treatment. One centre in study B had a slightly higher incidence of necrotising enterocolitis than the others. However, adjustment for any centre effects did not reduce the significance of the dietary findings.

In logistic regression models for all cases of necrotising enterocolitis and for confirmed cases (table IV), the independent variables were those of the factors above that were significantly related to the occurrence of necrotising enterocolitis. Length of gestation, duration of umbilical artery catheterisation, and age at first enteral feed were signficant factors in both models, but in both the type of diet was the factor most strongly related to necrotising enterocolitis. For all cases of necrotising enterocolitis, a high haemoglobin concentration and respiratory distress were also significant factors.

#### TABLE V—RELATION BETWEEN FREQUENCY OF NECROTISING ENTEROCOLITIS AND GESTATION IN BABIES RECEIVING HUMAN MILK AND IN THOSE FED SOLELY ON FORMULA

| — | All cases | | Confirmed cases | |
|---|---|---|---|---|
| | Formula only | Human milk* | Formula only | Human milk* |
| Gestation | | | | |
| 25–27 wk | 7/35 (20%) | 13/83 (16%) | 5/35 (14%) | 7/83 (8%) |
| 28–30 wk | 7/83 (8%) | 11/231 (5%) | 5/83 (6%) | 6/231 (3%) |
| 31–33 wk | 6/75 (8%) | 3/263 (1%) | 3/75 (4%) | 1/263 (0·4%) |
| 34–36 wk | 4/43 (9%) | 0/113 | 4/43 (9%) | 0/113 |

*Breast milk alone or in combination with formula

The effect of length of gestation on the occurrence of necrotising enterocolitis differed significantly (p<0·02) between infants fed formula only and those fed breast milk (either alone or in combination with formula). Thus, infants fed on formula only had little overall decline in the frequency of necrotising enterocolitis over the range of gestations studied (25–36 weeks) and no decline beyond 27 weeks. In contrast there was a sharp fall in the frequency of necrotising enterocolitis with length of gestation in infants receiving breast milk (table V); for example, by logistic regression the odds ratio for necrotising enterocolitis at 26 weeks compared with 32 weeks was 11·3 (p<0·001). In the group of babies born at more than 30 weeks' gestation, there were only 3 (0·8%) cases among the 376 fed on human milk (1 confirmed) compared with 10 (8·5%) among the 118 fed on formula only (7 confirmed); the odds ratio was 11·5 (3·1–43; p<0·0001) for all cases and 23·6 (2·9–194; p<0·0001) for confirmed cases.

There was also interaction between diet and the day of first feeding (p=0·05). In formula-fed babies delay in onset of the first feed was associated with a significantly lower incidence of necrotising enterocolitis, whereas in infants fed breast milk (alone or with formula) there was no such relation.

### Discussion

During the past 15 years breast milk has been promoted for the feeding of preterm infants on the grounds that it may protect against necrotising enterocolitis. The few data to support this assertion are not, however, widely accepted.[4,14,23] Indeed, a failure to establish clear benefits for breast milk in neonatal intensive care may be one of the reasons for a loss of enthusiasm for its use. In this large, prospective, multicentre study, the choice of early diet was the major factor associated with necrotising enterocolitis. Confirmed necrotising enterocolitis was 6 times as common in babies fed formula only than in those fed breast milk only; it was 10 times as common after adjustment for a wide range of factors associated previously with the disease. Furthermore, the risk of necrotising enterocolitis was 3·5 times higher in exclusively formula-fed infants than in those fed breast milk and formula combined, which suggests that breast milk can have an important protective role even when used as a supplement to formula feeding.

26% of our infants with confirmed necrotising enterocolitis died. Prognosis may be improving,[27] though an optimistic estimate for mortality in necrotising enterocolitis is 15–25%. If the frequency of cases in infants fed human milk either alone or in conjunction with formula is taken as a baseline, the excess frequency in babies who received no breast milk was 5–6 per 100 under 1850 g birthweight. Over the past 8 years the proportion of mothers in Cambridge providing any breast milk for their low birthweight infants has fallen from 75% to 55% (unpublished). Our enquiries suggest that in major parts of the UK the proportion providing any breast milk is likely to be lower. Furthermore, most British human milk banks have been closed. Probably about 50% of babies in neonatal intensive care receive no breast milk at all. If our data can be taken as representative and reflect causality, necrotising enterocolitis could occur in about 500 infants each year in the UK solely on account of exclusive formula feeding—more than 150 of them would require major abdominal surgery and about 100 would die.

The type of human milk given did not seem to affect the incidence of necrotising enterocolitis, despite theoretical predictions, from animal models, that only raw milk is

Case ID: 220302588
Control No.: 23063373

protective. We suggest, in the light of the finding that oral immunoglobulin in formula-fed babies was prophylactic,[10] that breast milk may protect against necrotising enterocolitis by providing IgA in the gut lumen. Most IgA remains intact after milk pasteurisation.[28] Thus when mother's milk is unavailable, the use of pasteurised breast milk could have a valuable place in the initial establishment of enteral feeding in preterm infants.

An important factor in the widespread closure of milk banks has been concern over the possibility of transmission by way of breast milk of human immunodeficiency virus (HIV), though some investigators have suggested that routine pasteurisation of breast milk would destroy HIV,[31] and HIV transmission has never been reported in a preterm infant fed pasteurised donor milk. This theoretical risk should be set against our finding of greater morbidity in premature babies who receive no human milk.

It is likely that a relation between diet and necrotising enterocolitis could have been missed in many previous studies that have had inadequate sample size and power, or inadequate control and monitoring of dietary intake. Our multicentre study was prospective, dietary assignment was strictly applied, and dietary management was carefully recorded and regulated; necrotising enterocolitis was a predetermined outcome response and extensive data were collected concomitantly that allowed adjustment for potential confounding factors. The diagnostic criteria we used for necrotising enterocolitis were those proposed after a large British multicentre study[26] rather than the similar criteria suggested by Bell[25] and most used in North America. Our cases all strictly met the criteria for grade 1 or 2 disease, and all the affected infants were treated with intravenous antibiotics and complete cessation of enteral feeding. Those confirmed by the most stringent criteria were presented separately, since they would be generally accepted as unequivocal cases.

As expected, length of gestation was a significant factor for necrotising enterocolitis. Nevertheless, over the whole range of gestation studied (25–36 weeks) the overall fall in confirmed necrotising enterocolitis risk was slightly smaller than the difference between groups fed exclusively on formula and on human milk. Although hypoxia and ischaemia have not been shown by some investigators to be risk factors for necrotising enterocolitis,[1,2,7] we found, as others have,[4-6] that respiratory distress, duration of use of an umbilical artery catheter (which might impede mesenteric flow, since most units used "high" catheter positioning), and polycythaemia (which could cause hyperviscosity and impair gut blood flow) were independently related to a higher incidence of the disease. These factors were not as strongly linked as diet.

In babies fed breast milk (alone or with formula) there was a sharp decline in incidence of necrotising enterocolitis with length of gestation; beyond 30 weeks' there was only 1 confirmed case among 376 babies. In contrast, there was no decline in necrotising enterocolitis incidence among formula-fed infants from 28 to 36 weeks' gestation; indeed beyond 30 weeks' gestation the overall incidence of confirmed disease was 20 times that in infants who received some breast milk. We suggest that early introduction of breast milk into the diets of preterm infants could make necrotising enterocolitis beyond 30 weeks' gestation a rarity.

In infants fed breast milk timing of the first feed was not related to frequency of necrotising enterocolitis, but in formula-fed infants, delay in starting feeds was associated

with a significant reduction—if enteral feeds were started on, for example day 9 rather than day 2, the risk of necrotising enterocolitis was reduced threefold. These data suggest that units offering only formula might reduce the frequency of necrotising enterocolitis by a more cautious approach to early feeding than would be needed if human milk was available.

In view of this strong link between diet and necrotising enterocolitis, feeding policies in neonatal units may need reappraisal. Active encouragement of mothers to provide at least some breast milk for their preterm infants, especially during the early weeks, seems justified. We recognise that such infants have increased nutritional requirements,[29,30] but these can be met by concomitant use of preterm formulas and by human milk fortification. Furthermore, we consider it valuable for a major neonatal referral unit to support a human milk bank, despite the difficulties of donor screening for HIV.

We thank Dr M. Bamford, Dr P. Crowle, Dr J. Dossetor, Dr R. Pearse, Dr A. Boon, and the staff of neonatal units in Cambridge, Ipswich, King's Lynn, Norwich, and Sheffield for their help and collaboration; Farley Health Products Limited for collaboration, supply of trial diets, and continuing financial assistance; and Dr O. Brooke for advice in preparing the paper.

## REFERENCES

1. Stoll BJ, Kano WP, Glass RI, Nahmias AJ, Brannon AW. Epidemiology of necrotizing enterocolitis: a case-control study. *J Pediatr* 1980; **96**: 447–51.
2. Kliegman RM, Hack M, Jones P, Fanaroff AA. Epidemiological study of necrotizing enterocolitis among low-birthweight infants. *J Pediatr* 1982; **100**: 440–44.
3. Kliegman RM, Fanaroff AA. Neonatal necrotizing enterocolitis: a nine-year experience. I. Epidemiology and uncommon observations. *Am J Dis Child* 1981; **135**: 603–07.
4. Bunton GL, Durbin GM, McIntosh N, et al. Necrotizing enterocolitis: controlled study of 3 years' experience in a neonatal intensive care unit. *Arch Dis Child* 1977; **52**: 772–77.
5. Palmer SR, Thomas SJ, Cooke RWI, et al. Birthweight-specific risk factors for necrotizing enterocolitis. *Commun Health* 1987; **41**: 210–14.
6. Smith MF, Borriello SP, Clayden GS, Casewell MW. Clinical and bacterial findings in necrotising enterocolitis: a controlled study. *J Infect* 1980; **2**: 23–31.
7. Yu VYH, Joseph R, Bajuk B, Orgill A, Astbury J. Perinatal risk factors for necrotising enterocolitis. *Arch Dis Child* 1984; **59**: 430–34.
8. Kleigman RM. Neonatal necrotizing enterocolitis: implications for an infectious disease. *Pediatr Clin North Am* 1979; **26**: 327–44.
9. Book LS, Overall JUC, Herbst JJ, Britt MR, Epstein B, Jung AL. Clustering of necrotizing enterocolitis: interruption by infection-control measures. *N Engl J Med* 1977; **297**: 984–86.
10. Eibl MM, Wolf HM, Furnkranz H, Rosenkranz A. Prevention of necrotizing enterocolitis in low-birth-weight infants by IgA-IgG feeding. *N Engl J Med* 1988; **319**: 1–7.
11. Anderson C, Collin M, OKeefe J. A widespread epidemic of mild necrotizing enterocolitis of unknown cause. *Am J Dis Child* 1984; **138**: 979.
12. Santulli TV, Schullinger JN, Heird WC, et al. Acute necrotizing enterocolitis in infancy: a review of 64 cases. *Pediatrics* 1975; **55**: 376–87.
13. Goldman HI. Feeding and necrotizing enterocolitis. *Am J Dis Child* 1980; **134**: 553–55.
14. Eyal F, Sagi E, Arad I, Avital A. Necrotizing enterocolitis in the very low birthweight infant: expressed breast milk feeding compared with parenteral feeding. *Arch Dis Child* 1982; **57**: 274–76.
15. Book LS, Herbert JJ, Atherton SO, Jung AL. Nectrotizing enterocolitis in low-birth-weight infants fed an elemental formula. *J Pediatr* 1975; **87**: 602–05.
16. Willis DM, Chabot J, Radde IC, Chance GW. Unsuspected hyperosmolality of oral solutions contributing to necrotizing enterocolitis in very-low-birthweight infants. *Pediatrics* 1977; **60**: 535–38.
17. LaGamma EF, Ostertag SG, Birenbaum H. Failure of delayed oral feedings to prevent necrotizing enterocolitis. Results of studying very-low birth-weight neonates. *Am J Dis Child* 1985; **139**: 385–89.
18. De Curtis M, Paone C, Vetrano G, Romano G, Paludetto R, Ciccimarra F. A case control study of necrotizing enterocolitis occurring over 8 years in a neonatal intensive care unit. *Eur J Pediatr* 1987; **146**: 398–400.

Case ID: 220302588
Control No.: 23063373

19. Kligman RM, Pittard WB, Fanaroff AA. Necrotizing enterocolitis in neonates fed human milk. *J Pediatr* 1979; **95:** 450–53.

20. Kosloske AM. Pathogenesis and prevention of necrotizing enterocolitis: a hypothesis based on personal observation. *Pediatrics* 1984; **74:** 1086–92.

21. Barlow B, Santulli TV, Heird WC, Pitt J, Blanc WC, Schullinger JN. An experimental study of acute neonatal enterocolitis—the importance of breast milk. *J Pediatr Surg* 1974; **9:** 587–95.

22. Pitt J, Barlow B, Heird WC. Protection against experimental necrotizing enterocolitis by maternal milk. I. Role of milk leukocytes. *Pediatr Res* 1977; **11:** 906–09.

23. Moriartey RR, Finer NN, Cox SF, et al. Necrotizing enterocolitis and human milk. *J Pediatr* 1979; **94:** 295–96.

24. Lucas A, Gore SM, Cole TJ, et al. Multicentre trial on feeding low birthweight infants: effects of diet on early growth. *Arch Dis Child* 1984; **59:** 722–30.

25. Bell MJ, Ternberg JL, Feigin RD, et al. Neonatal necrotizing enterocolitis: therapeutic decisions based upon clinical staging. *Ann Surg* 1978; **187:** 1–7.

26. British Association for Perinatal Paediatrics and the Public Health Laboratory Service Communicable Disease Surveillance Centre. Surveillance of necrotising enterocolitis, 1981–82. *Br Med J* 1983; **287:** 824–26.

27. Black TL, Carr MG, Korones SB. Necrotizing enterocolitis: improving survival within a single facility. *South Med J* 1989; **82:** 1103–07.

28. Evans TJ, Ryley JC, Neale LM. Effect of storage and heat on antimicrobial proteins in human milk. *Arch Dis Child* 1978; **53:** 239–41.

29. Lucas A, Brooke OG, Baker BA, Bishop N, Morley R. High alkaline phosphatase activity and growth in preterm neonates. *Arch Dis Child* 1989; **64:** 902–09.

30. Lucas A, Morley R, Cole TJ. Early diet in preterm babies and developmental status at 18 months. *Lancet* 1990; **335:** 1477–81.

31. Eglin RP, Wilkinson AR. HIV infection and pasteurisation of breast milk. *Lancet* 1987; i: 1093.

# Direct diagnosis of carriers of Duchenne and Becker muscular dystrophy by amplification of lymphocyte RNA

ROLAND G. ROBERTS     DAVID R. BENTLEY     TERESA F. M. BARBY
ELIZABETH MANNERS     MARTIN BOBROW

**Rapid detection of deletion and duplication mutations that cause Duchenne and Becker muscular dystrophy was achieved in patients and carriers after amplification of small amounts of mRNA from peripheral blood lymphocytes. The entire coding region of the dystrophin mRNA was amplified in 10 sections by reverse transcription and nested polymerase chain reaction, and the products were directly visualised on acrylamide minigels with ethidium staining. Major structural gene mutations were identified by the appearance of a band of different size to that of the wild type. The altered band was readily detected in all patients and heterozygous relatives. This non-radioactive test of venous blood samples can be used for unambiguous and rapid identification of virtually all carriers of deletions or insertions within the dystrophin gene.**

*Lancet* 1990; **336:** 1523–26.

## Introduction

Duchenne and Becker muscular dystrophies (DMD, BMD) are X-linked diseases which together affect about 1 in 3000 live male births. The dystrophin gene is very large and has an unusually high mutation rate; mutations in unrelated families are likely to be of independent origin and a third of all cases arise from new mutations.[1] About two-thirds of all affected infants have no family history of DMD or BMD; for such sporadic cases segregation analysis is usually uninformative and the carrier risk for related women is difficult to estimate.[2,3] Analysis of serum creatinine phosphokinase (CPK) concentrations[4] relies on the heterozygote's phenotypic expression and can give variable results; in conjunction with family data these yield Bayesian probabilities rather than definitive diagnosis.

In 65% of patients with DMD or BMD the disease-causing mutation consists of deletion or duplication of exons within the gene.[5] Such deletions are readily identified in patients by the absence of bands from Southern blots,[6,7] or by failure of amplification of individual reactions in multiplex polymerase chain reactions (PCRs).[8,9] However, diagnosis is complicated in carrier women by the presence of the normal chromosome, which masks the result from the defective chromosome. Carrier diagnosis (and duplication detection in patients) therefore requires dosage analysis by Southern blot[10] or PCR (Abbs S, et al, unpublished observations) in which the intensities of specific bands in different samples are compared. However, band intensity is dependent on various experimental factors, and carries a degree of uncertainty which many laboratories find unacceptable in clinical practice.

In 17% of patients with exon duplication or deletion the breakpoint is sufficiently close to a non-deleted exon that it lies within the restriction fragment detected by a cDNA probe on a Southern blot;[5] such a band of altered mobility can be detected in carrier women. The frequency of detection of such diagnostic junction fragments—which provide unequivocal identification of the mutation in carriers—can be greatly increased by the use of pulsed-field gel electrophoresis.[5,11] Such junction fragments may also be detected in mRNA: most deletion and duplication breakpoints lie within introns, which constitute over 99% of the dystrophin gene, so it is likely that transcription and transcript splicing are unaffected by the mutation. Thus a transcript from a defective gene would probably differ from the normal transcript only in that it bears a duplication or deletion of a number of exons. Amplification across the region of the mRNA which is duplicated or deleted should enable generation of a PCR product of anomalous size which is diagnostic of the presence of the defective gene.

Dystrophin mRNA is mainly expressed in muscle and brain, but Chelly et al[12] have shown that the dystrophin transcript is present in other tissues at about one copy per

ADDRESS: **Paediatric Research Unit, Division of Medical and Molecular Genetics, UMDS, Guy's Hospital, London SE1 9RT, UK** (R G Roberts, BA, D R Bentley, DPhil, T F M Barby, BSc, E Manners, BA, Prof M Bobrow, DSc) Correspondence to Mr R G. Roberts

Case ID: 220302588
Control No.: 23063373

# EXHIBIT "C"

Case ID: 220302588
Control No.: 23063373

www.jpeds.com • The Journal of Pediatrics

# ORIGINAL ARTICLES

# An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products

Sandra Sullivan, MD, Richard J. Schanler, MD, Jae H. Kim, MD, PhD, Aloka L. Patel, MD, Rudolf Trawöger, MD, Ursula Kiechl-Kohlendorfer, MD, Gary M. Chan, MD, Cynthia L. Blanco, MD, Steven Abrams, MD, C. Michael Cotten, MD, MHS, Nirupama Laroia, MD, Richard A. Ehrenkranz, MD, Golde Dudell, MD, Elizabeth A. Cristofalo, MD, MPH, Paula Meier, PhD, Martin L. Lee, PhD, David J. Rechtman, MD, and Alan Lucas, MD

**Objective** To evaluate the health benefits of an exclusively human milk–based diet compared with a diet of both human milk and bovine milk–based products in extremely premature infants.

**Study design** Infants fed their own mothers' milk were randomized to 1 of 3 study groups. Groups HM100 and HM40 received pasteurized donor human milk–based human milk fortifier when the enteral intake was 100 and 40 mL/kg/d, respectively, and both groups received pasteurized donor human milk if no mother's milk was available. Group BOV received bovine milk–based human milk fortifier when the enteral intake was 100 mL/kg/d and preterm formula if no mother's milk was available. Outcomes included duration of parenteral nutrition, morbidity, and growth.

**Results** The 3 groups (total n = 207 infants) had similar baseline demographic variables, duration of parenteral nutrition, rates of late-onset sepsis, and growth. The groups receiving an exclusively human milk diet had significantly lower rates of necrotizing enterocolitis (NEC; $P$ = .02) and NEC requiring surgical intervention ($P$ = .007).

**Conclusions** For extremely premature infants, an exclusively human milk–based diet is associated with significantly lower rates of NEC and surgical NEC when compared with a mother's milk–based diet that also includes bovine milk–based products. *(J Pediatr 2010;156:562-7).*

The health benefits of human milk for all infants, including those born extremely premature, have been increasingly recognized.[1] When compared with a diet of preterm formula, premature infants have improved feeding tolerance and a lower incidence of late-onset sepsis and necrotizing enterocolitis (NEC) when fed their mothers' milk.[2] It is a challenge for mothers of extremely premature infants, however, to provide sufficient milk to meet their infants' needs. In a recent study, only 30% of such mothers were able to supply 100% of their extremely premature infants' needs.[3] Pasteurized donor human milk would be an attractive proxy for mother's own milk, and donor milk banks have made milk available.[4] Indeed, a review of studies conducted in the 1980s, comparing donor human milk and formula, suggested that donor milk was associated with a significantly lower incidence of NEC.[5] Those studies, however, did not include a large proportion of extremely premature infants, and their nutritional protocols did not evaluate human milk fortifiers (HMF) or contemporary preterm formula.

A randomized trial compared fortified pasteurized donor human milk with preterm formula, both used as supplements when mother's own milk was not available.[3] That study did not find a protective effect of donor human milk on the combined incidence of late-onset sepsis and NEC but did note a significant

From the Department of Pediatrics, University of Florida (S.S.), Gainesville, FL; Department of Pediatrics, Schneider Children's Hospital at North Shore (R.S.), Manhasset, NY; Albert Einstein College of Medicine (R.S.), Bronx, NY; Department of Pediatrics, University of Rochester, Golisano Children's Hospital at Strong (N.L.), Rochester, NY; Department of Pediatrics, University of California, San Diego Medical Center (J.K.), San Diego, CA; Children's Hospital and Research Center (G.D.), Oakland, CA; Prolacta Bioscience (M.L., D.R.), Monrovia, CA; Pediatrics, Rush University Medical Center (A.P.), Chicago, IL; Department of Pediatrics, University of Utah Medical Center (G.C., P.M.), Salt Lake City, UT; Department of Pediatrics, University of Texas Health Science Center (C.B.), San Antonio, TX; Department of Pediatrics, Baylor College of Medicine (S.A.), Houston, TX; Department of Pediatrics, Duke University Medical Center (C.C.), Durham, NC; Pediatrics, Yale University School of Medicine (R.E.), New Haven, CT; Department of Pediatrics, Johns Hopkins School of Medicine (E.C.), Baltimore, MD; Department of Pediatrics, Innsbruck Medical University (R.T., U.K.), Innsbruck, Austria; and the MRC Child Nutrition Research Center, Institute of Child Health (A.L.), London, United Kingdom

S.S., R.J.S., J.H.K., A.L.P., R.T., U.K-K., G.M.C., C.L.B., S.A., C.M.C., N.L., R.A.E., G.D., and E.A.C. received financial support from Prolacta Bioscience. The authors were responsible for the conduct of the study and collection of the data. M.L.L. and D.J.R. are employees of Prolacta Bioscience. A.L. is a paid Consultant of Prolacta Bioscience. P.M. received no support or payment. S.A., C.L.B., E.A.C., R.A.E., M.L.L., A.L., P.M., D.J.R., and R.J.S. were responsible for the design of the study. M.L.L. was responsible for the data analyses. R.J.S. wrote the draft of the manuscript. All of the authors were responsible for review and interpretation of the data and review of the manuscript.

Clinicaltrials.gov reg. # NCT00506584

0022-3476/$ - see front matter. Copyright © 2010 Mosby Inc.
All rights reserved. 10.1016/j.jpeds.2009.10.040

| BOV | Bovine milk-based human milk fortifier |
| HMF | Human milk fortifier |
| HM40 | Human milk-based HMF added once feeding volume reached 40 mL/kg/day, and pasteurized donor milk used if no mother's own milk available. |
| HM100 | Human milk-based HMF added once feeding volume reached 100 mL/kg/day and pasteurized donor milk used if no mother's own milk available. |
| NEC | Necrotizing enterocolitis |
| PN | Parenteral nutrition |
| SD | Standard deviation |

Case ID: 220302588
Control No.: 23063373

protective effect of mother's own milk. The protocol in that study differed from previous studies in that the pasteurized donor human milk was fortified with bovine milk–based products, and some of the infants in the donor milk group were given preterm formula because of slower rates of growth. Thus no contemporary trial has investigated the effects of an exclusively human milk diet in extremely premature infants.

The technology now exists to collect, pasteurize, and process large quantities of screened donor human milk, labeled with its basic nutrient contents, and prepared as either a HMF or a donor milk alternative to mother's own milk.[6] This technology has prompted a randomized controlled trial in extremely premature infants to evaluate an exclusive human milk–based diet (that includes a human milk–based HMF and donor human milk if no mother's milk is available) compared with the usual feeding protocol comprising a mother's milk diet (that includes a bovine milk–based HMF and preterm formula if no mother's milk is available). We hypothesized that the health benefits (reduced duration of parenteral nutrition [PN], late-onset sepsis, and NEC) of an exclusively human milk–based diet would exceed those of the usual diet containing bovine milk–based products without detrimental effects on growth.

## Methods

Infants were recruited from 12 neonatal intensive care units, 11 in the United States and 1 in Austria. Eligibility criteria were as follow: birth weight 500 to 1250 g, intention to receive mother's milk, and ability to adhere to a feeding protocol on the basis of the use of mother's own milk, initiation of enteral feeding before 21 days after birth, and initiation of PN within 48 hours of birth. Infants were excluded if there were major congenital malformations or a high likelihood of transfer to a non-study institution during the study period.

Randomization was performed in blocks of 4 on strata defined by birth weight (500 to 750 g, 751 to 1000 g, and 1001 to 1250 g), and whether the infant was appropriate- or small-for-gestational-age (defined as 2 standard deviations below the mean weight for gestational age on the basis of intrauterine growth charts[7]). Separate block randomization schemes were prepared for each of the strata and performed centrally. The investigators were not aware of the block size. The need to ensure proper handling of mother's own milk precluded true blinding of the infants' caregivers.

Sample size calculation was based on the primary outcome of duration of PN, a surrogate of feeding tolerance and neonatal morbidity. The mean duration of PN in extremely premature infants fed their mother's fortified milk was 18 ± 11 days (Meier and Blanco, personal communication). To demonstrate a 40% reduction in PN days in either study group, a sample size of 62 infants per group was needed for a 2-sided alpha error of 2.5% and power of 90%. To account for 2 interim analyses by the independent Data Safety Monitoring Board, and an estimated proportion of protocol non-

adherence of 5%, the final sample was 69 infants per group. The study was approved by the institutional review boards of each center and written informed consent was obtained from the parents or legal guardians of all subjects before enrollment. Registered with Clinicaltrials.gov reg. # NCT00506584.

Infants were enrolled if their mothers intended to provide their own milk. When enteral nutrition was initiated, all study infants received their own mothers' milk but differed, as randomized, by the type of HMF they received and the type of milk they were given if no mother's own milk was available. Groups HM100 and HM40 received pasteurized donor human milk–based HMF (Prolact+ H$^2$MF; Prolacta Bioscience, Monrovia, California) when the enteral intake was 100 mL/kg/d and 40 mL/kg/d, respectively, and both groups received pasteurized and standardized 20 kcal/oz donor human milk (Neo20 Prolacta Bioscience) if no mother's milk was available. Group BOV received the usual feeding protocol of bovine milk–based HMF when the enteral intake was 100 mL/kg/d and preterm formula if no mother's own milk was available.

The duration of study participation was the earliest of the following milestones: 91 days of age, discharge from hospital, or attainment of 50% oral feedings (ie, 4 complete oral feedings per day). PN was initiated within 48 hours after birth. Trophic feedings were initiated 1 to 4 days after birth and were continued at 10 to 20 mL/kg/d as tolerated for up to 5 days. Subsequently, milk intake was increased by 10 to 20 mL/kg/d. Donor human milk–based HMF was added in the HM40 group when milk intake reached 40 mL/kg/d and in the HM100 group at 100 mL/kg/day. Bovine milk-based HMF (Enfamil HMF; Mead Johnson, Evansville, Indiana; or Similac HMF; Abbott Laboratories, Columbus, Ohio) was added in the BOV group when milk intake reached 100 mL/kg/d. After the HMF was added, milk intake was increased daily by 10 to 20 mL/kg to a maximum of 160 mL/kg/d. The nutritional content of the fortified milks used in the study is described in Table I (available at www.jpeds.com).

Daily body weight and weekly recumbent length and head circumference were recorded. Bronchopulmonary dysplasia was defined as the use of supplemental oxygen at 36 weeks postmenstrual age. Late-onset sepsis was defined as clinical signs and symptoms consistent with sepsis occurring more than 5 days after birth in association with the isolation of a causative organism from a blood culture.[3] In cases of coagulase-negative *Staphylococcus*, at least 2 separate positive cultures were required. NEC was defined as Bell Stage II disease or greater, and abdominal radiographs were read by radiologists unaware of study group assignment.[8] At the conclusion of the study, all cases of NEC were reviewed in a blinded fashion by a panel of 8 of the study investigators. Feeding intolerance was defined as gastric residuals greater than 50% of the prior feeding or more than 2 mL/kg, bile- or blood-stained gastric residuals, emesis, abdominal distention or tenderness, changes in stool pattern or consistency, presence of blood in the stool. Feeding intolerance was quantitated by

Case ID: 220302588
Control No.: 23063373

the number of days that feedings were withheld for ≥12 hours.

## Statistical Analyses

The 3 study groups were compared by use of an intent-to-treat paradigm, any randomized infant remained in their group for the final analyses. Kaplan-Meier[9] estimates for the distribution of PN days were compared among study groups with the log-rank test. The Wilcoxon rank-sum test was used for 2-way comparisons. Three-way comparisons used either the 1-way analysis of variance for normally distributed data or the Kruskal-Wallis test for nonnormal data. Categorical data were compared by use of the $\chi^2$ test with the $P$ value determined by an exact procedure (StatXact 7; Cytel Software Corporation, Cambridge, Massachusetts).

## Results

During the 14 months of the study, 334 infants were screened, and 207 were enrolled (**Figure 1**). The baseline characteristics of infants among the 3 study groups were similar (**Table II**). The ages of attainment of first enteral feeding (15, 11, and 16 days) and full (140 mL/kg/d) enteral feeding (21, 23, and 22 days) were similar among HM100, HM40, and BOV groups, respectively. There were no significant differences among study groups for the duration of PN, length of hospital stay, late-onset sepsis, or growth (**Table III**). The number of infants below the third percentile[7] at birth and at discharge was similar among groups.



**Figure 1.** Distribution of study subjects.

Because there were no differences between HM100 and HM40, the exclusive HM group (HM100 + HM40) was compared with the BOV group. This analysis revealed similarities in baseline data and most outcomes, with the exception that there were fewer black infants in the BOV group compared with the combined HM100 + HM40 groups, 14% versus 27%, $P = .046$, and that the rate of weight gain was greater in the BOV group compared with the HM100 + HM40 groups, $16.0 \pm 7.8$ vs $14.3 \pm 3.8$ g/kg/d, $P = .051$.

Significant differences, however, were observed among study groups for the incidence of NEC (**Figure 2**). When compared with the BOV group, there were fewer cases of NEC in the HM100 and HM40 groups and the combined exclusive human milk–based diet groups (HM100 + HM40). A significant difference among groups was observed for the combined outcome of NEC or death in HM100 (6%), HM40 (8.5%), and BOV (20%), respectively, $P = .02$. The onset of NEC was similar among groups, $35 \pm 18$, $41 \pm 18$, $28 \pm 12$ postnatal days and $31 \pm 1$, $32 \pm 3$, and $31 \pm 2$ weeks postmenstrual age, in Groups HM100, HM40, and BOV, respectively. The number of cases of NEC requiring surgical intervention was significantly lower in the HM100 and HM40 groups compared with BOV group (**Figure 2**). All cases of surgical NEC occurred in infants who received bovine milk-based milk products (either HMF or preterm formula) at some time before the onset of NEC (**Table IV**; available at www.jpeds.com). Seven of these infants were randomized to the BOV group, but 2 of these infants were in the HM100/HM40 groups who had received bovine milk-based HMF or formula in violation of the protocol.

The 19 cases of NEC were distributed as 1 to 4 cases per site among 9 of the study sites. When rates of NEC were tabulated for only infants who completed the study without any protocol violations, the same distribution of cases was observed: 1.7%, 3.2%, and 15.3%, in HM100, HM40, and BOV groups, respectively; $P = .006$. A multivariate logistic regression that controlled for confounding variables known to affect the incidence of NEC (5-minute APGAR score, quantity of mother's own milk received, gestational age, receipt of prenatal and postnatal steroids, black race, bronchopulmonary dysplasia[10,11]) found an odds ratio for NEC with an exclusive human milk diet of 0.23 (95% confidence interval = 0.08, 0.66), $P = .007$, or a 77% reduction in the odds of developing NEC while receiving an exclusive human milk diet. None of the other variables reached statistical significance.

Infants in all 3 groups received a large volume and proportion of their enteral intake as their own mother's milk (**Table III**). The BOV group received significantly more own mother's milk because the fortifier was a powdered preparation whereas a liquid fortification regimen was used in the exclusive human milk groups.

## Discussion

We conducted a randomized controlled multicenter trial to evaluate the potential health benefits of an exclusively human milk diet in extremely premature infants, 500 to

Case ID: 220302588
Control No.: 23063373

Case: 1:24-cv-11760 Document #: 1-4 Filed: 10/31/24 Page 117 of 471 PageID #:786

**Table II. Characteristics of study infants**

| Parameter | HM100 (n = 67) | HM40 (n = 71) | BOV (n = 69) | P value |
|---|---|---|---|---|
| Birth weight, g | 945 ± 202* | 909 ± 193 | 922 ± 197 | .56 |
| Gestational age, wk | 27.2 ± 2.2 | 27.1 ± 2.3 | 27.3 ± 2.0 | .93 |
| Male/Female, n (%) | 32/35 (48/52) | 25/46 (35/65) | 36/33 (52/48) | .11 |
| Small-for-gestational age, n (%) | 6 (9) | 6 (8) | 8 (12) | .80 |
| APGAR Score < 6, n (%) | 9 (13) | 4 (6) | 8 (12) | .28 |
| Black race n (%) | 20 (30) | 17 (24) | 10 (14) | .10 |
| Antenatal steroids, n (%) | 56 (83) | 51 (72) | 53 (77) | .26 |
| Mechanical ventilation at study entry, n (%) | 49 (73) | 56 (79) | 53 (77) | .73 |

*Mean ± SD.

1250 g birth weight. This study was unique for its use of human milk–based human milk fortification. We were unable to demonstrate significant differences among the groups for the primary health outcome, PN days, a surrogate measure for feeding tolerance and early morbidity. Furthermore, we did not find significant differences in several other clinical outcomes. We speculate that the lack of differences is a direct result of the overall high intake of mother's own milk, which comprised more than 70% of enteral nutrition across all study groups. The high human milk intake reflects contemporary trends of improved lactation support and caregiver awareness and is consistent with the impact of human milk studies on this measure.[2,12,13]

Surprisingly, the rates of NEC and NEC requiring surgery were markedly lower in the groups fed human milk exclusively (HM100 and HM40) compared with the BOV group. We found a reduction in NEC of 50% and surgical NEC of almost 90% in infants fed an exclusive human milk diet compared with a diet containing bovine milk–based products. We estimate that the number of infants needed to treat with an exclusively human milk–based diet to prevent 1 case of NEC is 10. The number needed to treat to prevent 1 case of surgical NEC or death is 8. No other intervention has been shown to have such a marked effect on the incidence of NEC.[14] The mean incidence of NEC in the Vermont-Oxford Database (2007), approximately 7% to 10%, is in the range observed in this study. A 50% reduction in NEC would

prevent between 1300 to 1850 cases annually, with each case leading to a high risk of death and long-term morbidity, and a hospitalization cost estimated at $138 000 to $238 000 per case.[4,15]

The lower incidence and severity of NEC in infants fed an exclusively human milk diet seen in our study are consistent with earlier reports. In 1990, Lucas and Cole[16] reported a reduction in the incidence of NEC among infants who received only human milk when compared with infants who received all bovine milk–based formula. Those infants who received a mixture of formula and human milk had an intermediate level of protection. Lucas[17] also reported a lower incidence of surgical NEC in infants fed unfortified compared with bovine milk-based fortified human milk. Lastly, 3 published meta-analyses concluded that donor human milk feeding was associated with less NEC.[5,18,19]

Our data contrast those reported in 2005,[3] which failed to find a protective effect of donor human milk on the combined incidence of sepsis and NEC, but reported that mother's own milk with bovine milk–based HMF was protective. That study, which also was analyzed on the intent-to-treat principle, included infants randomized to receive donor milk who were given formula because of poor growth, and all infants received a bovine milk–based fortifier. In 1984 Narayanan[20] reported a greater number of infections in premature infants fed pasteurized donor milk when they were also exposed to bovine milk-based formula. She concluded that pasteurized

**Table III. Study outcomes**

| Outcome | HM100 (n = 67) | HM40 (n = 71) | BOV (n = 69) | P value |
|---|---|---|---|---|
| Parenteral nutrition, days | 20* (14, 35) | 20 (12, 33) | 22 (14, 34) | .71 |
| Length of stay, days | 74 (61, 107) | 79 (64, 110) | 78 (67, 99) | .90 |
| Mother's own milk, mL per study | 4048 (841, 7479) | 4544 (627, 8012) | 5676 (1064, 8309) | .71 |
| Mother's own milk, % enteral intake | 73 (16, 82) | 70 (18, 80) | 82 (38, 100) | .002 |
| Late-onset sepsis (LOS), n (%) | 19 (28) | 15 (21) | 13 (19) | .39 |
| LOS and/or NEC, n (%) | 22 (33) | 20 (28) | 21 (30) | .84 |
| Retinopathy of prematurity, n (%) | 31 (46) | 25 (35) | 27 (39) | .41 |
| Ventilator, days | 25 (6, 54) | 25 (12, 50) | 34 (10, 58) | .54 |
| Oxygen therapy, days | 41 (24, 63) | 48 (12, 74) | 45 (19, 74) | .92 |
| Central line, days | 21 (15, 36) | 22 (14, 30) | 22 (16, 30) | .82 |
| Bronchopulmonary dysplasia, n (%) | 22 (33) | 26 (37) | 27 (39) | .74 |
| Weight gain, (g/kg/day) | 14.2 (11.9, 15.8) | 14.2 (12.3, 16.3) | 15.1 (12.8, 17.0) | .13 |
| Length increment, (cm/wk) | 0.86 (0.72, 1.08) | 0.88 (0.70, 1.03) | 0.94 (0.72, 1.16) | .35 |
| Head circumference increment, cm/wk | 0.76 (0.62, 0.85) | 0.75 (0.61, 0.88) | 0.75 (0.62, 0.86) | .99 |

*Median (25th, 75th percentile).

An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products

Case ID: 220302588
Control No.: 23063373

Case: 1:24-cv-11760 Document #: 1-4 Filed: 10/31/24 Page 118 of 471 PageID #:797



**Figure 2.** NEC and NEC surgery in study infants. There were significant differences in NEC among the 3 groups ($P = .05$), *$P = .04$ vs BOV, **$P = .09$ vs BOV, ***$P = .02$ vs BOV. There were significant differences in NEC requiring surgical intervention among the 3 groups ($P = .02$), †$P = .03$ vs BOV, ††$P = .007$ vs BOV. [ ] refers to number of infants.

donor milk was effective only if it was fed as the total source of enteral nutrition.[21] These data suggest that exclusive human milk diets may exert protective, rather than threshold, effects with respect to NEC. The feeding of a species-specific diet may be important for this protection. However, we cannot exclude the possibility that the protective effect primarily was due to the avoidance of non human milk–based protein. Indeed, an animal model for NEC requires intraluminal bovine casein to produce the enterocolitis.[22]

This study also introduced an earlier fortification strategy with human milk–based human milk fortifier (HM40) to assess, secondarily, if such early fortification could be tolerated without introducing added morbidity. The 71 infants receiving the early fortification strategy appeared to tolerate the feeding well and did not differ significantly in feeding tolerance or other outcomes from the HM100 group. These are encouraging data that suggest the possibility of earlier introduction of human milk–based fortification compared with the usual practice of adding HMF at an enteral intake of 100 mL/kg/d.

The strengths of this study include a randomization and stratification scheme that achieved a balance of patient characteristics across the study groups and good adherence to the protocol as evidenced by a very small number of protocol violations. The control group correctly mimicked how extremely premature infants are fed, by use of combinations of mother's own milk and bovine-based products (HMF and formula). Limitations include the lack of complete blinding, which was not possible because of the obvious physical differences in human milk and formula and the limited power to look at subgroups, including those defined by sex and birth weight.

We conclude that for extremely premature infants, an exclusively human milk–based diet is associated with a significant reduction in the rates of NEC and surgical NEC

compared with dietary exposure to bovine milk–based products. The similarities in other outcomes and the lower rate of NEC among study groups add support to the use of an exclusively human milk–based diet. The newer technology that enables an exclusively human milk diet with human milk–based fortification is now available to assist the ongoing efforts of neonatologists in their advocacy of human milk to reduce neonatal morbidity rates. ∎

Submitted for publication Apr 8, 2009; last revision received Sep 16, 2009; accepted Oct 29, 2009.

Reprint requests: Richard J. Schanler, MD, Division of Neonatal-Perinatal Medicine, North Shore University Hospital, 300 Community Dr, Manhasset, New York 11030. E-mail: schanler@nshs.edu.

## References

1. American Academy of Pediatrics. Section on Breastfeeding. Breastfeeding and the use of human milk. Pediatrics 2005;115:496-506.
2. Schanler RJ, Shulman RJ, Lau C. Feeding strategies for premature infants: Beneficial outcomes of feeding fortified human milk vs preterm formula. Pediatrics 1999;103:1150-7.
3. Schanler RJ, Lau C, Hurst NM, Smith EO. Randomized trial of donor human milk versus preterm formula as substitutes for mothers' own milk in the feeding of extremely premature infants. Pediatrics 2005; 116:400-6.
4. Arnold LDW. The cost-effectiveness of using banked donor milk in the neonatal intensive care unit: Prevention of necrotizing enterocolitis. J Hum Lact 2002;18:172-7.
5. Boyd CA, Quigley MA, Brocklehurst P. Donor breast milk versus infant formula for preterm infants: a systematic review and meta-analysis. Arch Dis Child Fetal Neonatal Ed 2007;92:F169-75.
6. Wojcik KY, Rechtman DJ, Lee ML, Montoya A, Medo ET. Macronutrient analysis of a nationwide sample of donor breast milk. J Am Diet Assoc 2009;109:137-40.
7. Alexander GR, Himes JH, Kaufman RB. A United States national reference for fetal growth. Obstet Gynecol 1996;87:163-8.
8. Walsh MC, Kliegman RM. Necrotizing enterocolitis: treatment based on staging criteria. Pediatr Clin North Am 1986;33:179-201.
9. Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. J Am Stat Assoc 1958;53:457-81.
10. Guthrie SO, Gordon PV, Thomas V, Throp JA, Peabody J, Clark RH. Necrotizing enterocolitis among neonates in the United States. J Perinatology 2003;23:278-85.
11. Uauy RD, Fanaroff AA, Korones SB, Phillips EA, Phillips JB, Wright LL. Necrotizing enterocolitis in very low birth weight infants: Biodemographic and clinical correlates. J Pediatr 1991;119:630-8.
12. Furman L, Taylor G, Minich N, Hack M. The effect of maternal milk on neonatal morbidity of very low-birth-weight infants. Arch Pediatr Adolesc Med 2003;157:66-71.
13. Meinzen-Derr J, Poindexter B, Wrage L, Morrow AL, Stoll B, Donovan EF. Role of human milk in extremely low birth weight infants' risk of necrotizing enterocolitis or death. J Perinatol 2009;29:57-62.
14. Bell EF. Preventing necrotizing enterocolitis: what works and how safe? Pediatrics 2005;115:173-4.
15. Bisquera JA, Cooper TR, Berseth CL. Impact of necrotizing enterocolitis on length of stay and hospital charges in very low birth weight infants. Pediatrics 2002;109:423-8.
16. Lucas A, Cole TJ. Breast milk and neonatal necrotizing enterocolitis. Lancet 1990;336:1519-23.
17. Lucas A, Fewtrell MS, Morley R, Lucas PJ, Baker BA, Lister G, et al. Randomized outcome trial of human milk fortification and developmental outcome in preterm infants. Am J Clin Nutr 1996;64:142-51.
18. McGuire W, Anthony MY. Donor human milk versus formula for preventing necrotising enterocolitis in preterm infants: systematic review. Arch Dis Child Fetal Neonatal Ed 2003;88:F11-4.

Case ID: 220302588
Control No.: 23063373

Case: 1:24-cv-11760 Document #: 1-4 Filed: 10/31/24 Page 119 of 471 PageID #:788

19. Quigley MA, Henderson G, Anthony MY, McGuire W. Formula milk versus donor breast milk for feeding preterm or low birth weight infants (review). Cochrane Database of Systematic Reviews 2007;1-41.

20. Narayanan I, Prakash K, Murthy NS, Gujral VV. Randomised controlled trial of effect of raw and holder pasteurised human milk and of formula supplements on incidence of neonatal infection. Lancet 1984;ii:1111-3.

21. Narayanan I, Gupta J. Human milk and neonatal infections. Acta Paediatr Scand Suppl 1989;351:126-30.

22. Koivusalo A, Kauppinen H, Anttila A, Rautelin H, Jusufovic J, Lindahl H, et al. Intraluminal casein model of necrotizing enterocolitis for assessment of mucosal destruction, bacterial translocation, and the effects of allopurinol and N-acetycysteine. Pediatr Surg Int 2002;18:712-7.

An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products

Case ID: 220302588
Control No.: 23063373

Case: 1:24-cv-11760 Document #: 1-4 Filed: 10/31/24 Page 120 of 471 PageID #:799

**Table I.** Computed energy and macronutrient contents of milks (per dL)

| Component | Mother's own milk* | Mother's own milk fortified with Prolacta fortifier[†] | Mother's own milk fortified with Similac HMF* | Mother's own milk fortified with Enfamil HMF[‡] |
|---|---|---|---|---|
| Energy (kcal) | 67 | 83 | 79 | 81 |
| Protein (g) | 1.4 | 2.3 | 2.3 | 2.5 |
| Carbohydrate (g) | 6.6 | 7.3 | 8.2 | 7 |
| Fat (g) | 3.9 | 4.9 | 4.1 | 4.9 |
| Calcium (mg) | 25 | 110 | 138 | 115 |
| Phosphorus (mg) | 13 | 59 | 78 | 63 |
| Osmolality[§] (mOsm/kg H$_2$0) | 290 | < 360 | est 385 | 325 |

*Abbott Nutrition, Columbus, Ohio. Product Description. 2009.
†Prolacta Bioscience, Monrovia, California. Product Description. 2009.
‡Mead Johnson Nutritionals, Evansville, Indiana. Product Description. 2009.
§NEOFAX 2009. Thomson Reuters, Montvale, New Jersey, pages 321-4.

**Table IV.** Characteristics of the NEC cases

| Study group | Birth weight (g) | Gestational age (wk) | First day enteral feeding (day) | First day bovine milk-based HMF or formula (day) | First day human milk-based fortifier (day) | NEC onset (day) | Comment |
|---|---|---|---|---|---|---|---|
| HM100 | 720 | 25 | 5 | | 32 | 35 | |
| HM100 | 560 | 25 | 4 | 47* | 20 | 53 | NEC surgery |
| HM100 | 1105 | 28 | 3 | | 9 | 18 | |
| HM40 | 530 | 22 | 3 | | 26 | 58 | |
| HM40 | 740 | 25 | 9 | | 17 | 38 | |
| HM40 | 990 | 27 | 1 | 1* | 7 | 22 | NEC surgery[†] |
| HM40 | 785 | 28 | 1 | 77 | 3 | 60 | |
| HM40 | 970 | 29 | 2 | 2* | 5 | 25 | |
| BOV | 670 | 25 | 18 | 24 | | 46 | NEC surgery |
| BOV | 690 | 25 | 1 | 1 | | 17 | NEC surgery |
| BOV | 1170 | 26 | 1 | 11 | | 25 | NEC surgery |
| BOV | 870 | 26 | 10 | 45 | 12[‡] | 51 | NEC surgery[†] |
| BOV | 1136 | 27 | 1 | 13 | | 18 | NEC surgery |
| BOV | 775 | 27 | 3 | 11 | | 16 | NEC surgery[†] |
| BOV | 1120 | 28 | 5 | 16 | | 38 | |
| BOV | 840 | 28 | 8 | 10 | | 29 | |
| BOV | 1230 | 29 | 2 | 2 | | 23 | |
| BOV | 1100 | 29 | 3 | 30 | | 14 | |
| BOV | 817 | 29 | 2 | 12 | | 26 | NEC surgery |

*Erroneously received formula or bovine milk-based HMF in violation of protocol.
†Died.
‡Erroneously received human milk-based HMF in violation of protocol.

Case ID: 220302588
Control No.: 23063373

# EXHIBIT A-42

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.                    Attorney for Plaintiffs



*Filed and Attested by the Office of Judicial Records 03 JUL 2023 02:40 pm F. HEWITT*

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, et al., <br>       Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   MARCH TERM, 2022 <br> :   No. 220302583 <br> : <br> : |
| HOLLI CARTER, et al., <br>       Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   MARCH TERM, 2022 <br> :   No. 220302588 <br> : <br> : |
| SHONDERA DRAYTON, et al., <br>       Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   MARCH TERM, 2022 <br> :   No. 220302594 <br> : <br> : |
| BRANDY GOODMOND, et al., <br>       Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   APRIL TERM, 2022 <br> :   No. 220400208 <br> : <br> : |

Case ID: 220302588
Control No.: 23062521

| | |
|---|---|
| BRANDY GOODMOND, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400212<br>:<br>: |
| TONYA GRAY, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400216<br>:<br>: |
| JANEE HENDERSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400127<br>:<br>: |
| DELQUAN HINES, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400136<br>:<br>: |
| SHEMIKA JOHNSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400162<br>:<br>: |
| KRISTEN KAJUFFA, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302978<br>:<br>: |
| NAFEESAH MAYS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302963<br>:<br>: |
| CATHERINE McMILLIAN, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400140<br>:<br>: |
| DAMEKA MOMENT, et al.,<br>Plaintiff, | :<br>: APRIL TERM, 2022 |

2

Case ID: 220302588<br>Control No.: 23062521

|  |  |
|---|---|
| v. | : No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| ERICA PADILLA, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302969 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| NYDIA PARKER, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| ALEXANDRIA ROSS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| LOREN SANDERS, et al., | : |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| SAMAYA SHORT, et al., | : |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| ALICE STILLS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| CHRISTINA TAYLOR, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| NATISHA THOMAS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |

3

Case ID: 220302588
Control No.: 23062521

| | |
|---|---|
| Defendants. : | |
| TRINA WALKER-SAVAGE and CLIFTON : <br> ISAIAH SAVAGE, JR., et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220400156 |
| JEANNATE WATSON, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302967 |
| ROBERT WHITFIELD, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | APRIL TERM, 2022 <br> No. 220400145 |
| GINA WIEGER, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302614 |
| GINA WIEGER, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302601 |
| SHANITA WIGGINS, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302986 |
| MELVENIA WILLIAMS, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | APRIL TERM, 2022 <br> No. 220400141 |
| IVYANN WITHERSPOON, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | APRIL TERM, 2022 <br> No. 220400138 |

Case ID: 220302588 <br> Control No.: 23062521

## **STIPULATION**

TO THE Prothonotary:

The parties stipulate that plaintiffs have until August 7, 2023 to reply to defendants' Preliminary Objections in the above-captioned matters, with defendants' reply briefs to be filed by August 17th.

July 3, 2023

Respectfully submitted,

| TROUTMAN PEPPER HAMILTON SANDERS LLP | KLINE & SPECTER, P.C. |
|---|---|
| */s/ Ronnie E. Fuchs* | */s/ Timothy A. Burke* |
| Sean P. Fahey, Esquire | Thomas R. Kline, Esquire |
| 3000 Two Logan Square | Tobias Millrood, Esquire |
| Philadelphia, PA 19103 | Elizabeth Crawford, Esquire |
| Tel: (215) 981-4296 | Melissa Merk, Esquire |
| | Timothy A. Burke, Esquire |
| Ronni E. Fuchs | 1525 Locust Street |
| 301 Carnegie Center, Suite 400 | Philadelphia, PA 19102 |
| Princeton, NJ 08540 | 1525 Locust Street |
| Tel: (609) 951-4183 | Philadelphia, PA 19102 |
| | Tel: (215) 772-1000 |
| Kimberly A. Brown | |
| JONES DAY | *Attorneys for Plaintiff* |
| 500 Grant Street, Suite 4500 | |
| Pittsburgh, PA 15219 | |
| Tel: (412) 394-7995 | |
| | |
| *Attorneys for Defendant Abbott Laboratories* | |
| BURNS WHITE LLC | TUCKER LAW GROUP, LLC |
| */s/ Richard S. Margulies* | */s/ Kenneth A. Murphy* |
| James A. Young, Esquire | Kenneth A. Murphy, Esquire |
| Richard S. Margulies, Esquire | Heather R. Olson, Esquire |
| Susan R. Engle, Esquire | Ten Penn Center |
| Attorney ID Nos. 00213/62306/81671 | 1801 Market Street, Suite 2500 |
| 1880 John F. Kennedy Boulevard, 10th FL | Philadelphia, PA 19103 |

5

Case ID: 220302588
Control No.: 23062521

| | |
|---|---|
| Philadelphia, PA 19103<br>Tel: (215) 587-1625<br><br>*Attorneys for Defendant University of Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and University of Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Penn Medicine* | WELSH & RECKER, P.C.<br>Catherine M. Recker<br>Amy B. Carver<br>Richard D. Walk, III<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br><br>*Attorneys for Defendant Mead Johnson & Company LLC and* Mead Johnson Nutrition Company |
| BURNS WHITE LLC<br><br>*/s/ Richard S. Margulies*<br>James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625<br><br>*Attorneys for Defendant, Temple University Health System, Inc., d/b/a Temple University Hospital* | |

6

Case ID: 220302588<br>Control No.: 23062521

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2023, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


Dated: July 3, 2023                    /s/ Timothy A. Burke
                                       Timothy A. Burke

7

# EXHIBIT A-43

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 23072509 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
| --- | --- |
| | 08/07/2023 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March Term, 2022
*Month* *Year*
No. 02588

Name of Filing Party:
HOLLI CARTER-PLF
J C-PMNR

CARTER ETAL VS MEAD JOHNSON & COMPANY, LLC, ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*  ☒ Motion
☐ Answer to Petition  ☐ Response to Motion

Has another petition/motion been decided in this case? ☐ Yes ☒ No
Is another petition/motion pending? ☐ Yes ☒ No
*If the answer to either question is yes, you must identify the judge(s):*

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

| I. CASE PROGRAM | II. PARTIES *(required for proof of service)* |
| --- | --- |
| DAY FORWARD/MAJOR JURY PROGRAM | (Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.) |
| Name of Judicial Team Leader: <u>JUDGE LINDA CARPENTER</u> | JAMES A YOUNG<br>  BURNS WHITE LLC 1880 JOHN F. KENNEDY BOULEVARD 10TH FLOOR , PHILADELPHIA PA 19103 |
| Applicable Petition/Motion Deadline: <u>N/A</u> | RICHARD S MARGULIES<br>  BURNS WHITE LLC 1880 JFK BLVD., 10TH FLR , PHILADELPHIA PA 19103 |
| Has deadline been previously extended by the Court: <u>N/A</u> | RONNI E FUCHS<br>  301 CARNEGIE CENTER SUITE 400 , PRINCETON NJ 08540 |
| | KENNETH A MURPHY<br>  TUCKER LAW GROUP, LLC 1801 MARKET STREET SUITE 2500 , PHILADELPHIA PA 19103-6996 |
| | MARQUES HILLMAN RICHESON<br>  JONES DAY 901 LAKESIDE AVENUE NORTH POINT , CLEVELAND OH 44114 |

### III. OTHER

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

| July 14, 2023 | TOBIAS L. MILLROOD |
| --- | --- |
| *(Attorney Signature/Unrepresented Party)* | *(Date)* | *(Print Name)* | *(Attorney I.D. No.)* |

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2307027690
17-JUL-23 09:34:18

MEAGHANN C PORTH
  CAMPBELL CONROY & ONEIL PC 1205
  WESTLAKES DR #330 , BERWYN PA 19312
RICHARD D WALK
  306 WALNUT ST , PHILADELPHIA PA 19106
ERICA L GERSON
  STEPTOE & JOHNSON, LLP 1330
  CONNECTICUT AVE NW , WASHINGTO DC
  20036

**FILED**
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

**KLINE AND SPECTER, P.C.**
By:    TOBIAS L. MILLROOD, ESQUIRE
       ELIZABETH A. CRAWFORD, ESQUIRE
       JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA  19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@KlineSpecter.com
Jack.Oneill@klinespecter.com

|  |  |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor,<br><br>*Plaintiff*,<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE,<br><br>*Defendants.* | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO.  2588** |

**PLAINTIFF HOLLI CARTER'S MOTION FOR ADMISSION**
***PRO HAC VICE* OF BENJAMIN WHITING**

Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, through the undersigned sponsoring counsel, moves this Court to admit Benjamin Whiting *pro hac vice* as co-counsel on behalf of Plaintiff for all purposes allowed by law in the above captioned matter.  In support of this motion, Ms. Carter states as follows:

1.       This is a civil action about the development of necrotizing enterocolitis ("NEC"), and related injuries, by a premature infant due to the use of the Defendant Manufacturers' cow's milk-based preterm infant feeding products at the Defendant Hospital.  Plaintiff Holli Carter, on

her own behalf and as Parent and Natural Guardian of J.C., a Minor, is represented in this action by the undersigned counsel who is admitted to the Bar of this Commonwealth to practice law.

2.     The general rule for admission *pro hac vice* in the Commonwealth is stated in Pa. B.A.R. 301(a):

> An attorney, barrister or advocate who is qualified to practice in the courts of another state or of a foreign jurisdiction may be specially admitted to the bar of this Commonwealth for purposes limited to a particular case. An attorney, barrister or advocate admitted pro hac vice in a case shall not thereby be authorized to act as attorney of record in the case.

3.     Mr. Whiting satisfies the requirements of Pa. B.A.R. 301(a).  As set forth in the candidate verification pursuant to Pa. R.C.P. 1012.1(c), attached as **Exhibit A**, and incorporated herein, Mr. Whiting is an attorney with the law firm Keller Postman LLC, located at 150 N Riverside Plaza, Suite 4100, Chicago, Illinois 60606.  Mr. Whiting was admitted to the practice of law in the State of Illinois and in the State of New York in 2011.  Mr. Whiting has been and remains a member in good standing with the Bar.

4.     Mr. Whiting has not been the subject of disciplinary action in any court or before any Bar.

5.     Ms. Carter has retained the services of Mr. Whiting and his firm in regard to the above captioned lawsuit.  This matter is a complex product liability lawsuit and Mr. Whiting has extensive and specialized knowledge of this type of case.

6.     Mr. Whiting seeks admission *pro hac vice* under Rule 301 of the Pennsylvania Bar Admission Rules for the purpose of participating with the undersigned counsel in further proceedings and trial in the above captioned matter.

7.     All fees required by 204 Pa. Code § 81.505 have been paid and the Pennsylvania IOLTA Board's acknowledgement letter is attached as **Exhibit B**.  Mr. Whiting's law firm will pay any city business and wage taxes required.

Case ID: 220302588
Control No.: 23072509

8.      Mr. Whiting's good reputation and competence is attested to in the sponsor verification attached pursuant to Pa. R.C.P. 1012.1(d)(2) as **Exhibit C**, and incorporated herein.

9.      As set forth in the motion and the exhibits incorporated herein, there exists no good cause for denial of Ms. Carter's Motion for Admission *Pro Hac Vice* of Benjamin Whiting.  No party will be prejudiced by Mr. Whiting's admission *pro hac vice*.

WHEREFORE, Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, respectfully requests that this Court enter the attached Order granting admission *pro hac vice* in this matter for Benjamin Whiting, Esquire.

Respectfully submitted,

KLINE & SPECTER, P.C.


By: /s/ Tobias L. Millrood
Tobias L. Millrood, Esq.
Attorney for Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a Minor

Dated: July 14, 2023

3

## <u>CERTIFICATE OF SERVICE</u>

      I, Tobias L. Millrood, hereby certify that a true and correct copy of the foregoing Motion for Admission *Pro Hac Vice* of Benjamin Whiting was filed this date via the First Judicial District of Pennsylvania's Electronic Filing System, which thereby deems the foregoing as served on all counsel of record pursuant to Rule 205.4(g)(2)(ii) of the Pennsylvania Rules of Civil Procedure.

/s/ Tobias L. Millrood       
TOBIAS L. MILLROOD, ESQUIRE

Dated: July 14, 2023

4

Case ID: 220302588
Control No.: 23072509

FILED
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

# EXHIBIT A

Case ID: 220302588
Control No.: 23072509

**KLINE AND SPECTER, P.C.**
By:    TOBIAS L. MILLROOD, ESQUIRE
        ELIZABETH A. CRAWFORD, ESQUIRE
        JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@Klinespecter.com
Jack.Oneill@klinespecter.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor,<br><br>          *Plaintiff,*<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE,<br><br>          *Defendants.* | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 2588** |

**CANDIDATE VERIFICATION STATEMENT PURSUANT TO PA. R.C.P. 1012.1(c)**

I, Benjamin Whiting, Esquire, being duly sworn, state as follows:

      1.      I am an attorney and have been duly qualified and admitted to practice before the highest court of the State of New York since April 14, 2011, New York license number 4935888, and before the highest court of the State of Illinois since November 10, 2011, Illinois license number 630721.

      2.      I am also admitted to the United States District Court for the Central District of Illinois, Northern District of Illinois, Southern District of Illinois, and the Southern District of New York and the United States Circuit Court of Appeals for the Federal Circuit.

3.      I am affiliated with the law firm Keller Postman LLC, 150 N Riverside Plaza, Suite 4100, Chicago, Illinois 60606.

4.      I have never been suspended, disbarred, or otherwise disciplined.

5.      I am not currently subject to any disciplinary proceedings.

6.      I have applied for admission *pro hac vice* in the following cases in the Philadelphia Court of Common Pleas:

a.  *Abdullah v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2583
b.  *McMillian v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0140
c.  *Carter v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2588
d.  *Drayton v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2594
e.  *Stills v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2617
f.  *Mays v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2963
g.  *Padilla v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2969
h.  *Kajuffa v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2978
i.  *Ross v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2981
j.  *Parker v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2983
k.  *Henderson v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0127
l.  *Williams v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0141
m.  *Sanders v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0153
n.  *Walker-Savage v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0156
o.  *Thomas v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0158
p.  *Wieger v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 2601
q.  *Gray v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0216

7.      No motions for admission *pro hac vice* have been denied.

8.      I shall comply with and be bound by the applicable statutes, case law and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

9.      I shall submit to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the matter for which admission *pro hac vice* is being sought.

Case ID: 220302588
Control No.: 23072509

10.     I have consented to the appointment of Tobias L. Millrood, Esquire as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in the matter for which admission *pro hac vice* is sought.

11.     The undersigned verifies that the facts set forth in the foregoing candidate verification are true and correct to the best of his knowledge, information, and belief and understands that any false statements are made subject to the penalties of 18 Pa. Code § 4904 relating to unsworn falsification to authorities.

/s/ Benjamin Whiting
BENJAMIN WHITING, ESQUIRE

Dated: July 14, 2023

3

## **VERIFICATION**

I, Benjamin J. Whiting, Esquire hereby verify that the facts contained in the *Pro Hac Vice* motions specified below are true and correct to the best of my knowledge, information and belief. I further understand that these statements are made subject to penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsification to authorities.

    a. *Carter v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2588
    b. *Drayton v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2594
    c. *Stills v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2617
    d. *Mays v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2963
    e. *Padilla v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2969
    f. *Kajuffa v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2978
    g. *Ross v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2981
    h. *Parker v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2983
    i. *Henderson v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0127
    j. *Williams v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0141
    k. *Sanders v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0153
    l. *Walker-Savage v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0156
    m. *Thomas v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0158
    n. *Wieger v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 2601
    o. *Gray v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0216

Benjamin J. Whiting, Esquire

DATE: 7/12/2023

Case ID: 220302588
Control No.: 23072509

FILED
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

# EXHIBIT B

Case ID: 220302588
Control No.: 23072509



SUPREME COURT OF PENNSYLVANIA
PENNSYLVANIA INTEREST ON
LAWYERS TRUST ACCOUNT BOARD

May 26, 2023

BENJAMIN WHITING, Esq.
KELLER POSTMAN
150 N. RIVERSIDE PLAZA
SUITE 4100
CHICAGO, IL 60606

SENT TO BENJAMIN WHITING VIA Email: BEN.WHITING@KELLERPOSTMAN.COM

Dear Attorney WHITING:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Carter v. Mead Johnson & Company, LLC et al., no. 2588, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc: TOBIAS LAEL MILLROOD, Esq.

    tobi.millrood@klinespecter.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302588
Control No.: 23072509

FILED
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

# EXHIBIT C

Case ID: 220302588
Control No.: 23072509

**KLINE AND SPECTER, P.C.**
By:     TOBIAS L. MILLROOD, ESQUIRE
        ELIZABETH A. CRAWFORD, ESQUIRE
        JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@KlineSpecter.com
Jack.Oneill@klinespecter.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, <br><br> *Plaintiff*, <br><br> v. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, <br><br> *Defendants*. | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY <br><br> CIVIL TRIAL DIVISION <br><br> MARCH TERM 2022 NO.  2588 |

### SPONSOR VERIFICATION STATEMENT PURSUANT TO PA. R.C.P. 1012.1(d)

I, Tobias L. Millrood, being duly sworn, state as follows:

1.      I am an attorney duly admitted to practice law before this Court and am a partner in the law firm Kline & Specter, P.C., counsel for Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, in the above captioned matter.

2.      I submit this verification in support of Ms. Carter's Motion for Admission *Pro Hac Vice* of Benjamin Whiting for purposes of serving as co-counsel to Ms. Carter.

3.      After reasonable investigation, I believe Benjamin Whiting, Esquire, is a reputable and competent attorney and I am in a position to recommend his admission.

4.      I have previously acted as the sponsor of other candidates for admission *pro hac vice* in this and other courts of record in this Commonwealth.

5.      The proceeds from the settlement of a cause of action in which Benjamin Whiting, Esquire, is granted admission *pro hac vice* shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

6.      The undersigned verifies that the facts set forth in the foregoing sponsor verification are true and correct to the best of her knowledge, information, and belief and understands that any false statements are made subject to the penalties of 18 Pa. Code § 4904 relating to unsworn falsification to authorities.

/s/ Tobias L. Millrood
TOBIAS L. MILLROOD, ESQUIRE

Dated: July 14, 2023

2

**FILED**
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiff*, | CIVIL TRIAL DIVISION |
| v. | MARCH TERM 2022 NO. 2588 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, | |
| *Defendants*. | |

## ORDER

AND NOW THIS _____ day of _____, 2023, upon consideration of Plaintiff

Holli Carter's Motion for Admission *Pro Hac Vice* of Benjamin Whiting, it is hereby **ORDERED**

that the motion is **GRANTED**.  It is further **ORDERED** that pursuant to Pennsylvania Rule of

Civil Procedure 1012.1, Pennsylvania Bar Admission Rule 301, and 204 Pa. Code § 81.503,

Benjamin Whiting, Esquire, is hereby specially admitted to the Bar of this Commonwealth for

purposes limited to this particular civil action to represent Plaintiff Holli Carter, on her own behalf

and as Parent and Natural Guardian of J.C., a Minor.  Counsel *pro hac vice* shall pay all city

business and wage taxes as required by the Court.

BY THE COURT:

_____
J.

# EXHIBIT A-44

## IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## COURT OF COMMON PLEAS OF PHILADELPHIA
## CIVIL TRIAL DIVISION

ABDULLAH ETAL            :       **CASE ID: 220302583**

                                      :

VS                         :

                                        :

MEAD JOHNSON & COMPANY     :

### ORDER

**AND NOW**, this 24th day of July 2023, it is hereby ORDERED that Plaintiff may file an

amended complaint on or before September 8, 2023 (or other date agreed to by counsel). It is

FURTHER ORDERED, this order shall also apply to the following captioned matters:

| | |
|---|---|
| 220302588 | CARTER ETAL VS MEAD JOHNSON & COMPANY |
| 220302594 | DRAYTON ETAL VS MEAD JOHNSON & COMPANY |
| 220302601 | WIEGER ETAL VS MEAD JOHNSON & COMPANY |
| 220302606 | TAYLOR ETAL VS MEAD JOHNSON & COMPANY |
| 220302614 | WIEGER ETAL VS MEAD JOHNSON & COMPANY |
| 220302617 | STILLS ETAL VS MEAD JOHNSON NUTRITION |
| 220302963 | MAYS ETAL VS MEAD JOHNSON & COMPANY |
| 220302967 | WATSON ETAL VS MEAD JOHNSON & COMPANY |
| 220302969 | PADILLA ETAL VS MEAD JOHNSON & COMPANY |
| 220302978 | KAJUFFA ETAL VS MEAD JOHNSON & COMPANY |
| 220302981 | ROSS ETAL VS MEAD JOHNSON & COMPANY |
| 220302983 | PARKER ETAL VS MEAD JOHNSON & COMPANY |
| 220302986 | WIGGINS ETAL VS MEAD JOHNSON & COMPANY |
| 220400127 | HENDERSON ETAL VS MEAD JOHNSON & COMPANY |
| 220400136 | HINES ETAL VS MEAD JOHNSON & COMPANY |
| 220400138 | WITHERSPOON ETAL VS MEAD JOHNSON & COMPANY |
| 220400140 | MCMILLIAN ETAL VS MEAD JOHNSON & COMPANY |
| 220400141 | WILLIAMS ETAL VS MEAD JOHNSON & COMPANY |
| 220400142 | MOMENT ETAL VS MEAD JOHNSON & COMPANY |
| 220400145 | WHITFIELD ETAL VS MEAD JOHNSON & COMPANY |
| 220400153 | SANDERS ETAL VS MEAD JOHNSON & COMPANY |
| 220400156 | WALKER-SAVAGE ETAL VS MEAD JOHNSON & COMPANY |
| 220400158 | THOMAS ETAL VS MEAD JOHNSON & COMPANY |
| 220400159 | SHORT ETAL VS MEAD JOHNSON & COMPANY |
| 220400162 | JOHNSON ETAL VS MEAD JOHNSON & COMPANY |
| 220400208 | GOODMOND ETAL VS MEAD JOHNSON & COMPANY |
| 220400212 | GOODMOND ETAL VS MEAD JOHNSON & COMPANY |
| 220400216 | GRAY ETAL VS MEAD JOHNSON & COMPANY |

ORDER-Carter Etal Vs Mead Johnson



22030258800087

BY THE COURT:

CARPENTER, J.

# EXHIBIT A-45

## IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## COURT OF COMMON PLEAS OF PHILADELPHIA
## CIVIL TRIAL DIVISION

ABDULLAH ETAL            :       **CASE ID: 220302583**

                                     :

VS                             :

                                     :

MEAD JOHNSON & COMPANY       :

## <u>ORDER</u>

**AND NOW**, this 24th day of July 2023, it is hereby ORDERED that all discovery is to be completed by June 3, 2024 and all other case management deadlines to extend therefrom. It is FURTHER ORDERED, this extension shall also apply to the following captioned matters:

| | |
|---|---|
| 220302588 | **CARTER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302594 | **DRAYTON ETAL VS MEAD JOHNSON & COMPANY** |
| 220302601 | **WIEGER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302606 | **TAYLOR ETAL VS MEAD JOHNSON & COMPANY** |
| 220302614 | **WIEGER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302617 | **STILLS ETAL VS MEAD JOHNSON NUTRITION** |
| 220302963 | **MAYS ETAL VS MEAD JOHNSON & COMPANY** |
| 220302967 | **WATSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220302969 | **PADILLA ETAL VS MEAD JOHNSON & COMPANY** |
| 220302978 | **KAJUFFA ETAL VS MEAD JOHNSON & COMPANY** |
| 220302981 | **ROSS ETAL VS MEAD JOHNSON & COMPANY** |
| 220302983 | **PARKER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302986 | **WIGGINS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400127 | **HENDERSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400136 | **HINES ETAL VS MEAD JOHNSON & COMPANY** |
| 220400138 | **WITHERSPOON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400140 | **MCMILLIAN ETAL VS MEAD JOHNSON & COMPANY** |
| 220400141 | **WILLIAMS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400142 | **MOMENT ETAL VS MEAD JOHNSON & COMPANY** |
| 220400145 | **WHITFIELD ETAL VS MEAD JOHNSON & COMPANY** |
| 220400153 | **SANDERS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400156 | **WALKER-SAVAGE ETAL VS MEAD JOHNSON & COMPANY** |
| 220400158 | **THOMAS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400159 | **SHORT ETAL VS MEAD JOHNSON & COMPANY** |
| 220400162 | **JOHNSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400208 | **GOODMOND ETAL VS MEAD JOHNSON & COMPANY** |
| 220400212 | **GOODMOND ETAL VS MEAD JOHNSON & COMPANY** |
| 220400216 | **GRAY ETAL VS MEAD JOHNSON & COMPANY** |

ORDER-Carter Etal Vs Mead Johnson



22030258800088

BY THE COURT:

CARPENTER, J.

# EXHIBIT A-46



**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| **CARTER ETAL** | **March Term 2022** |
| **VS** | **No. 02588** |
| **MEAD JOHNSON & COMPANY, LLC, ETAL** | |

## *REVISED CASE MANAGEMENT ORDER*

Be advised that the Case Management Order issued for the above-captioned action has been revised as follows:

1. All discovery shall be completed not later than 03-JUN-2024.

2. Plaintiff shall submit expert reports not later than 01-JUL-2024.

3. Defendant shall submit expert reports not later than 05-AUG-2024.

4. All pre-trial motions other than motions in limine shall be filed not later than 05-AUG-2024.

5. A settlement conference will be scheduled any time after 03-SEP-2024.

6. A pre-trial conference will be scheduled at any time after 04-NOV-2024.

7. It is expected that this case shall be ready for trial by 02-DEC-2024.

All other terms and conditions on the original Case Management Order will remain in full force and effect.

*BY THE COURT:*

24-JUL-2023

**LINDA CARPENTER, J.**
**TEAM LEADER**

FJB88780(REV. 5/21/18)

RVCMO-Carter Etal Vs Mead Joh



22030258800092

# EXHIBIT A-47

**FILED**
14 JUL 2023 04:31 pm
Civil Administration
P. CHROY

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiff,* | CIVIL TRIAL DIVISION |
| v. | MARCH TERM 2022 NO. 2588 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, | |
| *Defendants.* | |

## ORDER

AND NOW THIS __14th__ day of __AUGUST__, 2023, upon consideration of Plaintiff

Holli Carter's Motion for Admission *Pro Hac Vice* of Benjamin Whiting, it is hereby **ORDERED**

that the motion is **GRANTED**. It is further **ORDERED** that pursuant to Pennsylvania Rule of

Civil Procedure 1012.1, Pennsylvania Bar Admission Rule 301, and 204 Pa. Code § 81.503,

Benjamin Whiting, Esquire, is hereby specially admitted to the Bar of this Commonwealth for

purposes limited to this particular civil action to represent Plaintiff Holli Carter, on her own behalf

and as Parent and Natural Guardian of J.C., a Minor. Counsel *pro hac vice* shall pay all city

business and wage taxes as required by the Court.

BY THE COURT:

_____ J.

220302588-Carter Etal Vs Mead Johnson

22030258800097

Case ID: 220302588
Control No.: 23072509

# EXHIBIT A-48

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the Office of Judicial Records 08 SEP 2023 04:41 pm C. PERRY*

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor,<br><br>             *Plaintiff*,<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>             *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022 NO. 2588** |

## NOTICE TO PLEAD AND DEFEND

| **NOTICE** | **ADVISO** |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |

Case ID: 220302588

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Case ID: 220302588

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, | **IN THE COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| *Plaintiff*, | **CIVIL TRIAL DIVISION** |
| v. | **MARCH TERM 2022** |
| | **NO. 2588** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of

3

Case ID: 220302588

Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants."   Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital.  Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.   This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.   As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Holli Carter is a natural adult person and a resident of New Jersey.  Ms. Carter is the parent and natural guardian of J.C., a minor.  Ms. Carter's address is 16 Carmen Drive, Cape May Court House, New Jersey 08210-2563.

Case ID: 220302588

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

## III.      JURISDICTION AND VENUE

Case ID: 220302588

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.    This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

*J.C.'s NEC Diagnosis*

11.    J.C. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 6, 2014.

12.    At birth, J.C.'s gestational age was approximately 24 weeks and he weighed 655 grams. Upon information and belief, J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth.

13.    Upon information and belief, J.C. developed NEC after ingesting Defendant Manufacturers' products.

6

14.     J.C.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU.  J.C. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and blood transfusions, and suffers from neurological injuries, as well as other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

7

Case ID: 220302588

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Carter Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Carter did not know, and had no reason to know or suspect, that J.C.'s NEC could have been caused by the Defendant Manufacturers' products.

Case ID: 220302588

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Carter*

24.     Despite exercising reasonable diligence, Ms. Carter was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of J.C.'s injuries.

25.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of J.C.'s NEC diagnosis, Ms. Carter undertook an investigation into the cause of the NEC by asking the doctors the cause of his NEC.

26.     The health care providers at Penn Medicine responded only that J.C. had gotten NEC because he was born premature.  Penn Medicine's response did not indicate that his NEC was caused by the Defendant Manufacturers' products.

27.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused J.C.'s injuries.  Penn Medicine's response at the time did not give Ms. Carter any reason to suspect any wrongdoing on the part of the Defendants.

28.     Ms. Carter is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

29.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Carter had no reason to doubt their word.

30.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

31.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to

9

Case ID: 220302588

mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

32.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

33.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed in below, any research conducted by Ms. Carter immediately after J.C.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused J.C.'s injuries.

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302588

34.     Ms. Carter also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to him.  Not only was Ms. Carter unaware that the Defendant Manufacturers' products caused J.C.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Carter, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

35.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

36.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

37.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

38.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its

Case ID: 220302588

hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

39.     Additionally, Defendant Hospital failed to inform Ms. Carter that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Carter was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Carter asked Plaintiff's health care providers at Defendant Hospital why a premature infant like J.C. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to J.C. could increase the risk of NEC to preterm infants, responding only that J.C. had gotten NEC solely because he was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

40.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Carter of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Carter that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like J.C., it was enough for Ms. Carter to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

Case ID: 220302588

41.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

13

Case ID: 220302588

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 220302588

49. Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50. One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51. Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302588

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53. Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

16

Case ID: 220302588




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and

Case ID: 220302588

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital.   On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts.   And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge.   The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.    Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments.  They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.    To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.    On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

Case ID: 220302588

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to J.C.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like J.C.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to J.C.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like J.C.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 220302588

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like J.C.

### The Defendant Manufacturers' Inadequate Warnings

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 220302588

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 220302588

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

75.    On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

76.    To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.    It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

77.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 220302588

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

78.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

79.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

80.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

23

Case ID: 220302588

81.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

82.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

83.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

84.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 220302588

**CAUSES OF ACTION**
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

85.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

86.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

87.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

88.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.  Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

89.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

90.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

91.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

25

Case ID: 220302588

facility.

92.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

93.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

94.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 220302588

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

95.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

96.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

97.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

98.        Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

27

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b. Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c. Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

28

Case ID: 220302588

h.    Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

99.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

100.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

101.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

102.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

29

Case ID: 220302588

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

## COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

103.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

105.   At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

30

106.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

107.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

      d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

      e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

      f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

Case ID: 220302588

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

108. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

109. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

110. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

32

Case ID: 220302588

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

112.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

113.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

114.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

33

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

115.   Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

116.   Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.   That cow's milk-based products were safe for premature infants; and/or

e.   That cow's milk-based products were necessary for optimum growth; and/or

f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

34

Case ID: 220302588

g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.     Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

117.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

118.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

119.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

120.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

35

of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

121.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

36

Case ID: 220302588

herein.

122. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

123. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

124. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

125. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

      a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

      b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

      c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

Case ID: 220302588

    d.       That cow's milk-based products were safe for premature infants; and/or

    e.       That cow's milk-based products were necessary for optimum growth; and/or

    f.       That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.       That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.       That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.       Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

126.    Abbott and Mead were negligent or careless in not determining those representations to be false.

127.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

128.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

Case ID: 220302588

129.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

130.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302588

g.     For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

131.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

133.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

134.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

135.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

136.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

Case ID: 220302588

and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

137.    Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

138.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

139.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

> a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
> c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302588

d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

140.  Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

141.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

142.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

42

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

143.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

144.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

43

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by
law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection
with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

145.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth
herein.

146.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the
Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of
Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty
to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality
care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the
Injured Infant to oversee its healthcare professionals and medical staff that provided patient care
to the Injured Infant.

147.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant
in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply,
distribution, and use of products that were free of unreasonable risk of harm when used in their
intended manner and for their intended purpose and ensured quality care for the Injured Infant.

148.    At all times relevant to this action, the Injured Infant used the cow's milk-based products
purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their
intended manner and for their intended purpose.

Case ID: 220302588

149.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

150.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

152.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302588

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

Case ID: 220302588

g.     Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.     Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

154.   A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

155.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

156.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 220302588

developing NEC and significant injuries.

157. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

158. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

159. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

160. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d.    Failing to oversee its healthcare professionals and medical staff to restrict

48

Case ID: 220302588

their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.     Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.     Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.     Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

161.   A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

49

Case ID: 220302588

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

162.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

163.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 220302588

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

166.    Plaintiff hereby demands a jury trial for all claims triable.


Dated:    9/8/2023

                                        Respectfully submitted,

                                        **KLINE & SPECTER, P.C.**


                                        By:    _____/s/ Timothy A. Burke_____
                                               Thomas R. Kline, Esq.
                                               Tobias L. Millrood, Esq.
                                               Elizabeth A. Crawford, Esq.
                                               Timothy A. Burke, Esq.
                                               John P. O'Neill, Esq.
                                               Attorney I.D. Nos.: 28895 / 77764 / 313702 /
                                               320927 / 205677

51

Case ID: 220302588

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

Case ID: 220302588

# EXHIBIT A-49

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**STEPTOE & JOHNSON, LLP**
Erica L. Gerson, Esquire
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3049
egerson@steptoe.com

**ATTORNEYS FOR MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

Filed and Attested by the Office of Judicial Records 30 MAR 2022 10:45 pm B. MERCEDES

| | |
|---|---|
| **HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiffs, | **MARCH TERM, 2022** |
| v. | **No. 2588** |
| **MEAD JOHNSON & COMPANY, LLC, et al.** | |
| Defendants. | |

## WITHDRAWAL OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly withdraw the appearance of Erica L. Gerson as counsel for Defendants,

Mead Johnson & Company, LLC and Mead Johnson Nutrition Company in the above-

referenced matter.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire

**STEPTOE & JOHNSON, LLP**

/s/ Erica L. Gerson
Erica L. Gerson, Esquire

**Attorneys for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

Dated: September 22, 2023

**CERTIFICATE OF SERVICE**

I, Kenneth A. Murphy, Esquire, hereby certify that I caused to be served a true and correct copy of the foregoing document to all counsel of record via the Court's electronic filing system.

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

Dated: September 22, 2023

# EXHIBIT A-50

Filed and Attested by the
Office of Judicial Records
PHILADELPHIA 09 JUN 2023 01:29 pm
S. GILLIAM

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiff | CIVIL DIVISION |
| v. | MARCH TERM, 2022 NO. 2588 |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____ 2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                                   J.

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiff | CIVIL DIVISION |
| v. | MARCH TERM, 2022 NO. 2588 |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

## ALTERNATIVE ORDER

**AND NOW**, this          day of                    2023, upon consideration of the

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of

Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of

Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto,

it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further

**ORDERED** that:

1.    Count VI of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2.    Count VII of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3.    Plaintiffs' claims for punitive damages as to Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious, outrageous, intentional and/or fraudulent conduct;

4.    Plaintiff Holli Carter's claims in her own right are **DISMISSED** with prejudice; and

5.    Plaintiffs' Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____

                                                                                            J.

BURNS WHITE LLC
By:  James A. Young, Esq.
       Richard S. Margulies, Esq.
       Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor<br><br>Plaintiff<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2588 |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Amended Complaint, and, in support thereof, aver as follows:

**I.      INTRODUCTION**

1.      Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott

Case ID: 220302588
Control No.: 23096253

Laboratories ("Abbott"). Se̲e̲ Plaintiffs' Complaint, attached as Exhibit "A."[1]  On September 8,

2023, Plaintiffs filed an Amended Complaint.  See Plaintiffs' Amended Complaint, attached as

Exhibit "B."

2. Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania

Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's

milk-based infant formula by premature infants following their birth.[2]

3. Plaintiffs allege that "upon information and belief" the Plaintiff-minors, including

J.C., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that

premature infants are at increased risk to develop. *See* Plaintiffs' Amended Complaint, attached as

Exhibit "B," ¶ 13. Plaintiffs allege that premature infants fed with their mother's breast milk or

donor breast milk are at decreased risk of developing NEC as compared with infants given cow's

milk-based infant formula.[3]

4. In addition to asserting product liability claims against the infant formula

manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are

liable based on theories of failure to warn and corporate liability. [4]

---

[1] Shortly after the filing of the Complaint, this case was removed to federal court.  Following briefing and a hearing, the case was remanded to this Honorable Court.  There was then an effort by all Defendants to transfer these cases to this Court's Mass Tort Program.  Plaintiffs opposed this request, and same was denied by this Honorable Court. These preliminary objections were timely filed after the initial filing of the Complaint, but never ruled upon.

[2] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[3] Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, as discussed *infra* and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula.

[4] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiffs' contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302588
Control No.: 23096253

5.     The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Amended Complaint.

6.     Plaintiffs aver that J.C. was born prematurely on October 6, 2014 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after his birth." *Id.*, ¶¶ 11-12.

7.     Plaintiffs further allege that "upon information and belief" J.C. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

8.     Plaintiffs generally allege that J.C. "suffered injuries, including but not limited to a diagnosis of NEC, treatment with antibiotics and blood transfusions, and suffers from neurological injuries, as well as other long-term health effects." *Id.*, ¶ 14.

9.     Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.     ARGUMENT

### A.     DEMURRER TO COUNT VI: FAILURE TO WARN

10.     Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

11.     Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

12.     In support of this theory, Plaintiffs simply aver that "(e)xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding

3

products cause NEC in preterm and low-birth-weight infants, which may in turn lead to other medical complications, surgeries, long-term health problems, and death." *See* Exhibit "B," ¶16.

13.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

14.     Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

15.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

16.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

4

17. "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308.

18. Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

19. Although Plaintiffs vaguely refer in their Amended Complaint to research studies and trials relating to the purported risks of cow's milk-based products in premature infants, no such studies have been cited for the proposition that feeding premature infants cow's milk-based formula causes NEC in preterm and low-birth-weight infants.

20. At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "B" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, Plaintiffs fail to cite any such research or trials with specificity to support their claim.

21. Simply put, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

22. Further, assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no

Case ID: 220302588
Control No.: 23096253

duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

23.     Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

24.     The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

25.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and

Case ID: 220302588
Control No.: 23096253

those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

26.     Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

27.     Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

28.     Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B.      DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

29.     In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

30.     Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

31.     Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

7

32.     Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

33.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

34.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

35.     Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

36.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

37.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

38.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs

8

Case ID: 220302588
Control No.: 23096253

considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

39.     Additionally, even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

40.     The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

41.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

42.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

43.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

9

Case ID: 220302588
Control No.: 23096253

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

44. Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

45. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

46. Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

47. Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v.*

Case ID: 220302588
Control No.: 23096253

*Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

48.     Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

49.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "B," ¶¶ 11-14.

50.     Plaintiffs aver that the minor was born prematurely, the gestational age, and birth weight; however, Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

51.     Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor.

52.     Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

53.     The Amended Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC with specificity.

Case ID: 220302588
Control No.: 23096253

54. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

55. These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

### D. MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

56. In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages.

57. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

58. Rather, Plaintiffs merely allege vaguely that Moving Defendants "negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant," *See* Exhibit "B" at ¶135, absent any context to indicate that such an action was inappropriate based on the specific issues involved in J.C.'s medical care and condition following birth.

59. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

60. Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula

Case ID: 220302588
Control No.: 23096253

in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

61.    Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

62.    Absent specific factual allegations to justify the claim that the use of infant formula in J.C.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

63.     Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

64.    Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

65.    Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa.

Case ID: 220302588
Control No.: 23096253

Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

66.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

67.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

68.      Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

69.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not

Case ID: 220302588
Control No.: 23096253

recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

70.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Case ID: 220302588
Control No.: 23096253

71.    Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

72.    The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

Case ID: 220302588
Control No.: 23096253

73. Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c) Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

74. Plaintiffs allege in this action that unidentified "staff" fed J.C. Similac and/or Enfamil at Pennsylvania Hospital shortly after his birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "B," ¶ 12.

75. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

76. In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

77. For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

**E.** **MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS**

78. Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of J.C.

Case ID: 220302588
Control No.: 23096253

79.     Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "B," ¶¶ 144, and 165.

80.     However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

81.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

82.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

83.     Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

18

84. Plaintiffs allege that J.C. was born on October 6, 2014, was fed the Defendant manufacturers' products shortly after his birth, and developed NEC shortly thereafter. *See* Exhibit "B," ¶¶ 11-13.

85. Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

86. In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. *See*, Exhibit "B" ¶¶ 23 – 41.

87. However, it is well established in Pennsylvania that a plaintiff need not know the precise extent of injuries before the statutory period begins to run. *Levenson v. Souser*, 384 Pa. Super. 132, 557 A.2d 1081, 1090 (1989).

88. Furthermore, any contention by Plaintiffs that the statute of limitations must be tolled until such time that a plaintiff first suspected that there had been medical negligence with regard to her infant's treatment must similarly be rejected.

89. It is well settled law that, in accordance with the discovery rule, a plaintiff need not know that she has a cause of action or suspects there has been negligence before the statute of limitations commences. *Colonna v. Rice,* 664 A.2d 979, 981 (Pa. Super. 1995); *Bigansky v. Thomas Jefferson Univ. Hosp.*, 658 A.2d 423, 427, 431 n.5 (Pa. Super. 1995); *Brooks v. Sagovia*, 636 A.2d 1201, 1204 (Pa. Super. 1994); *E.J.M. v. Archdiocese of Phila.,* 622 A.2d 1388, 1394 (Pa. Super. 1993); *DeMartino v. Albert Einstein Med. Center*, 460 A.2d 295, 298-299 (Pa. Super. 1983).

90. Indeed, it has been expressly held that "[k]nowledge of the negligence is not part of the discovery rule." *DeMartino*, *supra*, 460 A.2d at 299.

19

91.     A plaintiff need only know that there was an injury and who caused that injury, a plaintiff need not know the full extent of the injury or even suspect negligence.  *Nicolaou v. Martin,* 195 A.3d 880, 892-93 (Pa. 2018); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011); *Wilson v. El-Daief,* 964 A.2d 354, 364 (Pa. 2009).

92.     Based upon the facts plead by Plaintiffs, J.C. is alleged to have developed NEC shortly after his birth.  See Exhibit "B" ¶¶11 – 14.  Accordingly, Plaintiff-parent knew of an injury in 2014, making any claim in her own right clearly time barred, regardless of whether she knew the extent of any claimed injury and/or when she suspected that the injury was caused by negligence.

## F.    MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

93.     Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

94.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

95.     In this case, no verification is attached to the Amended Complaint in violation of Rule 1024. *See* Exhibit "B."

96.     Accordingly, the Amended Complaint should be stricken for lack of an appropriate verification.

**WHEREFORE**, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Case ID: 220302588
Control No.: 23096253

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

21

BURNS WHITE LLC
By: James A. Young, Esq.
     Richard S. Margulies, Esq.
     Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor<br><br>Plaintiff<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022 NO. 2588 |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' COMPLAINT**

**I.     MATTER BEFORE THE COURT**

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Amended Complaint.

While patently obvious that Plaintiffs' Amended Complaint must be dismissed for clear and important violations of the procedural requirements governing pleadings and verification of the accuracy of the factual averments of the Amended Complaint (there are not separate counts identified for the causes of action of each of the Plaintiffs attempts to allege), most of which are averred "upon information and belief," the substance of Plaintiffs' allegations do not support any

Case ID: 220302588
Control No.: 23096253

legally recognized cause of action against Moving Defendants, under Pennsylvania law. Our procedural rules do not permit a plaintiff to simply identify allegedly tortious conduct by a defendant without pleading the necessary facts to satisfy the elements of the tortious conduct.

Here, Plaintiffs plead that Moving Defendants permitted Co-Defendants' cow's milk-based infant formula to be fed to prematurely born infants, which allegedly caused those infants to develop necrotizing enterocolitis ("NEC"). Plaintiffs then plead themselves out of Court by attempting to support a "failure to warn" claim by referencing unnamed studies and trials in an attempt to establish that cow's milk-based infant formulas cause NEC. Thus, distinct from the Amended Complaint's procedural shortcomings, Plaintiffs have failed to plead facts that support the "failure to warn" and corporate liability causes of action that they attempt to assert against Moving Defendants. It is further noteworthy that there is no viable "failure to warn" cause of action that is recognized under Pennsylvania law against Moving Defendants, as explained in this submission by Moving Defendants.

## II.     STATEMENT OF QUESTIONS PRESENTED

1.     Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint "Failure to Warn" cause of action with prejudice because Plaintiffs' Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous and Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

2.     Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint "Failure to Warn" cause of action with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's

Case ID: 220302588
Control No.: 23096253

milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

3.     Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint "Corporate Negligence" cause of action with prejudice because Moving Defendants cannot be held liable on such a theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

4.     Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint "Corporate Negligence" cause of action with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

5.     Whether this Honorable Court should strike Plaintiffs' Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

6.     Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

Case ID: 220302588
Control No.: 23096253

7.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action, and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020 and based on the applicable statute of limitations?

*Suggested answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiffs' Amended Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested answer in the affirmative.*

## III.   <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including J.C., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Amended Complaint, attached as Exhibit "B" at ¶ 14. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302588
Control No.: 23096253

"Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Plaintiffs' Amended Complaint, attached as Exhibit "B" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Although Plaintiffs baldly aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Amended Complaint only to research studies and trials with no specificity whatsoever. As discussed in detail *supra*, even assuming the truth of the factual allegations stated in Plaintiffs' Amended Complaint, Plaintiffs' allegations do not support the conclusion that NEC is caused by cow's milk-based products. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that J.C. was born prematurely on October 6, 2014 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after his birth." *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" J.C. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13. No specific details are provided regarding the infant's condition following birth other than that he developed NEC on an unidentified date, that he was treated with antibiotics and blood transfusions, and suffers from neurological injuries as well as other long-term health effects. Id at ¶14. No specific facts are provided by Plaintiffs as to any medical care J.C. received, for what period of time J.C. allegedly ingested cow's milk-based products, and which product(s) he

---

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

Case ID: 220302588
Control No.: 23096253

allegedly ingested.[3] Finally, the Amended Complaint is silent as to the nature and extent of J.C.'s alleged injuries other than a vague reference to " neurological injuries" and "long term health effects." *Id.* ¶ 14.

Further, the Amended Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at Pennsylvania Hospital regarding the allegations that J.C. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at Pennsylvania Hospital related to breastfeeding and/or using cow's milk-based products in this case, including whether or not she was encouraged to breastfeed and/or was unable or declined to do so. As noted, Plaintiffs plead that Plaintiff Minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff Minor developed NEC as a result.

Plaintiffs further fail to disclose in their Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 48, 49.

Case ID: 220302588
Control No.: 23096253

for sale include cow milk; 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

Case ID: 220302588
Control No.: 23096253

IV.    **ARGUMENT**

    A.  **DEMURRER TO COUNT VI: FAILURE TO WARN**

        1.  **Moving Defendants Cannot Be Held Liable to Plaintiffs Based on a Theory of Failure to Warn Because the Infant Formula is Not Unreasonably Dangerous**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products manufactured by Mead Johnson and Abbott cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger. However, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates that NEC is caused by cow's milk-based infant formula. Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the products in question are indeed unreasonably dangerous. Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

Case ID: 220302588
Control No.: 23096253

"Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.* Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn. They have not done so as the studies they cite in their Complaint do not

Case ID: 220302588
Control No.: 23096253

say – based on the very allegations in the Complaint - what Plaintiffs claim they do. Therefore, Moving Defendants had no corresponding duty to warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "B" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – a claim that is unsupported by any specific studies or trials in the Amended Complaint. *Id.* Admittedly, if a product directly causes NEC in preterm and low birth weight infants, that product would certainly be dangerous. However, Plaintiffs' Amended Complaint does nothing to support this bald allegation.

Ultimately, Plaintiffs' claim that Defendant Manufacturers' cow's milk-based feeding products cause NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. However, Plaintiffs have not, and cannot, establish causation. Plaintiffs readily admit at paragraph 16 of the Amended Complaint that preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. All that Plaintiffs' Amended Complaint demonstrates, as pleaded under these facts, is that breast milk may be better at reducing that already high risk of NEC in these infants than cow's milk-based alternatives. This proposition does not make the Defendant Manufacturers' cow's milk-based alternatives unreasonably dangerous within the meaning of § 388 of the Restatement (Second) of Torts and, accordingly, does not trigger a duty to warn on the part of Moving Defendants.

### 2. Moving Defendants Are Not a "Supplier" and, Therefore, Cannot Be Held Liable for Negligent Failure to Warn

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as dangerous for their intended use as opposed to simply being a less effective

Case ID: 220302588
Control No.: 23096253

alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because they are not considered a supplier of cow's milk-based feeding products. Plaintiffs cite to no caselaw in Pennsylvania holding that a hospital is considered a supplier under § 388. Indeed, extensive research into this topic turns up no prior decisions where a Pennsylvania court has found a hospital to be a supplier in a products liability case for negligent failure to warn.

To determine a hospital may be defined as supplier of products ancillary to and following medical services within the meaning of § 388 would be to impose on the hospital a duty to warn about every conceivable object a patient may encounter in a hospital, right down to the napkins available in the hospital cafeteria. Imposing such a duty does nothing to advance the purpose of products liability law, i.e. to protect consumers from dangerous products in the stream of commerce. Moving Defendants are not in the best position to determine what products are available in the market for premature and low weight birth infants. In light of this, Plaintiffs have not sufficiently pleaded that Moving Defendants are a supplier under § 388.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Amended Complaint.

### 3. There is no Legal Basis for Plaintiffs to Present an Informed Consent Claim Regarding the Use of Cow's milk-based products

Case ID: 220302588
Control No.: 23096253

Plaintiffs' failure to warn claim is couched in language of product liability related to Moving Defendants' alleged duty "as a purchaser, supplier and/or distributor" to provide a product (cow's milk-based infant formula) that was free of unreasonable risk of harm to consumers (parents and their premature infants). This theory fails for the reasons stated above. However, to the extent that Plaintiffs are alleging that Moving Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products, such a claim is also clearly precluded by Pennsylvania law.

Plaintiffs broadly allege that Moving Defendants failed to warn of the alleged dangers of cow's milk-based products and provide them with information necessary "to make an informed choice about whether to allow their baby to be fed the Defendant Manufacturers' products." *See* Exhibit "B" at ¶ 139. This purported failure to warn/inform allegedly led Plaintiff-minor to be fed a cow's milk-based product that Plaintiffs' contend caused and/or increased the risk of NEC. *Id.* at ¶ 143. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

12

Case ID: 220302588
Control No.: 23096253

(a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

(1) Performing surgery, including the related administration of anesthesia.

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination

13

Case ID: 220302588
Control No.: 23096253

by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and

14

acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further, "[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

## B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

### 1. Moving Defendants Cannot be Held Liable for Corporate Negligence Regarding a Food Product Which is Permitted for its Intended Use Pursuant to Federal Law

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide

15

cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the Thompson decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, Thompson requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

Id. at 1386-87 (citations omitted and emphasis added). Thus, corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "Thompson requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

16

Case ID: 220302588
Control No.: 23096253

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Complaint should be dismissed with prejudice.

### 2. Plaintiffs Are Precluded From Pursuing Corporate Negligence Claims as to The Trustees of the University of Pennsylvania

As noted *infra*, the Pennsylvania Supreme Court set forth certain nondelegable duties of hospitals, which if violated may support a finding of corporate negligence. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its

17

relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts**

Case ID: 220302588
Control No.: 23096253

**are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable Defendants to prepare their defenses. *See* Exhibit "B," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely, the gestational age and birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based

19

Case ID: 220302588
Control No.: 23096253

products. Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, what specific treatment was provided for that condition, and for how long.

The Amended Complaint further fails to state the nature of the "neurological injuries" and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

In short, Plaintiffs' Amended Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

### D. MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" J.C. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate

Case ID: 220302588
Control No.: 23096253

based on the specific issues involved in J.C.'s medical care and condition following birth. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in J.C.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Case ID: 220302588
Control No.: 23096253

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)      Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b)      Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

41  P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

22

Case ID: 220302588
Control No.: 23096253

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed

Case ID: 220302588
Control No.: 23096253

to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of

Case ID: 220302588
Control No.: 23096253

reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations in the Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed J.C. Similac and/or Enfamil at Pennsylvania Hospital shortly after his birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "B," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

Case ID: 220302588
Control No.: 23096253

### E. **MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS**

#### 1. **Plaintiff-Parent has Failed to State a Cause of Action**

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of J.C. Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "B," ¶¶ 144, 157 and 165. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

#### 2. **Plaintiffs are Required to Plead Separate Claims Pursuant to Pa.R.C.P. 1020**

Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

#### 3. **Plaintiff-Parent's Claim Is Precluded Pursuant to the Statute of Limitations**

26

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that J.C. was born on October 6, 2014, was fed the Defendant manufacturers' products shortly after his birth, and developed NEC shortly thereafter. *See* Exhibit "B," ¶¶ 11-13. Thus, since the Amended Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬

In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. *See*, Exhibit "B" ¶¶ 23 – 41. More specifically, Plaintiffs have attempted to invoke the Pennsylvania "discovery rule" by arguing that the applicable statute of limitations did not commence until Plaintiff-parent saw an advertisement related to litigation concerning cow's milk-based infant formula and NEC. See Exhibit "B" at ¶33.

The discovery rule is a recognized exception to the general rule that a statute of limitations begins to run from the date that a negligent act occurs. The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992). However, in accordance with the discovery rule, a plaintiff need not know the precise medical cause of the injury for the statute of limitations to begin

Case ID: 220302588
Control No.: 23096253

running; she need only to have known that an injury occurred. *Groover v. Riddle Memorial Hospital*, 357 Pa. Super. 420, 516 A.2d 53 (1986).

Any contention by Plaintiffs that the statute of limitations must be tolled until such time that a plaintiff first suspected that there had been medical negligence with regard to her infant's treatment must similarly be rejected. It is well established in Pennsylvania that a plaintiff need not know the precise extent of injuries before the statutory period begins to run. *Levenson v. Souser*, 384 Pa. Super. 132, 557 A.2d 1081, 1090 (1989). Further, it is well settled law that, in accordance with the discovery rule, a plaintiff need not know that she has a cause of action or suspects there has been negligence before the statute of limitations commences. *Colonna v. Rice,* 664 A.2d 979, 981 (Pa. Super. 1995); *Bigansky v. Thomas Jefferson Univ. Hosp*., 658 A.2d 423, 427, 431 n.5 (Pa. Super. 1995); *Brooks v. Sagovia*, 636 A.2d 1201, 1204 (Pa. Super. 1994); *E.J.M. v. Archdiocese of Phila.,* 622 A.2d 1388, 1394 (Pa. Super. 1993); *DeMartino v. Albert Einstein Med. Center*, 460 A.2d 295, 298-299 (Pa. Super. 1983). Indeed, it has been expressly held that "[k]nowledge of the negligence is not part of the discovery rule." *DeMartino*, *supra*, 460 A.2d at 299. A plaintiff need only know that there was an injury and who caused that injury, a plaintiff need not know the full extent of the injury or even suspect negligence. *Nicolaou v. Martin,* 195 A.3d 880, 892-93 (Pa. 2018); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011); *Wilson v. El-Daief,* 964 A.2d 354, 364 (Pa. 2009).

Based upon the facts plead by Plaintiffs, J.C. is alleged to have developed NEC shortly after his birth. See Exhibit "B" ¶¶11 – 14. Accordingly, Plaintiff-parent knew of an injury in 2014, making any claim in her own right clearly time barred, regardless of whether she knew the extent of any claimed injury and/or when she suspected that the injury was caused by negligence.

Case ID: 220302588
Control No.: 23096253

The statute of limitations for Plaintiff-parent had clearly expired by the time this action was commenced on March 24, 2022.

**F.  MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, Plaintiffs' Amended Complaint is unverified in violation of Rule 1024. *See* Exhibit "B." Accordingly, the Amended Complaint should be stricken for lack of an appropriate verification.

**V,  REQUESTED RELIEF**

For the foregoing reasons, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

BURNS WHITE LLC

BY:

JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Case ID: 220302588
Control No.: 23096253

**CERTIFICATE OF SERVICE**

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, to be served via the electronic filing system to all counsel of record.


BY: _____
    RICHARD S. MARGULIES, ESQ.


Dated: September 27, 2023

*#5 On Page #2*

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| **MARCH 2022** | **0002588** |
| E-Filing Number: 2203054589 | |

*Filed and Attested by the Office of Judicial Records 27 SEP 2023 01:29 pm S. GILLIAM*

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| HOLLI CARTER | MEAD JOHNSON & COMPANY, LLC |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| 16 CARMEN DRIVE<br>CAPE MAY  NJ 08210 | ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD  IL 62703 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| J C | MEAD JOHNSON NUTRITION COMPANY |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| 16 CARMEN DRIVE<br>CAPE MAY  NJ 08210 | ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD  IL 62703 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| | ABBOTT LABORATORIES |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| | CT CORPORATION SYSTEM  208 SO. LASALLE STREET<br>SUITE 814<br>CHICAGO  IL 60604 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 5 | [X] Complaint   [ ] Petition Action   [ ] Notice of Appeal<br>[ ] Writ of Summons   [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration<br>[X] Jury<br>[ ] Non-Jury<br>[ ] Other: | [ ] Mass Tort<br>[ ] Savings Action<br>[ ] Petition | [ ] Commerce<br>[ ] Minor Court Appeal<br>[ ] Statutory Appeals | [ ] Settlement<br>[ ] Minors<br>[ ] W/D/Survival |

| CASE TYPE AND CODE |
|---|
| 2P - PRODUCT LIABILITY |

| STATUTORY BASIS FOR CAUSE OF ACTION |
|---|
| |

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED<br>PRO PROTHY**<br>MAR **24** 2022<br>S. RICE | IS CASE SUBJECT TO COORDINATION ORDER?<br>YES     NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>HOLLI CARTER , J C</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| TRACY A. FINKEN | ONE LOGAN SQUARE<br>130 N. 18TH ST.<br>SUITE 1600<br>PHILADELPHIA PA 19103 |
| PHONE NUMBER      FAX NUMBER | |
| (215)735-0773      (215)875-7731 | |
| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
| 82258 | tfinken@anapolweiss.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
| *TRACY FINKEN* | Thursday, March 24, 2022, 02:18 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

Case ID: 220302588<br>Control No.: 23096253

**COMPLETE LIST OF DEFENDANTS:**

1. MEAD JOHNSON & COMPANY, LLC,
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
2. MEAD JOHNSON NUTRITION COMPANY
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
3. ABBOTT LABORATORIES
   CT CORPORATION SYSTEM  208 SO. LASALLE STREET  SUITE 814
   CHICAGO  IL 60604
4. THE PA HOSPITAL OF THE UNIVERSITY OF PA HEALTH SYSTEM
   ALIAS: PENNSYLVANIA HOSPITAL
   3400 CIVIC CENTER BLVD
   PHILADELPHIA  PA 19104
5. THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA
   ALIAS: PENN MEDICINE
   133 SOUTH 36TH STREET
   PHILADELPHIA  PA 19104

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
Identification Number: 82258
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
(215) 735-0773
Email: tfinken@anapolweiss.com

Filed and Attested by the
Office of Judicial Records
24 MAR 2022 02:18 pm
S. RICE

**ATTORNEY FOR PLAINTIFFS**

KELLER LENKNER LLC
BY: Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**ATTORNEY FOR PLAINTIFFS**

WALSH LAW PLLC
BY: Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **HOLLI CARTER, on her own behalf and as** | : | **COURT OF COMMON PLEAS** |
| **Parent and Natural Guardian of J.C., a minor** | : | **PHILADELPHIA COUNTY** |
| **16 Carmen Drive** | : | |
| **Cape May, NJ 08210** | : | |
| **Plaintiffs** | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO.** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |
| **CT Corporation System** | : | |
| **208 So. Lasalle Street, Suite 814** | : | |

1

Chicago, IL 60604　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
**THE PENNSYLVANIA HOSPITAL OF**　　:
**THE UNIVERSITY OF PENNSYLVANIA**　:
**HEALTH SYSTEM d/b/a PENNSYLVANIA**　:
**HOSPITAL**　　　　　　　　　　　　:
**3400 Civic Center Blvd.**　　　　　:
**Philadelphia, PA 19104**　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
**THE TRUSTEES OF THE UNIVERSITY OF**　:
**PENNSYLVANIA d/b/a PENN MEDICINE**　:
**133 South 36th Street**　　　　　　　:
**Philadelphia, PA 19104**　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　**Defendants**　　　　　　　: 　**JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA  19107<br>TELEPHONE: (215) 238-1701 | ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

2

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

ANAPOL WEISS
BY: TRACY FINKEN, ESQUIRE
IDENTIFICATION NUMBER: 82258
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
(215) 735-0773
EMAIL: TFINKEN@ANAPOLWEISS.COM                    **ATTORNEY FOR PLAINTIFFS**

KELLER LENKNER LLC
BY: ASHLEY KELLER (*PRO HAC VICE FORTHCOMING*)
150 N. RIVERSIDE PLAZA, SUITE 4100
CHICAGO, ILLINOIS 60606
TELEPHONE: (312) 741-5220
FAX: (312) 971-3502
EMAIL: ACK@KELLERLENKNER.COM                      **ATTORNEY FOR PLAINTIFFS**

WALSH LAW PLLC
BY:  ALEX WALSH (*PRO HAC VICE FORTHCOMING*)
1050 CONNECTICUT AVE, NW, SUITE 500
WASHINGTON, D.C. 20036
TELEPHONE: (202) 780-4127
FAX: (202) 780-3678
EMAIL: AWALSH@ALEXWALSHLAW.COM                     **ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **HOLLI CARTER,** ON HER OWN BEHALF<br>behalf AND AS PARENT AND NATURAL GUARDIAN<br>OF J.C., A MINOR<br>**16 CARMEN DRIVE**<br>**CAPE MAY, NJ 08210**<br>**PLAINTIFFS** | : | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |
| V. | : | **CIVIL ACTION** |
| **MEAD JOHNSON & COMPANY, LLC**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>SPRINGFIELD, IL 62703 | : | **NO.** |
| **MEAD JOHNSON NUTRITION COMPANY**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>SPRINGFIELD, IL 62703 | : | |
| **ABBOTT LABORATORIES**<br>CT CORPORATION SYSTEM<br>**208 SO. LASALLE STREET, SUITE 814**<br>CHICAGO, IL 60604 | : | |
| **THE PENNSYLVANIA HOSPITAL OF**<br>**THE UNIVERSITY OF PENNSYLVANIA**<br>**HEALTH SYSTEM** D/B/A **PENNSYLVANIA** | : | |

3

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

**HOSPITAL**
**3400 CIVIC CENTER BLVD.**
**PHILADELPHIA, PA 19104**

**THE TRUSTEES OF THE UNIVERSITY OF**
**PENNSYLVANIA D/B/A PENN MEDICINE**
**133 SOUTH 36TH STREET**
**PHILADELPHIA, PA 19104**

**DEFENDANTS**                    :          **JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.     INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II. PARTIES

3. Plaintiff Holli Carter is a natural adult person and a resident of New Jersey. Ms. Carter is the parent and natural guardian of J.C., a minor. Ms. Carter's address is 16 Carmen Drive, Cape May, New Jersey 08210.

4. Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5. Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.    JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.    FACTUAL ALLEGATIONS

### *J.C.'s NEC Diagnosis*

11.     J.C. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 6, 2014.

12.     Upon information and belief J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after his birth.

13.     Upon information and belief shortly after J.C. first ingested the Defendant Manufacturers' products, he developed NEC.

14.     J.C. suffered injuries and has continued to suffer long term health effects.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis."  The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

22.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### *The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products*

30.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

31.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding.  We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets.  For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up.  During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.  At some point, the website was edited to remove this statement.  However, upon information and belief, the statement remained on the website until at least December 2020.

12

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder).  In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use.  For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks.  Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk."  The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

40.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253




43.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

15

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

### *The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online.  No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

51.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants.  Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online.  No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

56.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of those

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

57.    To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.  It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

58.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59.    Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.  In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

*Safer Alternative Designs*

63.  The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.  Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65.  On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
## COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

66.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68.  Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

69.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

76.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

  a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

  b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

  c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

    d. Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

    h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

83.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

 a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

 b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

 c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

 d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

 e.  For interest as permitted by law;

 f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

 g.  For such other and further relief as the Court deems proper.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.   At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.   Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.   Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

   a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

26

Case ID: 220302588
Control No.: 23096253

c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

90.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

92.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302588
Control No.: 23096253

g. For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

29

Case ID: 220302588
Control No.: 23096253

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98.     Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99.     The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

100.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to

30

Case ID: 220302588
Control No.: 23096253

allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

103.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

105.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.   Abbott and Mead were negligent or careless in not determining those representations to be false.

109.   The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

110.   The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

33

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

   a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

   c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

   d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

   e. For interest as permitted by law;

Case ID: 220302588
Control No.: 23096253

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

113.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.  Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116.  Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117.  Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute,

and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119. Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

125.     As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126.     As a further direct and proximate result of Penn Medicine and Pennsylvania  failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

   a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

   c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

   d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive,  reckless, and/or malicious conduct, as permitted by law;

Case ID: 220302588

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

127.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.  Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.  Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

131. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

41

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136.   A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 220302588
Case ID: 220302588
Control No.: 23096253

144.   A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

    a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302588
Control No.: 23096253

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

148. Plaintiff hereby demands a jury trial for all claims triable.


Dated: March 24, 2022

Respectfully submitted,

**ANAPOL WEISS**

Tracy Finken
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Email: tfinken@anapolweiss.com

**KELLER LENKNER LLC**
Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220

Case ID: 220302588
Control No.: 23096253

Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

Tracy Finken

48

**<u>VERIFICATION</u>**

I, the undersigned, Tracy Finken, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____
Tracy Finken

Date: March 24, 2022

49

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com



Filed and Attested by the
Office of Judicial Records
08 SEP 2023 04:29 pm
SC GILLIAM

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
|                *Plaintiff*, | CIVIL TRIAL DIVISION |
|    v. | MARCH TERM 2022 NO. 2588 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | |
|                *Defendants*. | |

## NOTICE TO PLEAD AND DEFEND

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**ADVISO**

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usno no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

1

Case ID: 220302588
Control No.: 23096253

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Case ID: 220302588
Control No.: 23096253

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, | : IN THE COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: **CIVIL TRIAL DIVISION**<br>: |
| *Plaintiff*, | : **MARCH TERM 2022** |
| v. | : **NO. 2588** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | :<br>:<br>:<br>:<br>:<br>:<br>: |
| *Defendants*. | :<br>:<br>: |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of

3

Case ID: 220302588
Control No.: 23096253

Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.     INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.     Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.     PARTIES

3.     Plaintiff Holli Carter is a natural adult person and a resident of New Jersey. Ms. Carter is the parent and natural guardian of J.C., a minor. Ms. Carter's address is 16 Carmen Drive, Cape May Court House, New Jersey 08210-2563.

4

Case ID: 220302588
Control No.: 23096253

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

Case ID: 220302588
Control No.: 23096253

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.      This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.    FACTUAL ALLEGATIONS

### *J.C.'s NEC Diagnosis*

11.      J.C. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 6, 2014.

12.      At birth, J.C.'s gestational age was approximately 24 weeks and he weighed 655 grams. Upon information and belief, J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth.

13.      Upon information and belief, J.C. developed NEC after ingesting Defendant Manufacturers' products.

6

14.     J.C.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU.  J.C. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and blood transfusions, and suffers from neurological injuries, as well as other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

7

Case ID: 220302588
Control No.: 23096253

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### Ms. Carter Discovers Her Claim

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Carter did not know, and had no reason to know or suspect, that J.C.'s NEC could have been caused by the Defendant Manufacturers' products.

Case ID: 220302588
Control No.: 23096253

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Carter***

24.     Despite exercising reasonable diligence, Ms. Carter was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of J.C.'s injuries.

25.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of J.C.'s NEC diagnosis, Ms. Carter undertook an investigation into the cause of the NEC by asking the doctors the cause of his NEC.

26.     The health care providers at Penn Medicine responded only that J.C. had gotten NEC because he was born premature.  Penn Medicine's response did not indicate that his NEC was caused by the Defendant Manufacturers' products.

27.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused J.C.'s injuries.  Penn Medicine's response at the time did not give Ms. Carter any reason to suspect any wrongdoing on the part of the Defendants.

28.     Ms. Carter is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

29.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Carter had no reason to doubt their word.

30.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

31.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to

Case ID: 220302588
Control No.: 23096253

mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

32.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

33.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed in below, any research conducted by Ms. Carter immediately after J.C.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused J.C.'s injuries.

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302588
Control No.: 23096253

34.     Ms. Carter also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to him.  Not only was Ms. Carter unaware that the Defendant Manufacturers' products caused J.C.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Carter, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

35.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

36.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

37.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

38.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its

11

Case ID: 220302588
Control No.: 23096253

hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

39.     Additionally, Defendant Hospital failed to inform Ms. Carter that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Carter was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Carter asked Plaintiff's health care providers at Defendant Hospital why a premature infant like J.C. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to J.C. could increase the risk of NEC to preterm infants, responding only that J.C. had gotten NEC solely because he was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

40.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Carter of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Carter that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like J.C., it was enough for Ms. Carter to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

Case ID: 220302588
Control No.: 23096253

41.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302588
Control No.: 23096253

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 220302588
Control No.: 23096253

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge

15

Case ID: 220302588
Control No.: 23096253

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

16

Case ID: 220302588
Control No.: 23096253




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and

17

Case ID: 220302588
Control No.: 23096253

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.    Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.    To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.    On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

Case ID: 220302588
Control No.: 23096253

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to J.C.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like J.C.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to J.C.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like J.C.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 220302588
Control No.: 23096253

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like J.C.

*The Defendant Manufacturers' Inadequate Warnings*

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 220302588
Control No.: 23096253

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 220302588
Control No.: 23096253

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

75.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

76.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.     The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

77.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 220302588
Control No.: 23096253

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

78.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

79.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

80.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

Case ID: 220302588
Control No.: 23096253

81.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.   These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### Safer Alternative Designs

82.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

83.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.   This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

84.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 220302588
Control No.: 23096253

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

85.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

86.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

87.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

88.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

89.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

90.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

91.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

25

Case ID: 220302588
Control No.: 23096253

facility.

92.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

93.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

94.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational

26

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

95.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

96.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

97.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

98.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

27

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b. Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c. Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

28

Case ID: 220302588
Control No.: 23096253

        h.      Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

99.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

100.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

101.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

102.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

      WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

        a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

        b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

Case ID: 220302588
Control No.: 23096253

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

103.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

105.   At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

30

106. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

107. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

> a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or
>
> b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
> c.   Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or
>
> d.   Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or
>
> e.   Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or
>
> f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

31

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

108.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

109.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

110.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302588
Control No.: 23096253

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

112. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

113. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

114. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

33

Case ID: 220302588
Control No.: 23096253

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

115.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

116.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

      a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

      b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

      c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

      d.    That cow's milk-based products were safe for premature infants; and/or

      e.    That cow's milk-based products were necessary for optimum growth; and/or

      f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

Case ID: 220302588
Control No.: 23096253

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

117.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.    The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

118.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.    The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

119.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

120.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 220302588
Control No.: 23096253

of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.    For interest as permitted by law;

    f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.    For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

121.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

36

herein.

122.   At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

123.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

124.   In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

125.   Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

   a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

   b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

   c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

37

    d.      That cow's milk-based products were safe for premature infants; and/or

    e.      That cow's milk-based products were necessary for optimum growth; and/or

    f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

126.    Abbott and Mead were negligent or careless in not determining those representations to be false.

127.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

128.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

Case ID: 220302588
Control No.: 23096253

129.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

130.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302588
Control No.: 23096253

g.   For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

131.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.   Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

133.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

134.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

135.   Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

136.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

Case ID: 220302588
Control No.: 23096253

and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

137.    Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

138.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

139.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

> a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
> c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302588
Control No.: 23096253

      d.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

      e.     Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

      f.     Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

      g.     Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

140.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

141.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

142.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302588
Control No.: 23096253

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

143.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

144.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

43

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Penn Medicine and Pennsylvania Hospital)**

145.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

146.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

147.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

148.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

44

Case ID: 220302588
Control No.: 23096253

149.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

150.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

152.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302588
Control No.: 23096253

a.    Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.    Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.    Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.    Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.    Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.    Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

46

Case ID: 220302588
Control No.: 23096253

g.    Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.    Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

154.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

155.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

156.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 220302588
Control No.: 23096253

developing NEC and significant injuries.

157.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

158.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

159.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

160.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

> a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or
>
> b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or
>
> d.    Failing to oversee its healthcare professionals and medical staff to restrict

Case ID: 220302588
Control No.: 23096253

their feeding of cow's milk-based products to premature babies; and/or

e.      Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.      Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.      Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.      Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.      Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

161.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

49

Case ID: 220302588
Control No.: 23096253

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

162.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

163.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 220302588
Control No.: 23096253

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

166.   Plaintiff hereby demands a jury trial for all claims triable.


Dated:     9/8/2023

                                   Respectfully submitted,

                                   **KLINE & SPECTER, P.C.**


                         By:     _____/s/ Timothy A. Burke_____
                                   Thomas R. Kline, Esq.
                                   Tobias L. Millrood, Esq.
                                   Elizabeth A. Crawford, Esq.
                                   Timothy A. Burke, Esq.
                                   John P. O'Neill, Esq.
                                   Attorney I.D. Nos.: 28895 / 77764 / 313702 /
                                   320927 / 205677

51

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

Case ID: 220302588
Control No.: 23096253

# EXHIBIT A-51

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the Office of Judicial Records 28 SEP 2023 03:31 pm G. IMPERATO*

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |

DAMEKA MOMENT, et al.,                          :
                   *Plaintiff,*             :   APRIL TERM, 2022
        v.                              :   No. 220400142
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

NYDIA PARKER, et al.,                            :
                   *Plaintiff,*             :   MARCH TERM, 2022
        v.                              :   No. 220302983
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

ALEXANDRIA ROSS, et al.,                         :
                   *Plaintiff,*             :   MARCH TERM, 2022
        v.                              :   No. 220302981
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

LOREN SANDERS, et al.,                           :
                   *Plaintiff,*             :   APRIL TERM, 2022
        v.                              :   No. 220400153
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

SAMAYA SHORT, et al.,                            :
                   *Plaintiff,*             :   APRIL TERM, 2022
        v.                              :   No. 220400159
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

ALICE STILLS, et al.,                            :
                   *Plaintiff,*             :   MARCH TERM, 2022
        v.                              :   No. 220302617
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

CHRISTINA TAYLOR, et al.,                        :
                   *Plaintiff,*             :   MARCH TERM, 2022
        v.                              :   No. 220302606
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

NATISHA THOMAS, et al.,                          :
                   *Plaintiff,*             :   MARCH TERM, 2022
        v.                              :   No. 220400158
MEAD JOHNSON & COMPANY, LLC, et al.,            :
                   *Defendants.*           :

Case ID: 220302588
Control No.: 23096752

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>    No. 220400156 |
| JEANNATE WATSON, et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>    No. 220302967 |
| GINA WIEGER, et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>    No. 220302614 |
| GINA WIEGER, et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>    No. 220302601 |
| SHANITA WIGGINS, et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>    No. 220302986 |
| MELVENIA WILLIAMS, et al.,<br>        *Plaintiff,*<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        *Defendants.* | :<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>    No. 220400141 |

## **ORDER OF THE COURT**

On this _____ day of _____, 2023, upon consideration of defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaints, its brief in support, and any response thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaints are SUSTAINED. It is further ORDERED that Counts I through V of plaintiffs' complaints are DISMISSED as to Abbott Laboratories.

BY THE COURT:

_____

**NOTICE TO PLEAD**

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.

_Sean P Fahey_
_____

*Counsel for Defendant Abbott Laboratories*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| HOLLI CARTER, et al.,                     : | |
|       *Plaintiff,*          : | MARCH TERM, 2022 |
|     v.                          : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| BRANDY GOODMOND, et al.,                  : | |
|       *Plaintiff,*          : | APRIL TERM, 2022 |
|     v.                          : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| BRANDY GOODMOND, et al.,                  : | |
|       *Plaintiff,*          : | APRIL TERM, 2022 |
|     v.                          : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| JANEE HENDERSON, et al.,                  : | |
|       *Plaintiff,*          : | APRIL TERM, 2022 |
|     v.                          : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| KRISTEN KAJUFFA, et al.,                  : | |
|       *Plaintiff,*          : | MARCH TERM, 2022 |
|     v.                          : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| NAFEESAH MAYS, et al.,                    : | |
|       *Plaintiff,*          : | MARCH TERM, 2022 |
|     v.                          : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |
| CATHERINE McMILLIAN, et al.,              : | |
|       *Plaintiff,*          : | APRIL TERM, 2022 |
|     v.                          : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al.,   : | |
|       *Defendants.*        : | |

Case ID: 220302588
Control No.: 23096752

| | |
|---|---|
| DAMEKA MOMENT, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| NYDIA PARKER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALEXANDRIA ROSS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

Case ID: 220302588
Control No.: 23096752

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220400156 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| JEANNATE WATSON, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| SHANITA WIGGINS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| MELVENIA WILLIAMS, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

Case ID: 220302588
Control No.: 23096752

## <u>DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS</u><br><u>TO PLAINTIFFS' AMENDED COMPLAINTS</u>

This Court recognized obvious deficiencies in the 29 complaints that plaintiffs previously filed in the preterm infant nutrition cases and allowed plaintiffs time to cure these deficiencies— but plaintiffs have failed to do so. Instead, in 21 of the 29 cases, plaintiffs filed "amended" complaints that fail to remedy any of the fatal deficiencies recognized by the Court in the first instance. Rather than fixing the pleading defects, plaintiffs recycle the nearly identical, generic allegations they previously made—without any attempt to differentiate among the individual cases involving different infants born across different decades, at four different hospitals, with entirely different NICU teams and treatment courses involving different feeding regimens and nutrition products. Plaintiffs' carbon-copy amended complaints remain legally insufficient and are pled with insufficient specificity. Pursuant to Rules 1028(a)(2), 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil Procedure, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1.      In the above-captioned lawsuits, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed each of these actions against defendants Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson"), Abbott, and each infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiff, and that plaintiff was injured as a result.

2.      In their original complaints, plaintiffs alleged seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I),

Case ID: 220302588<br>Control No.: 23096752

strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. Each complaint was filed by a parent ("plaintiff-parent") on his or her own behalf, and also as a parent and natural guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3.  On June 12, 2023, Abbott filed preliminary objections to plaintiffs' complaints on the grounds that their claims were legally insufficient and pled with insufficient specificity. Mead Johnson and certain hospital defendants filed preliminary objections as well.

4.  During a case management conference held on July 29, 2023, this Court acknowledged deficiencies in the complaints and provided plaintiffs with an opportunity to file amended complaints to correct, among other things, clear deficiencies related to product identification and plaintiffs' misrepresentation claims.

5.  On September 8, 2023, plaintiffs filed amended complaints in 21 of the 29 preterm infant nutrition cases pending at that time. The amended complaints involve the same basic claims as the original complaints, premised on allegations that medical professionals at the infants' birth hospitals administered Abbott's and/or Mead Johnson's cow milk-based infant nutrition products to them as newborns, and that they were injured as a result. *See, e.g.*, *Carter* Amended Complaint (the reference "Am. Compl.") ¶¶ 1-2, 12.[1]

---

[1] The substantive allegations against Abbott in all 21 amended complaints are nearly identical, although the precise paragraph numbering may diverge slightly. The amended complaints in the following 6 cases use identical paragraph numbering: *Carter* (the reference Am. Compl.), *Henderson, Short, Thomas, Walker-Savage, Wieger (M.P.)*. Paragraph numbers for the other 15 complaints are cited in footnotes herein. With respect to the subject matter of this particular footnote, the same allegations are found at Am. Compl. ¶¶ 1-2, 12: *Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*; Am. Compl. ¶¶ 1-2, 11: *Kajuffa, Parker, Ross, Wiggins*. The Amended Complaint in this case is attached as Exhibit A.

Case ID: 220302588
Control No.: 23096752

6.      Plaintiffs' amended complaints fail to cure the deficiencies previously identified by the defendants and recognized by this Court.

## I.   PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

7.      Abbott incorporates the foregoing paragraphs as if set forth herein.

8.      Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

9.      "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

10.     Despite a second opportunity, plaintiffs fail to do so. Plaintiffs' amended complaints are devoid of any ***facts*** showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants. Tellingly, plaintiffs removed citations to the handful of studies on which they relied in their original complaints—none of which supported plaintiffs' bald contention that cow's milk-based feeding products cause NEC.

11.     Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II.  PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

12.     Abbott incorporates the foregoing paragraphs as if set forth herein.

13.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

-7-

14.     Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least *designate* the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

15.     Once again, plaintiffs fail to do so. Instead, they simply allege in each case, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. *See* Am. Compl. ¶ 93.[2]

16.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

17.     Abbott incorporates the foregoing paragraphs as if set forth herein.

18.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

19.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968.

---

[2] Same allegation found at Am. Compl. ¶ 90: *Taylor*; Am. Compl. ¶ 91: *Moment, Stills, Williams*; Am. Compl. ¶ 93: *Henderson, Short, Thomas, Walker-Savage, Wieger MP*; Am. Compl. ¶ 94: *Sanders, Wieger SP*; Am. Compl ¶ 97: *Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 103: *McMillian*.

Case ID: 220302588
Control No.: 23096752

Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

20.    Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

21.    Abbott incorporates the foregoing paragraphs as if set forth herein.

22.    Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

23.    Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs once again fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed. *See Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1073 (Pa. Super. Ct. 2003) (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity").

24.    Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

25.    Abbott incorporates the foregoing paragraphs as if set forth herein.

26.    Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

Case ID: 220302588
Control No.: 23096752

27.     In the unnumbered paragraph of the amended complaints appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. Am. Compl. ¶ 1.[3]

28.     Paragraphs 1 and 13 of the reference Amended Complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.[4]

29.     Paragraph 14 of the reference Amended Complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") shortly after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 14.[5]

30.     Paragraph 54 of the reference Amended Complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiff saw the allegedly misleading marketing campaigns. *Id.* ¶ 54.[6]

---

[3] Same allegation found at Am. Compl. ¶ 1 in all amended complaints.

[4] Same allegation found at Am. Compl. ¶¶ 1, 12: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶¶ 1, 13: *Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP.*

[5] Same allegation found at Am. Compl. ¶ 13: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 14: *Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP.*

[6] Same allegation found at Am. Compl. ¶ 51: *Ross, Wiggins, McMillian, Taylor*; Am. Compl ¶ 52: *Moment, Stills, Williams*; Am. Compl. ¶ 53: *Kajuffa, Parker*; Am. Compl. ¶ 54: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Wieger SP, Goodmond Ryh G., Goodmond Rya G., Mays, Watson*; Am. Compl. ¶ 55: *Sanders.*

Case ID: 220302588
Control No.: 23096752

31. Across Counts I through V of the amended complaints, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Am. Compl. Counts I-V.

32. Because plaintiffs have continued to lump Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, Abbott lacks clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3) and warrant dismissal. *See Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where plaintiff did not differentiate between defendants in averring the conduct and claims).

33. Accordingly, this preliminary objection should be sustained, and all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken—which would leave only a shell of a complaint that would warrant dismissal in any event.[7]

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENTS' TIME-BARRED CLAIMS IN 20 CASES.

34. Abbott incorporates the foregoing paragraphs as if set forth herein.

35. Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

36. Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

---

[7] For example, in the reference Amended Complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1-2, 12-13, 19, 21-24, 26-27, 30-31, 33-44, 46, 52, 54-59, 62, 78-84, and 85-130. These deficiencies appear in all of the amended complaints, though paragraph numbering differs across some of the cases.

Case ID: 220302588
Control No.: 23096752

37.     While the statute of limitations began running on plaintiff-parents' claims on or around the date of the infant-plaintiffs' birth (second column in the chart below), plaintiff-parents' complaints in 20 cases were not filed until the date appearing in the third column below—in all instances, many years after the statute of limitations period had expired (fourth column in chart below).

| Plaintiff Name | Alleged Date of Birth | Filing Date of Complaint | Time Elapsed from Birth to Filing |
|---|---|---|---|
| Carter, Holli (obo J.C.) | 10/06/2014 | 03/24/2022 | 7 years and 5 months |
| Goodmond, Brandy (obo Rya G.) | 12/31/2007 | 04/04/2022 | 14 years and 3 months |
| Goodmond, Brandy (obo Ryh G.) | 08/01/2010 | 04/04/2022 | 11 years and 8 months |
| Henderson, Janee (obo S.C.) | 07/15/2007 | 04/04/2022 | 14 years and 8 months |
| Kajuffa, Kristen (obo B.K.) | 01/18/2007 | 03/29/2022 | 15 years and 2 months |
| Mays, Nafeesah (obo A. R.) | 07/15/2005 | 03/29/2022 | 16 years and 8 months |
| McMillian, Catherine (obo T.M.) | 11/14/2005 | 04/04/2022 | 16 years and 4 months |
| Moment, Dameka (obo A.M.) | 11/30/2017 | 04/04/2022 | 4 years and 4 months |
| Parker, Nydia (obo M.H.) | 07/31/2016 | 03/29/2022 | 5 years and 7 months |
| Sanders, Loren (obo Q.S.) | 03/17/2007 | 04/04/2022 | 15 years |
| Short, Samaya (obo S.M.) | 10/26/2017 | 04/04/2022 | 4 years and 5 months |
| Stills, Alice (obo M.E.) | 09/28/2007 | 03/24/2022 | 14 years and 5 months |
| Taylor, Christina (obo I.H.) | 10/09/2010 | 03/24/2022 | 11 years and 5 months |
| Thomas, Natisha (obo R.T.) | 12/24/2015 | 04/04/2022 | 6 years and 3 months |
| Walker-Savage, Trina, and Clifton Isaiah Savage, Jr. | 08/09/2002 | 040/4/2022 | 19 years and 7 months |
| Watson, Jeannate (obo B.I.) | 02/05/2015 | 03/29/2022 | 7 years and 1 months |
| Wieger, Gina (obo M.P.) | 12/13/2013 | 03/24/2022 | 8 years and 3 months |

-12-

Case ID: 220302588
Control No.: 23096752

| Plaintiff Name | Alleged Date of Birth | Filing Date of Complaint | Time Elapsed from Birth to Filing |
|---|---|---|---|
| Wieger, Gina (obo S.P.) | 12/13/2013 | 03/24/2022 | 8 years and 3 months |
| Wiggins, Shanita (obo T.B.) | 01/28/2010 | 03/29/2022 | 12 years and 2 months |

38.     Plaintiff-parents' claims in these cases are thus time-barred. And plaintiffs have not alleged sufficient facts to support any application of the discovery rule.

39.     Accordingly, plaintiff-parents' claims should be dismissed, and this preliminary objection should be sustained.

## VII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

40.     Abbott incorporates the foregoing paragraphs as if set forth herein.

41.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

42.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

43.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

44.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient, as these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

45.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make bare allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D.

Case ID: 220302588
Control No.: 23096752

& C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

46.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

## VIII.   PRELIMINARY OBJECTION REGARDING PLAINTIFFS' FAILURE TO PROPERLY VERIFY THEIR AMENDED COMPLAINTS.

47.     Abbott incorporates the foregoing paragraphs as if set forth herein.

48.     Pursuant to Pa. R. Civ. P. 1028(a)(2), a preliminary objection may be filed by any party to a pleading regarding a party's failure to conform to a rule of court.

49.     Pa. R. Civ. P. 1024(a) provides that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa. R. Civ. P. 1024(a).

50.     Rule 1024(c) provides that the verification "shall be made by one or more of the parties filing the pleading," unless a qualifying exception applies. *See id.* R. 1024(c). In the event the verification is signed by someone other than the filing party, the verification must set forth "the reason why the verification is not made by a party." *See id.*

51.     Here, plaintiffs' amended complaints are neither verified by plaintiffs themselves nor by their counsel.

52.     Plaintiffs failed to conform to Rule 1024(c) in verifying their complaints and, accordingly, Abbott respectfully requests that this Court strike the complaints.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(2), 1028(a)(3), and 1028 (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.

Case ID: 220302588
Control No.: 23096752

Dated: September 28, 2023

Respectfully Submitted:

/s/ Sean P. Fahey

Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Joseph E. O'Neil

Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Ronni E. Fuchs

Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson

Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery

Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Case ID: 220302588
Control No.: 23096752

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| HOLLI CARTER, et al., | : |
| *Plaintiff,* | :   MARCH TERM, 2022 |
| v. | :   No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| BRANDY GOODMOND, et al., | : |
| *Plaintiff,* | :   APRIL TERM, 2022 |
| v. | :   No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| BRANDY GOODMOND, et al., | : |
| *Plaintiff,* | :   APRIL TERM, 2022 |
| v. | :   No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| JANEE HENDERSON, et al., | : |
| *Plaintiff,* | :   APRIL TERM, 2022 |
| v. | :   No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| KRISTEN KAJUFFA, et al., | : |
| *Plaintiff,* | :   MARCH TERM, 2022 |
| v. | :   No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| NAFEESAH MAYS, et al., | : |
| *Plaintiff,* | :   MARCH TERM, 2022 |
| v. | :   No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| CATHERINE McMILLIAN, et al., | : |
| *Plaintiff,* | :   APRIL TERM, 2022 |
| v. | :   No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| DAMEKA MOMENT, et al., | : |
| *Plaintiff,* | :   APRIL TERM, 2022 |
| v. | :   No. 220400142 |

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| NYDIA PARKER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALEXANDRIA ROSS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON | : |
| ISAIAH SAVAGE, JR., et al., | : MARCH TERM, 2022 |
| *Plaintiff,* | : No. 220400156 |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |

-2-

Case ID: 220302588
Control No.: 23096752

| | |
|---|---|
| *Defendants.* | : |
| JEANNATE WATSON, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| GINA WIEGER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| GINA WIEGER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| SHANITA WIGGINS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |
| MELVENIA WILLIAMS, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

Case ID: 220302588
Control No.: 23096752

## <u>DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF</u>
## <u>PRELIMINARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINTS</u>

### MATTER BEFORE THE COURT

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' amended complaints are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(2), 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the amended complaints for insufficient specificity, legal insufficiency of pleading, and/or failure to conform to a rule of court.

### STATEMENT OF QUESTIONS INVOLVED

1.  Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

2.  Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

3.  Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.  Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.  Should the Court sustain Abbott's preliminary objections and dismiss the amended complaints as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

-4-

Case ID: 220302588
Control No.: 23096752

6.     Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss plaintiff-parents' claims as time-barred? Answer: Yes.

7.     Should the Court sustain Abbott's preliminary objections to the amended complaints and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

8.     Should the Court sustain Abbott's preliminary objections to the amended complaints and strike plaintiffs' improperly verified amended complaints for failure to conform to a rule of court? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs filed twenty-one nearly identical amended complaints with this Court in a misguided attempt to attack specialized infant formulas and fortifiers essential to the survival and development of premature infants in neonatal intensive care units ("NICUs"). Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products tailored to address the distinct nutritional needs of premature, low birthweight infants.[1] These infants face complex challenges and often daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once this optimal nutrition source is no longer an option, the infant must have an alternative source. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient on its own to meet the premature infant's extraordinary needs. The same is

---

[1] Abbott manufactures infant nutrition products under the "Similac" brand name. Am. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4. These allegations are in the same paragraphs across all amended complaints.

Case ID: 220302588
Control No.: 23096752

true of donor milk. Accordingly, NICU specialists use their judgment to fill the supply and/or nutritional gaps with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The infants in these cases all allegedly developed necrotizing enterocolitis ("NEC"), which is primarily a disease of prematurity that can result in inflammation and death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Am. Compl. ¶ 16.[2] Indeed, NEC affects around 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and the many other medical risks these vulnerable premature infants face.

Each plaintiff-parent alleges that their infant was born prematurely at a Philadelphia-area hospital. *See id.* ¶ 11.[3] Their amended complaints allege "upon information and belief" that their infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital after his/her birth. *Id.* ¶ 12.[4] Plaintiffs further claim that their infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. *Id.* ¶¶ 13-14.[5]

---

[2] Same allegation found at Am. Compl. ¶ 15: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 16: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger, SP*.

[3] Same allegation found at Am. Compl. ¶ 10: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 11: *Carter, Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[4] Same allegation found at Am. Compl. ¶ 11: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 12: *Carter, Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[5] Same allegation found at Am. Compl. ¶¶ 12-13: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶¶ 13-14: *Carter, Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

Case ID: 220302588
Control No.: 23096752

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g, id.* ¶ 22.[6] According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. *Id.* ¶ 116.[7]

Plaintiffs each bring five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

As the Court recognized at the July 29, 2023 conference, noticeably absent from all of plaintiffs' complaints is any identification of the products that were actually administered to their infants. Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the amended complaints identifying any product sold by Abbott as the specific product that was administered to any specific infant. Further, there are no allegations indicating that plaintiffs saw, heard, or were otherwise exposed to the allegedly false

---

[6] Same allegation found at Am. Compl. ¶ 21 *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 22: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[7] Same allegation found at Am. Compl. ¶ 113: *Taylor*; Am. Compl. ¶ 114: *Moment, Stills, Williams*; Am. Compl. ¶ 116: *Henderson, Short, Thomas, Walker-Savage, Wieger MP*; Am. Compl. ¶ 117: *Sanders, Wieger SP*; Am. Compl. ¶ 120: *Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 126: *McMillian*.

Case ID: 220302588
Control No.: 23096752

representations made by Abbott and/or Mead Johnson about their products. These pleading deficiencies, among others, have not been cured by plaintiffs, and are fatal to their claims.

## ARGUMENT

Despite a second bite at the apple, the allegations in plaintiffs' amended complaints remain legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the product administered to their infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each;

- plaintiff-parents' claims in 20 of the actions[8] are barred by the statute of limitations;

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity; and

- plaintiffs' amended complaints are not verified.

Accordingly, all claims against Abbott should be dismissed.

## **Legal Standard**

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. Ct. 2002)). So

---

[8] *See* Chart in Abbott Preliminary Objections, ¶ 37.

Case ID: 220302588
Control No.: 23096752

the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620

Case ID: 220302588
Control No.: 23096752

A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## I. PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' amended complaints. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[9] Plaintiffs' amended complaints fail to allege sufficient facts demonstrating that Abbott's cow's milk-based products were unreasonably dangerous for their intended use.

In their initial complaints, plaintiffs cited a number of studies and reports ostensibly supporting their claim that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants. As detailed in Abbott's prior preliminary objections, plaintiffs' reliance on these materials was misleading because none of them stood for this proposition, and instead showed simply that human breast milk may be protective against the risk of NEC.

Tellingly, plaintiffs removed all factual allegations related to these studies and reports from their amended complaints. *See* Am. Compl. at p. 7. Now, plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's

---

[9] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

-10-

Case ID: 220302588
Control No.: 23096752

milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any ***facts*** to support this bald assertion. *Id.* ¶ 16.[10] Nor have they alleged any ***facts*** supporting a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based products "cause NEC and greatly increase the likelihood that a baby will develop NEC." *Id.* ¶¶ 21-22;[11] *see also Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

Instead, plaintiffs (again) simply allege that "[b]reast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." *Id.* ¶ 20.[12] As Abbott previously explained, the mere fact that certain components in human breast milk may reduce the risk of NEC is not equivalent to a showing that cow's milk-based products ***cause*** NEC. As plaintiffs still acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible to and at high risk of developing NEC. Am.

---

[10] Same allegation found at Am. Compl. ¶ 15: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 16: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger, SP*.

[11] Same allegation found at Am. Compl. ¶¶ 20-21 *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶¶ 21-22: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[12] Same allegation found at Am. Compl. ¶ 19 *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 20: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

-11-

Case ID: 220302588
Control No.: 23096752

Compl. ¶ 16.[13] Indeed, plaintiffs even concede that NEC is "a disease that can occur in children who are *not* fed the Defendant Manufacturers' products" at all. *Id.* ¶ 31 (emphasis in original).[14]

Thus, Plaintiffs' amended complaints are devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I-II)

### A. Plaintiffs' Amended Complaints Again Fail to Identify the Specific Product That Allegedly Caused the Infants' Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' amended complaints still fail to identify the specific product that allegedly caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191-92 (Pa. Super. Ct. 1993).

Despite this Court's recognition of plaintiffs' failure to identify which defendant's product their infant was administered, plaintiffs' amended complaints again fail to identify the specific product they maintain caused their alleged injuries. Instead, as before, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under

---

[13] Same allegation found at Am. Compl. ¶ 15: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 16: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger, SP*.

[14] Same allegation found at Am. Compl. ¶ 28: *Ross, Wiggins, Taylor*; Am. Compl. ¶ 29: *McMillian*; Am. Compl. ¶ 30: *Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker*; Am. Compl. ¶ 31: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Wieger SP*; Am. Compl. ¶ 32: *Sanders*.

Case ID: 220302588
Control No.: 23096752

the Similac or Enfamil brand names, Am. Compl. ¶¶ 4-5,[15] and surmise "upon information and belief" that their infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12.[16] These allegations are plainly insufficient because plaintiffs also claim that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac **or** Enfamil in their respective NICUs. *Id.* ¶ 22[17]; *id.* ¶ 58.[18] Yet, plaintiffs still fail to identify which product from which manufacturer was allegedly administered to their infant. As such, even viewing the amended complaints in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968-69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

**B.  Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement**

Prior to filing their amended complaints, nearly every plaintiff was provided medical records by the hospital defendant at which their infant was born that contain information about which product their infant was administered in the NICU. Plaintiffs, therefore, cannot truthfully assert that they are unable to identify which product their infant was administered prior to

---

[15] Same allegations found at Am. Compl. ¶¶ 4-5 in all Amended Complaints.

[16] Same allegation found at Am. Compl. ¶ 11: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 12: *Carter, Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[17] Same allegation found at Am. Compl. ¶ 21 *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 22: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP*.

[18] Same allegation found at Am. Compl. ¶ 55: *Ross, Wiggins, McMillian, Taylor*; Am. Compl. ¶ 56: *Moment, Stills, Williams*; Am. Compl. ¶ 57: *Kajuffa, Parker*; Am. Compl. ¶ 58: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Wieger SP*; Am. Compl. ¶ 59: *Sanders*.

Case ID: 220302588
Control No.: 23096752

developing NEC. In an effort to evade their pleading obligations, plaintiffs' amended complaints now seek to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. Plaintiffs also allege (for the first time) that Abbott, Mead Johnson, and the hospital defendants "acted in concert" to "fraudulently convey false and misleading information concerning the risk of NEC . . . caused by Defendant Manufacturers' preterm infant formula products." *Id.* ¶ 35.[19]

No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174-75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where

---

[19] Same allegation found at Am. Compl. ¶ 32: *Ross, Wiggins, McMillian, Taylor*; Am. Compl. ¶ 33: *Stills, Williams*; Am. Compl. ¶ 34: *Moment, Kajuffa, Parker*; Am. Compl. ¶ 35: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Wieger SP*; Am. Compl. ¶ 36: *Sanders*.

Case ID: 220302588
Control No.: 23096752

the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market). For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

## III. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims do: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of *the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967-68.

As noted above, plaintiffs allege only "upon information and belief" that their infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*,

Case ID: 220302588
Control No.: 23096752

Am. Compl. ¶¶ 4-5[20]; *id.* ¶ 12.[21] Plaintiffs do not, however, identify the exact product (if any) made by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

## IV. PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV-V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' amended complaints do nothing to remedy the fatal lack of specificity regarding their misrepresentation claims. Despite the concerns this Court expressed, plaintiffs again fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts

---

[20] Same allegations found at Am. Compl. ¶¶ 4-5 in all amended complaints.

[21] Same allegation found at Am. Compl. ¶ 11: *Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 12: *Carter, Henderson, Short, Thomas Walker-Savage, Wieger MP, Moment, Stills, Williams, Goodmond Rya G., Goodmond Ryh G., Mays, Watson, McMillian, Sanders, Taylor, Wieger SP.*

-16-

Case ID: 220302588
Control No.: 23096752

clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation. *See id.* at 561. The amended complaints fail in multiple ways to plead these elements with specificity.

*First*, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made representations in its marketing materials, such generalized allegations are woefully deficient and lacking in specificity to set forth a claim of fraud. *See id.* And, in any event, plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. Accordingly, plaintiffs again fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J.*

-17-

Case ID: 220302588
Control No.: 23096752

*Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

*Second*, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the amended complaints cannot plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v.*

-18-

Case ID: 220302588
Control No.: 23096752

*Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V. PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I-V.

Despite clear guidance from the Court, plaintiffs' amended complaints still fail to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon*, 176 A.3d at 260 (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

Ignoring this clear law, plaintiffs' amended complaints are riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.,* Reference Am. Compl. ¶¶ 1-2, 12-13, 19, 21-24, 26-27, 30-31, 33-44, 46, 52, 54-59, 62, 78-84, and 85-130.[22] But the amended complaints do not allege any facts establishing which specific product from which specific manufacturer gave rise to plaintiffs' claims, nor do they adequately allege the specific conduct attributable to each manufacturer. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact pleading rules. Because plaintiffs continue to fail to distinguish between defendants in their amended complaints, all claims against Abbott should be dismissed,

---

[22] These allegations appear in all of the amended complaints, though paragraph numbers may differ.

Case ID: 220302588
Control No.: 23096752

or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken—which would leave only a shell of a complaint that would warrant dismissal in any event.

## VI. PLAINTIFF-PARENT'S CLAIMS ARE TIME-BARRED IN 20 CASES AND SHOULD BE DISMISSED

Plaintiff-parents' claims in 20 cases[23] are time-barred by Pennsylvania law, which sets a two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

The statute of limitations on plaintiff-parents' claims began to run shortly after their infants' birth date, when the infants allegedly developed NEC.  Accordingly, 20 of the 21 lawsuits filed by plaintiffs are time-barred because, although they allege infant birth dates between August 9, 2002 (*Walker-Savage*) and November 30, 2017 (*Moment*), and although they each allege that their infant developed NEC shortly thereafter when administered Abbott and/or Mead Johnson's products, these lawsuits were not filed until sometime between March 24, 2022 and April 4, 2022—well after the limitations period expired. Consequently, plaintiff-parents' claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

In their amended complaints, plaintiffs add several allegations in a futile attempt to invoke the discovery rule. These allegations, however, do not save plaintiff-parents' untimely claims. For example, Plaintiffs point to a 2020 Abbott article as purported evidence of concealment, in an

---

[23] *See* Chart in Abbott Preliminary Objections, ¶ 37.

-20-

attempt to explain their delay in filing their complaints, *see* Am. Compl. ¶ 32,[24] but the article offers no support to their position, much less the "clear, precise, and convincing" evidence of fraudulent concealment necessary to support application of the discovery rule. *See K.A.R. v. T.G.L.*, 107 A.3d 770, 780 (Pa. Super. Ct. 2014) (noting that, for purposes of the discovery rule, the "plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence").

*First*, the amended complaints do not allege that any plaintiff actually relied on this Abbott article. Indeed, the amended complaints do not allege that any plaintiff actually read or was even aware of any specific statement made by Abbott.

*Second*, the cited article was published on July 22, 2020. That is years after the statute of limitations expired on these plaintiff-parents' claims, which makes it impossible for any plaintiff to have been lulled "into a false sense of security about the use of [Abbott's] products" by the article at the time of the alleged injury. *See, e.g.*, *id.* ¶ 31.[25]

*Third*, no reasonable person could have been misled by the article. In portions of the article omitted by plaintiffs, Abbott strongly encourages the use of breastmilk with premature infants, for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

---

[24] Same allegation found at Am. Compl. ¶ 29: *Ross, Wiggins, Taylor*; Am. Compl. ¶ 30: *McMillian, Stills, Williams*; Am. Compl. ¶ 31: *Moment, Kajuffa, Parker*; Am. Compl. ¶ 32: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Wieger SP*; Am. Compl. ¶ 33: *Sanders*.

[25] Same allegation found at Am. Compl. ¶ 28: *Ross, Wiggins, Taylor*; Am. Compl. ¶ 29: *McMillian, Stills, Williams*; Am. Compl. ¶ 30: *Moment, Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker*; Am. Compl. ¶ 31: *Henderson, Short, Thomas, Walker-Savage, Wieger MP, Wieger SP*; Am. Compl. ¶ 32: *Sanders*.

Case ID: 220302588
Control No.: 23096752

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020). Needless to say, the actual document controls over the misleading excerpts cited in the amended complaint, neither of which can save plaintiff-parents' untimely claims.[26]

## VII. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken, as their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and

---

[26] The only other statements attributed to Abbott in the amended complaints are (1) allegations that Abbott's website at one point stated: "for infants who are not breastfed . . . infant formula is the only appropriate, safe alternative to meet babies' nutritional needs" and (2) a statement concerning a singular product, NeoSure, that "[d]uring her first full year, feed her Similac Neosure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." *See, e.g.*, Am. Compl. ¶¶ 47-48. Again, however, the amended complaints fail to allege that any plaintiff actually read or was aware of these statements, that the statements are themselves misleading, or even that any infant was fed NeoSure as opposed to something else.

Case ID: 220302588
Control No.: 23096752

that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Am. Compl. ¶ 106 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketing, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent.");[27] *id.* ¶ 126

---

[27] Same allegation found at Am. Compl. ¶ 103: *Taylor*; Am. Compl. ¶ 104: *Moment, Stills, Williams*; Am. Compl. ¶ 106: *Henderson, Short, Thomas, Walker-Savage, Wieger MP*; Am. Compl. ¶ 107: *Sanders, Wieger SP*; Am. Compl. ¶ 110: *Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 116: *McMillian*.

Case ID: 220302588
Control No.: 23096752

("Abbott and Mead were negligent or careless in not determining those representations to be false.").[28]

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant' Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Am. Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these bald assertions of "malicious" conduct with any allegations of fact.

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Am. Compl. ¶ 88,[29] but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

---

[28] Same allegation found at Am. Compl. ¶ 123: *Taylor*; Am. Compl. ¶ 124: *Moment, Stills, Williams*; Am. Compl. ¶ 126: *Henderson, Short, Thomas, Walker-Savage, Wieger MP*; Am. Compl. ¶ 127: *Sanders, Wieger SP*; Am. Compl. ¶ 130: *Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 136: *McMillian*.

[29] Same allegation found at Am. Compl. ¶ 85: *Taylor*; Am. Compl. ¶ 86: *Moment, Stills, Williams*; Am. Compl. ¶ 88: *Henderson, Short, Thomas, Walker-Savage, Wieger MP*; Am. Compl. ¶ 89: *Sanders, Wieger SP*; Am. Compl. ¶ 92: *Goodmond Ryh G., Goodmond Rya G., Mays, Watson, Kajuffa, Parker, Ross, Wiggins*; Am. Compl. ¶ 98: *McMillian*.

Case ID: 220302588
Control No.: 23096752

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as wholly conclusory, lacking the requisite factual specificity, and legally insufficient.

## VIII. PLAINTIFFS FAIL TO VERIFY THEIR AMENDED COMPLAINTS UNDER RULE 1024(C)

Finally, plaintiffs' amended complaints should also be stricken because they are not verified—despite yet another opportunity to correct this basic error. Rule 1024 mandates that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified." *See* Pa. R. Civ. P. 1024(a). Subsection (c) of the Rule also explicitly mandates that:

> [t]he verification shall be made by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of the person's information as to matters not stated upon his or her own knowledge and the reason why the verification is not made by a party.

*Id.* at 1024(c).

Once again, plaintiffs' amended complaints are neither verified by plaintiffs themselves nor by their counsel. *See* Am. Compl. Consequently, they should be stricken for failure to comply with Pa. R. Civ. P. 1028(a)(2) and 1024(c).

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' amended complaints should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Case ID: 220302588
Control No.: 23096752

Dated: September 28, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Case ID: 220302588
Control No.: 23096752

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: September 28, 2023                    */s/ Ronni E. Fuchs*
                                                         Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

# EXHIBIT A

Case ID: 220302588
Control No.: 23096752

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the
Office of Judicial Records
08 SEP 2023 04:41 pm
C. PERRY*

|  |  |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, <br><br>                *Plaintiff*, <br><br>   v. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, <br><br>               *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** <br><br> **CIVIL TRIAL DIVISION** <br><br> **MARCH TERM 2022 NO. 2588** |

## NOTICE TO PLEAD AND DEFEND

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

**ADVISO**

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usno no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

1

Case ID: 220302588
Control No.: 23096752

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Case ID: 220302588
Control No.: 23096752

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor,<br><br>              *Plaintiff*,<br><br>  v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>              *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 2588** |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of

3

Case ID: 220302588
Control No.: 23096752

Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I. INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II. PARTIES

3. Plaintiff Holli Carter is a natural adult person and a resident of New Jersey. Ms. Carter is the parent and natural guardian of J.C., a minor. Ms. Carter's address is 16 Carmen Drive, Cape May Court House, New Jersey 08210-2563.

4

Case ID: 220302588
Control No.: 23096752

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

Case ID: 220302588
Control No.: 23096752

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.      FACTUAL ALLEGATIONS

### *J.C.'s NEC Diagnosis*

11.     J.C. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 6, 2014.

12.     At birth, J.C.'s gestational age was approximately 24 weeks and he weighed 655 grams. Upon information and belief, J.C. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth.

13.     Upon information and belief, J.C. developed NEC after ingesting Defendant Manufacturers' products.

6

14.     J.C.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU.  J.C. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and blood transfusions, and suffers from neurological injuries, as well as other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

7

Case ID: 220302588
Control No.: 23096752

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Carter Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Carter did not know, and had no reason to know or suspect, that J.C.'s NEC could have been caused by the Defendant Manufacturers' products.

Case ID: 220302588
Control No.: 23096752

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Carter***

24.     Despite exercising reasonable diligence, Ms. Carter was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of J.C.'s injuries.

25.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of J.C.'s NEC diagnosis, Ms. Carter undertook an investigation into the cause of the NEC by asking the doctors the cause of his NEC.

26.     The health care providers at Penn Medicine responded only that J.C. had gotten NEC because he was born premature.  Penn Medicine's response did not indicate that his NEC was caused by the Defendant Manufacturers' products.

27.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused J.C.'s injuries.  Penn Medicine's response at the time did not give Ms. Carter any reason to suspect any wrongdoing on the part of the Defendants.

28.     Ms. Carter is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

29.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Carter had no reason to doubt their word.

30.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

31.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to

Case ID: 220302588
Control No.: 23096752

mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

32.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

33.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed in below, any research conducted by Ms. Carter immediately after J.C.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused J.C.'s injuries.

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302588
Control No.: 23096752

34.     Ms. Carter also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to him.  Not only was Ms. Carter unaware that the Defendant Manufacturers' products caused J.C.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Carter, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

35.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

36.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

37.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

38.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its

11

Case ID: 220302588
Control No.: 23096752

hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

39.     Additionally, Defendant Hospital failed to inform Ms. Carter that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Carter was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Carter asked Plaintiff's health care providers at Defendant Hospital why a premature infant like J.C. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to J.C. could increase the risk of NEC to preterm infants, responding only that J.C. had gotten NEC solely because he was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

40.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Carter of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Carter that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like J.C., it was enough for Ms. Carter to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

Case ID: 220302588
Control No.: 23096752

41.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

13

Case ID: 220302588
Control No.: 23096752

46.    While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.    For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.    Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

14

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302588
Control No.: 23096752

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53. Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302588
Control No.: 23096752




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and

17

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

Case ID: 220302588
Control No.: 23096752

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to J.C.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like J.C.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to J.C.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like J.C.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 220302588
Control No.: 23096752

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like J.C.

### The Defendant Manufacturers' Inadequate Warnings

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

20

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

21

Case ID: 220302588
Control No.: 23096752

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

75.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

76.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

77.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

22

Case ID: 220302588
Control No.: 23096752

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

78.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

79.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

80.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

Case ID: 220302588
Control No.: 23096752

81.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

82.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

83.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

84.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 220302588
Control No.: 23096752

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

85.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

86.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

87.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

88.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

89.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

90.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

91.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

25

Case ID: 220302588
Control No.: 23096752

facility.

92.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

93.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

94.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

        WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

        a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

        b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

        c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

        d.     For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 220302588
Control No.: 23096752

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

95.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

96.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

97.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

98.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

27

Case ID: 220302588
Control No.: 23096752

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

28

h.     Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

99.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

100.     As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

101.     The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

102.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

Case ID: 220302588
Control No.: 23096752

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

**COUNT III:  NEGLIGENCE**
**(Against Abbott and Mead)**

103.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

105.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

Case ID: 220302588
Control No.: 23096752

106.   Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

107.   Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

   a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.   Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d.   Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

   e.   Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

   f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

Case ID: 220302588
Control No.: 23096752

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

108.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

109.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

110.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302588
Control No.: 23096752

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

112.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

113.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

114.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

33

Case ID: 220302588
Control No.: 23096752

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

115. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

116. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

    e. That cow's milk-based products were necessary for optimum growth; and/or

    f. That cow's milk-based products were similar or equivalent to breast milk; and/or

34

Case ID: 220302588
Control No.: 23096752

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

117.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

118.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

119.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

120.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 220302588
Control No.: 23096752

of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

121.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 220302588
Control No.: 23096752

herein.

122.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

123.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

124.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

125.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

      a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

      b.      That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

      c.      That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

Case ID: 220302588
Control No.: 23096752

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

126.    Abbott and Mead were negligent or careless in not determining those representations to be false.

127.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

128.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

Case ID: 220302588
Control No.: 23096752

129.   As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

130.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302588
Control No.: 23096752

g.     For such other and further relief as the Court deems proper.

**COUNT VI:  FAILURE TO WARN**
**(Against Penn Medicine and Pennsylvania Hospital)**

131.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

133.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

134.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

135.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

136.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

Case ID: 220302588
Control No.: 23096752

and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

137. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

138. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

139. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

<blockquote>
a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or
</blockquote>

Case ID: 220302588
Control No.: 23096752

d. Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

140. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

141. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

142. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302588
Control No.: 23096752

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

143. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

144. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

43

Case ID: 220302588
Control No.: 23096752

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

145.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

146.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

147.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

148.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 220302588
Control No.: 23096752

149.     Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

150.     Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.     Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

152.     Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.     Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302588
Control No.: 23096752

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

46

Case ID: 220302588
Control No.: 23096752

g.    Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.    Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

154.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

155.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

156.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 220302588
Control No.: 23096752

developing NEC and significant injuries.

157.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

158.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

159.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

160.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

> a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or
>
> b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or
>
> d.    Failing to oversee its healthcare professionals and medical staff to restrict

Case ID: 220302588
Control No.: 23096752

their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on
the information that should be provided to parents in order to make an
informed choice about whether to allow their babies to be fed the Defendant
Manufacturers' products, notwithstanding their substantial risk; and/or

f.     Failing to provide its healthcare professionals and medical staff with the
well- researched and well-established studies that link cow's milk-based
products to NEC and death in premature infants; and/or

g.     Failing to provide its healthcare professionals and medical staff with
warnings about the dangers of the Defendants' Manufacturers products in a
method reasonably calculated/expected to reach the parents of newborns;
and/or

h.     Failing to provide statistical evidence to its healthcare professionals and
medical staff showing the magnitude of increased risk of NEC in premature
infants associated with cow's milk-based products; and/or

i.     Failing to oversee its healthcare professionals and medical staff to ensure
that the Defendant Manufacturers' sales representatives' misrepresentations
that premature babies would not grow adequately with human milk and
human milk products and that use of donor milk was not advised for
premature infants had not influenced the use and/or misuse of the Defendant
Manufacturers' products.

161.   A reasonable hospital under the same or similar circumstances would have warned of the
above risks, would have instructed its healthcare professionals and medical staff on the safe use of

Case ID: 220302588
Control No.: 23096752

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

162.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

163.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 220302588
Control No.: 23096752

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

166.  Plaintiff hereby demands a jury trial for all claims triable.

Dated:    9/8/2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Timothy A. Burke_____
Thomas R. Kline, Esq.
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 / 320927 / 205677

51

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

Case ID: 220302588
Control No.: 23096752